UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                        Case No. 1:23-cr-20676

v.                                   Honorable Thomas L. Ludington
                                        United States District Judge

JEFFREY BARTLETT, et al.,

          Defendants.

_____/

**OPINION AND ORDER DENYING GOVERNMENT'S MOTION TO MODIFY
CONDITIONS OF PRETRIAL RELEASE AND DENYING DEFENDANTS' MOTION
TO MODIFY CONDITIONS OF PRETRIAL RELEASE**

Defendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, and Brian Bartlett are alleged to have defrauded the United States government throughout a nearly decade-long conspiracy. The starting point of this alleged conspiracy, according to the Government, is a "Secret Agreement" Defendants signed in 2011, which stated that each Defendant, regardless of what corporate records reflect, would own an equal 20% share of the net revenue of the "SSI Group." The SSI Group is a collection of five different corporate entities—including Surveying Solutions Inc. (SSI)—all owned and controlled by a combination of the four Defendants. As the lead entity within the SSI Group, SSI is a construction surveyor which derives most of its revenue through construction contracts with the Michigan Department of Transportation (MDOT), funded by the United Staes Department of Transportation (USDOT).

The Government alleges that, after signing the Secret Agreement in 2011 and up until late-2019, Defendants made numerous material misrepresentations concerning SSI's expenses, ownership, and relationships with the other SSI Group entities—all as part of a scheme to artificially inflate the profits each Defendant would receive when MDOT reimbursed SSI for

completing awarded contracts. Notably, the Government in this case is not the only party concerned by Defendants' corporate conduct. As a result of the federal indictment, the USDOT suspended Defendants Jeffrey Bartlett, Semenchuk, and Ball from participating in federally-funded transportation contracts.

All Defendants have been released pretrial subject to an unsecured $10,000 appearance bond, the condition that each refrain from committing further crimes, and a series of additional conditions requiring Defendants to, among other things, refrain from possessing firearms and refrain from talking about the case with each other unless Counsel is present. Currently before the Court is (1) the Government's Motion to add a condition that the suspended Defendants comply with their USDOT suspensions; and (2) Defendants' joint Motion to strike all conditions. For the reasons explained below, both motions will be denied and the conditions of Defendants' pretrial release will remain in place.

## I.

Defendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, and Brian Bartlett are charged with conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count I); conspiracy to defraud the United States, 18 U.S.C. § 371 (Count II); and wire fraud/aiding and abetting, 18 U.S.C. § 1342/18 U.S.C. § 2 (Counts III–XV). All charges stem from Defendants' alleged conduct involving Surveying Solutions Inc. and related companies, which the Government alleges defrauded the United States of hundreds of thousands of dollars throughout transportation contracts. *See generally* ECF No. 37. Although the Superseding Indictment was returned in February 2024, potentially relevant developments concerning Defendants and their corporate entities date back to 2000 and include years of alleged corporate misconduct and simultaneous administrative proceedings before the Michigan (MDOT) and the United States Department of Transportation

(USDOT). These developments, discussed in detail below, provide important context to addressing the pending motions concerning Defendants' pretrial release conditions.

### A. USDOT's Disadvantaged Business Enterprise Program and SSI Formation

In 1983, the USDOT created the Disadvantaged Business Enterprise (DBE) Program to "remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide. The primary . . . objective of the DBE [P]rogram is to level the playing field by providing small businesses owned and controlled by socially and economically disadvantaged individuals a fair opportunity to compete for federally funded transportation contracts." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise [https://perma.cc/LAA6-WW9U].

The DBE Program achieves this objective in part by certifying certain businesses as DBEs. Although USDOT largely delegates certification review to state and local agencies, federal regulation explains that an entity will only be certified as a DBE if it is (1) a small business, as defined by the Small Business Administration's regulations; (2) independent; and (3) "at least 51% owned by a socially or economically disadvantaged individual[]." 49 C.F.R. §§ 26.65(a), 26.69(b), 26.71. "In determining whether a potential DBE is an independent business, [reviewers] must scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, [and] financial . . . resources" and "must consider whether present . . . employer/employee relationships" between the owner of the potential DBE and personnel from non-DBE firms "compromise the independence of the potential DBE firm." 49 C.F.R. § 26.71(b). Turning to ownership, the entity's ownership "must be real, substantial, and continuing, going beyond pro

forma ownership" 49 C.F.R. § 26.69(c)(1). "[W]omen, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, [and] Subcontinent Asian Americans," are presumably socially disadvantaged. 49 C.F.R. § 26.67(a)(1). And an individual owner is presumably economically disadvantaged if the owner's net worth is less than $1.32 million. 49 C.F.R. § 26.67(a)(2)(i), (b)(1)(i). Certification is crucial because "the integrity of [the] DBE [P]rogram depends upon systematic procedures to ensure that only *bona fide* small firms, owned and controlled by socially and economically disadvantaged individual(s), are certified to participate as DBEs in DOT federally assisted programs." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (emphasis added) [https://perma.cc/LAA6-WW9U].

Importantly, once certified, DBEs may obtain increased contract opportunities because the DBE Program requires state and local transportation agencies that receive federal funding—like MDOT—to establish goals to increase DBE participation throughout the transportation contracting industry. 49 C.F.R. § 26.39. Examples of suggested goals include: (1) "establishing a race-neutral small business set-aside for prime contracts [;]" (2) for multi-year or "megaprojects," "requiring bidders on the prime contract to specify . . . subcontracts that are of a size that small businesses [and] DBEs, can reasonably perform[;]" (3) "requiring . . . prime contractor[s] to provide subcontracting opportunities of a size that small businesses, including DBEs, can reasonably perform, rather than self-performing all the work involved[;]" (4) "facilitat[ing] the ability of . . . joint ventures consisting of small businesses, including DBEs, to compete for and perform prime contracts[;]" and (5) "ensur[ing] that a reasonable number of prime contracts are of a size that small businesses, including DBEs, can reasonably perform." 49 C.F.R. § 26.39(b).

In August 2001, Guy Spreeman founded and incorporated Surveying Solutions, Inc. (SSI), a surveying company engaged in transportation contracting.[1] ECF No. 37 at PageID.102; *see also* Opinion Letter from Sheryl G. Williams, Acting Associate Director, External Civil Rights Programs Division, U.S. Dep't of Transp., to Franklin Adams, Manager, Business and Administrative Services Division, Mich. Dep't of Transp. (July 27, 2015), https://www.transportation.gov/sites/dot.gov/files/14-0071-Surveying%20Solutions%2C%20Inc..pdf [https://perma.cc/SU3Z-VUBV] [hereinafter USDOT Letter]. While Spreeman was SSI's owner, MDOT certified SSI as a DBE. USDOT Letter, pg. 1. But, after Spreeman died in January 2011, majority ownership of SSI "passed from his estate back to the corporation and remained as treasury stock while SSI sought a buyer for the company." *Id.* Courtney Stodolak, the longest-serving SSI employee at the time, attempted to purchase majority ownership but "dropped out when she could not secure adequate funding." *Id.* n. 2. So, "majority ownership passed by default" to Defendant Jeffrey Bartlett, who formerly owned 48% of SSI. *Id.* (emphasis added). Because Jeffrey Bartlett was a "non-disadvantaged individual," "MDOT removed SSI's DBE certification in July 2011." *Id.*

### B.  Alleged 2011 "Secret Agreement" and Equalization

On February 25, 2011, the Government alleges Defendant Jeffrey Bartlett—the new majority owner of SSI—entered into a "Secret Agreement" with Defendant Andrew Semenchuk, Defendant Brian Bartlett, Defendant Adam Ball, and nonparty Anthony Thelen.[2] ECF No. 37 at

---

[1] SSI currently advertises themselves as Michigan's "premier consulting firm" which specializes in in "geospatial/surveying services." *About*, SSI, https://ssi-mi.com/about/ (last accessed Apr. 9, 2024) [https://perma.cc/T2TW-EQVV]. Across three Michigan offices in Standish, St. John, and Saginaw, SSI has nearly 120 employees including professional surveyors, engineers, CAD technicians, and field crew members. *See id.*

[2] The Superseding Indictment lists only the Defendants and an unidentified fifth individual, known to the grant jury, as parties to the February 2011 Secret Agreement. ECF No. 37 at PageID.107–08. But, at the April 11, 2024 Evidentiary hearing, the Government identified this fifth individual as Anthony Thelen on the public record.

PageID.107–08. All five individuals allegedly agreed to equal ownership in the "SSI Group"—a group of companies the Government alleges includes (1) SSI, (2) Southfield IT, (3) 2SI Development, LLC ("2SI"), (4) 3SI Building and Leasing, LLC ("3SI"); and (5) Geo Precision Services, LLC ("Geo"). *Id.* at PageID.104. This Secret Agreement, signed by all Defendants, read as follows:

> It is the intent of this agreement that the Buyers and Sellers will each own a 20 percent undivided interest in the above named companies at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, Stock, Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have equal ownership of the companies at the completion of the "Buy In" period.

*Id.* at PageID.107. The "Sellers" were listed as Defendant Brian Bartlett, Defendant Jeffrey Bartlett, and Anthony Thelen. *See id.* The "Buyers" were listed as Defendant Adam Ball and Defendant Andrew Semenchuk. *Id.* at PageID.108.

Although the Secret Agreement was effectuated in 2011, and Defendants argue it was "superseded" by subsequent agreements, the Government alleges Defendants acted in accordance with the Secret Agreement as late as December 2017, by "equalizing" the SSI Group's net income or profits at the end of the year by adding the net revenue of all entities within the Group and dividing them such that each Defendant received their 20% share. ECF No. 37 at PageID.113–15. To accomplish this, the Government alleges Defendants would offer fictitious "loans" to one another and take fake loans from the SSI Group entities, with the expectation that the loans would never be paid. *Id.* For example, according to the Superseding Indictment, on December 28, 2017, Jeffrey Bartlett sent an email to SSI's Accountant titled "SSI Equalization[]" stating:

> I guess I personally was thinking more on the lines of getting "loans" from SSI in the 2017 year that we know would never be paid back and keep us all equal from year to year.

*Id.* at PageID.114. Three minutes later, Semenchuk sent Brian Bartlett, Adam Ball, and two other individuals whose names have been redacted an email titled "Update & Question" stating:

> [E]xactly bonuses to keep me under $350 and the rest loans that will never be paid back.[]

*Id.* Five minutes later, Ball responded:

> I thought there was some discussion of doing the loans 1/1/2018 so that 2017 did not show monster loans on the books to the owners for DBE.

*Id.* at PageID.115. Nine minutes later, Brian Bartlett responded:

> I thought the 2018 loans were for if we received a bunch more money and were not able to divert it to 2SI and NEC because they are maxed out. Then we would do so after the first of the year for Adam [Ball], Brian [Bartlett], [redacted], and Jeff [Bartlett]. Andy [Semenchuk] would get loans from SSI then . . .

*Id.*

### C. Alleged Efforts to Fraudulently Re-Certify SSI as a DBE

On June 2, 2011, shortly after signing the alleged February 2011 Secret Agreement, Defendant Semenchuk—an Asian Pacific Islander and the purported sole owner of Geo—applied for Geo's DBE certification. *See id.* at PageID.104, 109. Geo became DBE certified soon after. *See* USDOT Letter, pg. 2.

One year later, in June 2012, Geo purchased 51% of SSI and became its majority owner. *Id.*; *see also* ECF No. 37 at PageID.106–07. In October 2012, "MDOT revoked Geo's DBE status based upon its purchase of SSI" because "Geo was no longer operating as an independent business. []Semenchuk opted not to appeal the decertification, and instead decided to dissolve Geo[,] transfer all its assets to SSI, and operate solely under SSI's name[] because [SSI] had better name

recognition and a more established credit history." USDOT Letter, pg. 2. So, by December 2012, Semenchuk—rather than Geo as an entity—was SSI's majority owner.[3] *Id.*

On April 19, 2013, Semenchuk, the new purported majority owner of SSI, sought to certify SSI as a DBE. ECF No. 37 at PageID.109. On December 19, 2013, MDOT denied Semenchuk's application for several reasons. USDOT Letter, pg. 2–3. First, MDOT was concerned that SSI was not sufficiently independent. MDOT noted that SSI leased two of its three Michigan offices from 3SI and leased "25 vehicles, survey equipment, and a mobile scanner" from 2SI. *Id.* But two SSI employees—Defendant Brian Bartlett and Anthony Thelen—had ownership interest in 2SI and 3SI. *Id.* When pressed for more information, Semenchuk told MDOT officials in October 2013 that "neither he nor any owners of SSI possessed any ownership interest in" 2SI or 3SI and that all were "totally separate and distinct entities." *Id.* However, Semenchuk did not provide tax returns or outside lease agreements MDOT requested to corroborate his claims. *Id.* Second, MDOT "concluded that SSI could not prove by clear and convincing evidence that the transfer of ownership [to Semenchuk] occurred for reasons other than obtaining DBE certification[.]" *Id.*, pg. 5. Third, MDOT denied Semenchuk's DBE application because he had not proven by clear and convincing evidence that he, in fact, controlled SSI. Instead, MDOT questioned whether SSI was actually controlled by Jeffrey Bartlett because he was an experienced surveyor, owned SSI just before Semenchuk and Geo's purchase, and still owned 48% of SSI after Semenchuk and Geo's purchase. *See id.*, pg. 6.

---

[3] The Government cites Defendants' February 2011 Secret Agreement and maintains Semenchuk, in reality, only owned a 20% share of SSI equal to all other Defendants, and "never had ultimate managerial control[.]" ECF No. 37 at PageID.106–07.

On August 28, 2014, while an appeal of MDOT's DBE denial was pending, Defendant Jeffrey Bartlett sent Defendant Brian Bartlett, Defendant Ball, Defendant Semenchuk, and Anthony Thelen an email with the subject line "Re: accts" which read as follows:

> Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure.

ECF No. 37 at PageID.109 (emphasis in original).

On July 25, 2015, the USDOT ultimately reversed MDOT's decision and directed MDOT to certify SSI as a DBE "without delay[.]" USDOT Letter, pg. 7; ECF No. 37 at PageID.109. The USDOT held that "nothing in the record indicate[d] that" Defendant Brian Bartlett and Anthony Thelen's dual-status as SSI employees and owners of 2SI and 3SI compromised SSI's independence. USDOT Letter, pg. 4. Although "70% of SSI's business account payments (excluding personnel costs) were paid to [2SI and 3SI], the evidence in the record indicate[d] that the transactions between SSI and 2SI/3SI were arms-length transactions." *Id.* USDOT disagreed with MDOT's conclusion that Semenchuk purchased SSI solely to obtain SSI's DBE certification because, "in Mr. Semenchuk's words, he purchased SSI because he 'wanted to expand [Geo], eliminate competition, and ultimately make a profit.'" *Id.*, pg. 6. And, although Jeffrey Bartlett owned 48% of SSI and was an experienced surveyor, there was no evidence that he had "the power or authority to control the business[.]" *Id.*

In July of 2016, 2017, and 2018, Semenchuk submitted "No Change Affidavits" to MDOT in support of SSI's DBE certification. *Id.* at PageID.109. These affidavits affirmed that Semenchuk—a "socially disadvantaged" individual—was still SSI's majority owner. *See* 49 C.F.R. § 26.83(j). The Government alleges these representations were fraudulent because, per the February 2011 Secret Agreement, Semenchuk was not SSI's majority owner and, like all other Defendants, only owned a 20% share of the SSI Group. ECF No. 37 at PageID.106–07.

### D. Alleged Overbilling and Wire Fraud

The Government alleges "the [D]efendants knowingly devised and executed, and aided and abetted each other in devising and executing, a scheme to defraud and to obtain money from MDOT," funded by USDOT, "by means of false and fraudulent material pretenses, representations, and promises." ECF No. 37 at PageID.118.

Aside from the alleged ownership misrepresentations the Government alleges Defendants made to obtain DBE certification, the Government also alleges Defendants misrepresented SSI's relationship to the other companies within the SSI Group—2SI, 3SI, and Southfield IT—and misrepresented general payroll expenses. *See id.* at PageID.111 (alleging Defendants "falsely told MDOT they did not control or own any other companies . . . with the intent to deceive MDOT into paying the [D]efendants, through SSI, more in overhead costs and the fixed 11[%] fee they were entitled to.")

Beginning with 2SI, the Government alleges each Defendant owned a 20% share of 2SI's net revenue under the 2011 Secret Agreement, but that Defendants held 2SI out as an independent company through which SSI would lease surveying equipment necessary to complete awarded transportation contracts. *See id.* At some unknown point in time, Defendant Jeffrey Bartlett—when he was an officer and 48% minority owner of SSI—was listed as a signor on 2SI's checking account and was held out as 2SI's owner. ECF No. 37 at PageID.111. The Government alleges SSI submitted fraudulent claims to MDOT "relating to 2SI vehicles and equipment leases," from 2012 through "at least June 2019" which resulted in MDOT's overpayment and SSI's unearned profit. *Id.* at PageID.111–12 ("[D]efendants knew if they disclosed the fact that they owned and controlled 2SI and its mobile surveying scanners and vehicles . . . they would only be entitled to reimbursement for normal ownership costs[.] But, if they falsely claimed the scanners and vehicles

were leased by SSI from 2SI, [MDOT's] reimbursement would be substantially greater[.]"); *see also* USDOT Letter, pg. 2 ("SSI also leases 25 vehicles, survey equipment, and a mobile scanner from 2SI").

Similarly, the Government alleges each Defendant owned 20% of 3SI but falsely held 3SI out as an independent company through which SSI leased its property and rented its office space, to fraudulently inflate MDOT's reimbursement on the transportation contracts it awarded SSI. *See* ECF No. 37 at PageID.112; *see also* USDOT Letter, pg. 2 ("SSI leases two of its three office complexes from 3SI.").

The same is alleged for Southfield IT. The Government alleges Defendants represented to MDOT that Southfield IT was an independent company SSI paid for IT services necessary to fulfill their transportation contracts when, in reality, Southfield IT was owned and controlled by Defendants. ECF No. 37 at PageID.110. In February 2015, Southfield IT opened a bank account and listed Defendant Adam Ball—a SSI owner and officer—as one of its signors. *Id*. Once Southfield IT's account was opened, the Government alleges 99.2% of Southfield IT's "'funding' came through SSI" and 95.9% of this funding was "ultimately transferred back" to Defendants and their spouses.[4] *Id.* at PageID.111.

Turning to Defendants' payroll expenses, the Government alleges Defendants "agreed to falsely claim that certain individuals were employed by SSI, when [D]efendants knew these individuals were not." ECF No. 37 at PageID.113. Indeed, the Government alleges Defendants created "false and fraudulent timesheets and federal income tax forms" for these "ghost employees," and submitted this documentation to MDOT to inflate SSI's profits. *Id.*

---

[4] At the April 11, 2024 Evidentiary hearing, Defense Counsel asserted that many of the Southfield IT costs were disallowed in SSI's proposed overhead rates. *See also* ECF No. 48 at PageID.168 (asserting "Southfield IT simply did not increase SSI's overhead rate").

Ultimately, to pay and reimburse SSI, MDOT wired funds from its financial institution, Comerica Bank in Auburn Hills, Michigan, to SSI's account with Huntington National Bank in Columbus, Ohio. ECF No. 37 at PageID.118–20. The thirteen identified wire transfers from MDOT to SSI are as follows:

| DATE | AMOUNT |
| --- | --- |
| December 7, 2018 | $6,824.16 |
| December 7, 2018 | $74,570.94 |
| December 10, 2018 | $19,545.10 |
| December 12, 2018 | $73,038.61 |
| December 12, 2018 | $116,353.50 |
| December 12, 2018 | $26,139.49 |
| December 19, 2018 | $125,351.21 |
| December 19, 2018 | $80,238.15 |
| June 21, 2019 | $75,451.26 |
| June 27, 2019 | $120,391.62 |
| July 25, 2019 | $105,143.78 |
| July 25, 2019 | $65,103.49 |
| July 29, 2019 | $61,935.75 |
| **TOTAL:** | $950,087.06 |

*See id.* at PageID.119–20.

Notably, although each of the transfers above form the basis for a separate wire fraud Count in the Superseding Indictment, the Government has not yet explained how each cash transfer was connected to any of Defendant's alleged fraudulent misrepresentations. For example, it is not known whether the contracts at issue in each transfer were awarded to SSI *because of* their DBE status. The Government has also not yet explained *how* any of these transfers reflect SSI's alleged fraudulently-inflated overhead rate due to Defendants' alleged misrepresentations about SSI's employees and SSI's relationship to 2SI, 3SI, or Southfield IT. Defendants rebut the Government's allegations by citing SSI's audits—performed by independent third parties in May or June of 2014, 2015, 2016, 2017, and 2018—which consistently reported that SSI's overhead rate fairly represented its direct labor costs, fringe benefits, and general overhead. See ECF No. 48-3. But

these independent audits predated the alleged fraudulent transfers and, as explained below, MDOT

concluded that some of these audits were not credible.

### E. MDOT & Federal Investigation

Sometime before July 2019, MDOT's Office of Commission Audits (OCA) "performed a

routine consultant assessment of SSI's billings to MDOT. OCA concluded that SSI may have used

an inaccurate indirect cost rate for its contracting and invoicing, which may have resulted in

overbillings by SSI to MDOT." ECF No. 48-2 at PageID.186. Accordingly, on July 31, 2019, a

representative from MDOT's Prequalification Committee emailed Defendant Jeffrey Bartlett

informing him of OCA's inspection which (1) concluded that SSI's auditors did not "evaluate key

risk areas" as required by federal regulation and, (2) "identified the following related-party costs"

that did not appear to accord with federal regulation and represented leases or rental costs SSI paid

to "entities under common control[:]"

1. Vehicle and Equipment lease/rental costs paid to 2SI Developments LLC.
2. Any salaries and incentive compensation paid to relatives of the owner and executives, including Celena Thelen, Sarah Ball, Jenny Bartlett, and Jessica Bartlett.
3. Real estate lease costs paid to 3SI Building & Leasing, LLC.
4. Managed IT Service costs paid to Southfield IT Group.

ECF No. 48-1 at PageID.184.

On August 5, 2019, SSI appeared before MDOT's Prequalification Committee. ECF No.

48-2 at PageID.186. Three days later, the Committee issued a decision requiring SSI to submit a

re-audit of its 2017 indirect cost rates and required SSI to use a 110% direct cost rate on all future

invoices until MDOT approved SSI's re-audited 2017 indirect cost rate. *Id.* "On April 22, 2021,

the Committee issued a second decision requiring SSI to submit its re-audited 2017 indirect cost

rate within 30 days" and noted it would suspend SSI's prequalification if it did not meet this

deadline. *Id.*; *see also Prequalification for Construction Contractors*, MICH. DEP'T OF TRANSP.,

https://www.michigan.gov/mdot/business/contractors/prequalification (last visited Apr. 12, 2024)

("Anyone seeking to bid on and/or perform work on MDOT projects must be prequalified.")

[https://perma.cc/C55P-NBMR]. SSI appealed this second decision and, on October 8, 2021,

MDOT's "Tier III appeal panel upheld the [Prequalification] Committee's decision" and "removed

SSI's prequalification[.]" ECF No. 48-2 at PageID.186. SSI then submitted its re-audited 2017

indirect cost rate and its audited 2021 indirect cost rate, but MDOT was "unable to agree on certain

accounting conclusions and interpretations of corporate law as to the allowability of certain costs

in the 2017 indirect-cost-rate calculation[.]" *Id.*

Simultaneous to but separate from these MDOT administrative proceedings, the instant

federal criminal investigation had just begun. In July 2019, "federal agents executed search

warrants at SSI's offices and its principals' homes throughout Michigan." ECF No. 48 at

PageID.166. The Government then "provided significant pre-indictment discovery to Defendants'

prior counsel, including reverse proffer summaries and key documents . . . , the affidavits in support

of the search warrants, copies of Defendants' voluntary statements to the FBI, witness interview

statements and proffers, audit reports, and government work product." ECF No. 65 at PageID.265.

Further, "[a]t Defendants' request, the Government postponed its presentation to the grand jury to

allow Defendants time to hire additional counsel and make a presentation to the United States

Attorney . . . for the Eastern District of Michigan, urging that the prosecution be declined." *Id.* at

PageID.265–66. And, "[w]hen the [United States Attorney] rejected Defendant's request, the

Government granted Defendants additional time to 'appeal' the . . . decision to the Deputy Attorney

General in Washington, D.C., who also rejected Defendants' request to not prosecute the matter[.]"

*Id.* at PageID.266.

On June 6, 2022, after interviewing MDOT OCA official Chris Shafer, FBI Special Agent

Mitchell L. King reported the following:

1. MDOT "no longer has a mechanism to prevent SSI from working with MDOT. [Shafer] believed if SSI were indicted they would be suspended from participating in federal contracts, and if convicted SSI would be debarred from federal contracts. This would preclude SSI from doing business with MDOT." ECF No. 48-4 at PageID.203
2. "SSI has not been conducting any new business with MDOT as a prime contractor, but they have been doing some work as a sub-contractor." *Id.*
3. SSI's corporate counsel, Wade Fink, "is meeting with the highest levels of MDOT in an effort to come up with an amount SSI would pay back to MDOT. This would allow SSI to do work for MDOT again. During the meetings Fink has alleged malice on behalf of . . . OCA [but] [t]here is no incentive for OCA to be malicious towards SSI." *Id.*
4. "The most recent audit provided by SSI to OCA did not pass muster. OCA does not agree with the [overhead] rate developed by SSI's auditor. The audit was based off of 2017 numbers. SSI wants to get an audit [of] 2021 and get pre-qualified again with MDOT." *Id.*
5. "The posture of MDOT appears to be that SSI is cheap, they are the best at what they do, and there is a lot of work on the horizon." *Id.*

Five months after this report, in November 2022, SSI and the MDOT reached a settlement

in their administrative proceedings. *See* ECF No. 48-2. Text messages provided by the Parties

during the April 11, 2024 evidentiary hearing suggest that USDOT knew of and approved the terms

of this settlement before the Parties signed it. Under the terms of this settlement, despite their

disagreement on calculations and corporate law, MDOT agreed to accept SSI's re-audited 2017

cost rate and audited 2021 indirect cost rate. *Id.* at PageID.187. SSI agreed to pay $3,564,031.54

to MDOT "in full satisfaction of all claims related to SSI's billings to MDOT from August 1, 2016

to July 31, 2022," and MDOT agreed to reinstate SSI's prequalification. *Id.* at PageID.188.

However, the Parties also agreed that "MDOT may decide to immediately reinstitute its suspension

of SSI's prequalification if SSI, or any current or former SSI employee, is indicted or convicted

under federal or state law related to services rendered by SSI to MDOT or any other public

entity[.]" *Id.*

Defendants Jeffrey Bartlett, Semenchuk, and Ball were indicted in the instant case nearly one year later, on December 6, 2023. ECF No. 1 (charging each Defendant with conspiracy to commit wire fraud, wire fraud, and conspiracy to defraud the United States). On January 23, 2024, the USDOT's Federal Highway Administration notified these Defendants that each was suspended from "being a participant or principal 'in federally funded programs and projects, including both procurement and nonprocurement transactions' pending the conclusion of this [federal criminal] case." ECF No. 38 at PageID.128. Defendants Jeffrey Bartlett, Semenchuk, and Ball—the "Suspended Defendants"—did not contest their administrative suspensions and instead focused on SSI's reorganization. Notably, USDOT has not yet suspended Defendant Brian Bartlett, ECF No. 65 at PageID.264 n. 1,.who was not indicted until after USDOT suspended the other, Suspended Defendants. *See* ECF No. 37,

Since the federal indictment and USDOT suspension, "SSI continues to do business with MDOT on highway projects" but, Defendants claim, has been reorganized such that Defendants can still work for SSI without "participating" in federally-funded contracts and violating their suspensions. ECF No. 48 at PageID.172. Indeed, SSI removed all Defendants from its Board of Directors. ECF No. 65 at PageID.268. But Defendants Jeffrey and Brian Bartlett continue to serve as "advisors" and Defendants Ball and Semenchuk continue to work as SSI engineers, even though Semenchuk notes he, at times, does not know the source of the third-party contracts he works on. ECF Nos. 47 at PageID.159; 63 at PageID.254; 65 at PageID.268.

### F. Defendants' Detention Hearings and Pretrial Release

With this context in mind, this Court turns to the Parties' motions concerning Defendants' pretrial release conditions. ECF Nos. 38; 46.

The Suspended Defendants—Jeffrey Bartlett, Semenchuk, and Ball—appeared for arraignment on the initial indictment on December 15, 2023 before Magistrate Judge Curtis Ivy, Jr. *See* ECF Nos. 6; 7; 8. After holding a detention hearing for each Defendant, Judge Ivy released each Defendant pretrial, subject to a $10,000 unsecured bond, ECF Nos. 17; 19; 21, the condition that each Defendant refrain from committing further crime, and a set of "Additional Conditions" that each Defendant:

(1) Report as directed to Pretrial Services;
(2) Surrender their passport;
(3) Refrain from obtaining another passport, or any form of enhanced identification or international travel document;
(4) Restrict their travel to the state of Michigan, unless permission is granted by the Court or Pretrial Services;
(5) Not possess a firearm or other dangerous weapon, and remove all firearms and dangerous weapons from their house;
(6) Surrender any Concealed Pistol Licenses;[5] and
(7) Refrain from discussing the case with any victims, witnesses, or Codefendants unless Counsel is present

ECF Nos. 16 at PageID.42–44; 18 at PageID.49–51; 20 at PageID.56–58. Pretrial Services recommended Defendants' pretrial release subject to these Additional Conditions, concluding each Defendant posed a risk of flight and a danger to the community. And a Pretrial Services Officer testified about these conditions at each of the Suspended Defendants' detention hearings on December 15, 2023. *See* ECF No. 69 at PageID.306–12. Judge Ivy asked each Defendant and their Counsel if they understood the Additional Conditions and if they had any objections to Pretrial Services' recommendations. *Id.* at PageID.308–11. No objections were made and all Defendants agreed to abide by these Additional Conditions. *Id.*

---

[5] Notably, this condition was not imposed on Defendants Ball and Brian Bartlett. ECF Nos. 20 at PageID.57; 56 at PageID.224.

After the Grand Jury returned the Superseding Indictment, ECF No. 37, the Suspended Defendants appeared for arraignment on the Superseding Indictment on February 22, 2024 before Magistrate Judge Patricia T. Morris. *See* ECF No. 39. Judge Morris recognized that the issue of bond had already "been addressed" and that the Suspended Defendants were appearing "on bond." ECF No. 68 at PageID.292. After addressing Defense Counsels' request for additional time to respond to a motion the Government filed the night before the hearing, ECF No. 38, Judge Morris asked Defense Counsel if "there was anything else [that] should be address[ed]." ECF No. 68 at PageID.294. Defense Counsel responded with a "unanimous no," and did not raise the issue of the Suspended Defendants' pretrial release conditions. *Id.*

Defendant Brian Bartlett, who was added by the Superseding Indictment, was arraigned before Judge Morris on March 5, 2024. *See* ECF No. 51. Like all other Defendants, Defendant Brian Bartlett was released pretrial subject to a $10,000 unsecured bond, ECF No. 57; and the same set of Additional Conditions, with the exception that his travel is only restricted to the continental United States and that he is not required to surrender any Concealed Pistol Licenses. ECF No. 56. Unlike the other Defendants, Brian Bartlett's Counsel objected to the condition that he not possess a firearm, because "he lives in a rural area and is concerned about the safety of his of his family." ECF No. 51 at 4:03–4:38. Judge Morris overruled this objection and imposed the condition. *Id.* at 4:46–5:35 ("I'm not sure what would take this case out of the usual realm of cases where in general we ask that people not possess firearms or other dangerous weapons in the home both for our own pretrial services officers' safety as well as the safety of the community.").

Both the Government and Defendants seek to amend the conditions of Defendants' pretrial release. *See* ECF Nos. 38; 46.

**II.**

The Bail Reform Act allows both defendants and the Government to file motions to amend conditions of the defendant's pretrial release. 18 U.S.C. § 3145(a). Although the text of the Bail Reform Act is silent on the applicable standard of review, this Court routinely conducts *de novo* review rather than reviewing a Magistrate's detention decision solely for clear error. *See, e.g.*, *United States v. Koubriti*, No. 01-CR-80778, 2001 WL 1525270, at *5 (E.D. Mich. Oct. 16, 2001) ("District courts within the Sixth Circuit appear to adhere to a requirement of *de novo* review."); *United States v. Hazley*, No. CR 22-20612, 2023 WL 2711564, at *2 (E.D. Mich. Mar. 30, 2023); *United States v. Haywood*, No. CR 22-20417, 2023 WL 2465556, at *1 (E.D. Mich. Mar. 10, 2023); *United States v. Didani*, No. 21-20264, 2022 WL 2794284, at *2 (E.D. Mich. July 15, 2022); *United States v. Gray*, No. 21-CR-20516, 2021 WL 5114574, at *1 (E.D. Mich. Nov. 3, 2021).

"The default position of the law . . . is that that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). Here, the Parties do not dispute that Defendants should be released pretrial. However, when a defendant's release—whether on personal recognizance or subject to an unsecured appearance bond—endangers the community or does not reasonably ensure the defendant's appearance at trial, judicial officers may order a defendant's release be subject to the condition that the defendant refrain from committing further crime and be further subject to the "*least restrictive* further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(c) (emphasis added). Statutory examples of these additional conditions include requiring a defendant to:

> (1) abide by specified restrictions on personal associations, place of abode, or travel;

(2) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;
(3) report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;
(4) refrain from possessing a firearm, destructive device, or other dangerous weapon; and
(5) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

18 U.S.C. § 3142(c)(B)(iv)—(vi), (viii), (xiv).

In determining whether defendants should be released pretrial, and whether conditions of release would mitigate any flight risk or danger the defendants' release poses to the community, judicial officers consider:

(1) [t]he nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
(2) the weight of the evidence against the person;
(3) the history and characteristics of the person, including—
    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
    (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an[other] offense . . . ; and
(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3412(g).

"The government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or the community by clear and convincing evidence." *United States v. Shuklin*, No. 19-4171, 2020 WL 2992522, at *2 (6th Cir. Mar. 18, 2020) (quoting *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004)).

**III.**

On February 21, 2024, the Government filed a motion to modify the conditions of release

imposed on the Suspended Defendants (Jeffrey Bartlett, Semenchuk, and Ball), seeking

specifically to add a condition which would require each Suspended Defendant's compliance with

the terms of their USDOT suspensions. ECF No. 38. In addition to opposing the Government's

proposed condition, Defendants filed a motion seeking to strike *all* Additional Conditions imposed

on their pretrial release by Judge Ivy and Judge Morris.[6] ECF No. 46. Each motion will be

addressed in turn.

**A. Government's Motion to Add Condition of Pretrial Release**

The Government seeks to add a pretrial release condition which would require the

Suspended Defendants to:

> [C]omply with the terms and conditions of the U.S. Department of Transportation,
> Federal Highway Administration's nonprocurement suspension (effective January
> 23, 2024) throughout the duration of said suspension. The scope and terms of the
> nonprocurement suspension, as set forth on page 3 of the suspension notice, are as
> follows:
>
> > "An administrative suspension has the effect of excluding you from
> > being a participant or principal in any 'covered transaction' as
> > defined by [federal regulations]. A covered transaction is any
> > transaction that requires the consent of a USDOT official or, if no
> > such consent is required, any federally funded transaction that
> > equals or exceeds $25,000[.] Also, administrative suspensions have
> > the government-wide effect applying to all federally funded
> > programs and projects, including both procurement and
> > nonprocurement transactions."
>
> Should [the Suspended Defendant] have any questions as to whether his conduct
> complies with said suspension, the defendant (or his counsel) is encouraged to
> contact the [USDOT] Suspension and Debarment Team Leader specifically
> identified in the suspension notice: Senior Attorney Advisor Lisa MacPhee. An

---

[6] Although Defendant Semenchuk filed the Motion in his own name, all Defendants concurred in
the relief Defendant Semenchuk seeks, both in individual pleadings and on the record during the
April 11, 2024 evidentiary hearing. *See* ECF Nos. 48 at PageID.165; 63 at PageID.255–56.

- 21 -

alleged violation of this condition will only be triggered upon a written assertion by [USDOT] that the Defendant has violated the terms and conditions of their suspension, at which time the Court will consider the merits of the alleged violation of pretrial release conditions.

ECF No. 38 at PageID.133–34 (internal citations omitted).

The Government argues this additional condition is necessary to ensure the Suspended Defendants do not economically endanger their community, noting the Bail Reform Act "does not explicitly define the types of harm a court should protect against" when imposing conditions but that "danger to the community" should be interpreted broadly to include economic harm. *Id.* at PageID.129–30 (collecting cases). Because Defendants continue to associate and work with SSI, which continues to participate in federally-funded contracts, the Government argues this additional condition "is the least restrictive further condition that will reasonably assure the safety of the community and the government from further fraud and economic loss." *Id.* at PageID.133.

The Suspended Defendants respond that (1) risk of economic harm is not a cognizable consideration under the Bail Reform Act and, alternatively, (2) the language of the Government's proposed additional condition is too vague and does not place the Suspended Defendants on notice of what specific conduct would be violative. *See* ECF Nos. 48 at PageID.175–80; 49 at PageID.208–211; 63 at PageID.255–57.

The Bail Reform Act allows Courts to consider economic and pecuniary harm when assessing the danger a defendant poses to the community. *United States v. Ali*, No. 2:16-CR-20667, 2019 WL 7586530, at *3 (E.D. Mich. Oct. 4, 2019), *report and recommendation adopted*, No. 2:16-CR-20667-1, 2019 WL 5884388 (E.D. Mich. Nov. 12, 2019) ("'[D]anger to the community' under the Bail Reform Act is construed more broadly than mere concerns of potentially physical violence. It also encompasses potential 'pecuniary or economic harm.'" (quoting *United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992))); *United States v. Israel*, No. 17-CR-20366, 2017 WL

- 22 -

3084374, at *5 (E.D. Mich. July 20, 2017) (noting "it is true that economic harm may qualify as a danger contemplated by the Bail Reform Act" when granting pretrial release subject to bond and conditions for defendant charged with wire and bank fraud); *see also United States v. Thomas*, No. 3:14-CR-00182, 2020 WL 4734994, at *13 (M.D. Tenn. Aug. 14, 2020); *United States v. Broussard*, No. 3:19-CR-29-TAV-DCP, 2020 WL 3442321, at *4 (E.D. Tenn. June 23, 2020); *United States v. Spivak*, 555 F. Supp. 3d 541, 548 (N.D. Ohio 2021); *United States v. Isaacs*, 469 F. Supp. 3d 801, 804 (S.D. Ohio 2020).

However, the Government has not shown clear and convincing evidence that the Suspended Defendant's pretrial release poses significant economic danger. True, SSI continues to work on federally-funded contracts through MDOT. ECF No. 48 at PageID.169. True, the Suspended Defendants continue to associate and work for SSI. ECF Nos. 47 at PageID.159; 63 at PageID.254; 65 at PageID.268. But all Suspended Defendants have averred that SSI has been reorganized such that no Suspended Defendant "participates" in federally-funded contracts. ECF Nos. 48 at PageID.172; 49 at PageID.204; 63 at PageID.258. And the Government's "understanding" to the contrary, without more, does not rise to the level of clear and convincing evidence required by the Bail Reform Act. *See* ECF No. 38 at PageID.128.

In the alternative, even if the Government had shown clear and convincing evidence that the Suspended Defendant's pretrial release poses sufficient economic danger to the community, the proposed additional condition requiring the Suspended Defendants to comply with their USDOT suspensions would be denied for two additional reasons.

First, the proposed condition is unnecessary. The Suspended Defendants are already required to abide by their USDOT suspensions, albeit administratively. And although no Party has explained how USDOT monitors and enforces their internal suspensions, nothing in the record

suggests they are incapable of doing so. Further, a standard condition of the Suspended Defendants' pretrial release already requires them to refrain from committing further crime, including the "further fraud" the Government seeks to prevent through imposing this additional condition. *See* ECF Nos. 16 at PageID.41; 18 at PageID.48; 20 at PageID.55.

Second, the proposed condition is vague and does not place the Suspended Defendants on notice of specific conduct that would be violative. Pretrial release conditions must be "sufficiently clear and specific to serve as a guide for the person's conduct." 18 U.S.C. § 3142(h)(1). But, here, the Government's proposed condition does not explain what "being a participant or principal" in a federally-funded contract means. *See* ECF No. 38 at PageID.133. Instead, it "encourage[s]" the Suspended Defendants to contact USDOT "Senior Attorney Advisor Lisa MacPhee" if they have any questions about whether their conduct would be violative. *Id.* On this point, the Government argues that the proposed condition is sufficiently specific because it mirrors the language of the USDOT suspension, which the Suspended Defendants all aver they are currently complying with. ECF No. 65 at PageID.271. But what is sufficiently specific for USDOT is not necessarily sufficiently specific under the Bail Reform Act. And the Suspended Defendants' current claims of compliance do not reveal whether they are sufficiently aware of what specific future conduct may be violative. *See* ECF No. 63 at PageID.256 (posing five realistic hypotheticals and asking whether each violates the Government's proposed condition and the USDOT suspension).

Before turning to Defendants' Motion to Modify, it is worth noting the oddity of the Government's request.[7] At the April 11, 2024 Evidentiary hearing, the Government repeatedly asserted that the instant criminal investigation and charges are *separate* from MDOT and

---

[7] At the April 11, 2024 Evidentiary hearing, Counsel for the Government stated that USDOT has *never* asked the Department of Justice to seek a pretrial release condition requiring compliance with a USDOT suspension.

USDOT's administrative investigations and proceedings. But, at its core, the Government's proposed condition seeks to bootstrap an administrative sanction placed on the Suspended Defendants—triggered largely by the federal indictment—into a condition of their criminal pretrial release. As explained, instead of outlining what specific conduct violates the proposed condition vis-à-vis the USDOT suspension, the Government's proposed language "encourage[s]" the Suspended Defendants, proactively, to contact USDOT for guidance on what conduct would be violative. ECF No. 38 at PageID.133. And, reactively, an alleged violation of the proposed condition is only "triggered" by USDOT, which must first conclude that a Suspended Defendant violated the terms of their suspension. *Id.* After USDOT reaches this internal, administrative conclusion, the Government proposes that this Court then decide whether USDOT was correct that a Suspended Defendant's conduct was truly violative. *Id.* But this Court is not an administrative appellate adjudicator and will not second-guess, as a matter of federal criminal proceedings, the compliance conclusions of USDOT.

In sum, the Government's Motion to modify the Suspended Defendants' pretrial release conditions will be denied because the Government has not shown clear and convincing evidence that their pretrial release poses significant economic harm and because the proposed condition is unnecessary and nonspecific.

### B. Defendants' Motion to Strike Conditions of Pretrial Release

Turning to Defendant Semenchuk's Motion, joined by all other Defendants, Defendants seek to strike all Additional Conditions of their pretrial release, arguing they pose no flight risk or danger to the community to justify *any* conditions in the first instance. ECF Nos. 46; 48 at PageID.172–74; 59; 63. In addition to reviewing all evidence presented by the Parties throughout the April 11, 2024 evidentiary hearing, this Court has thoroughly reviewed the relevant pleadings,

the Pretrial Services Reports[8] prepared for each Defendant's detention hearing, and the transcripts and audio recordings of each Defendant's detention hearings before Judge Ivy and Judge Morris. Having conducted *de novo* review, this Court concludes Defendants pose a risk of nonappearance and danger to the community, but that both risks are appropriately mitigated by the pretrial conditions currently in place.

Beginning with the first § 3142(g) factor, although the crimes charged in the Superseding Indictment are non-violent, they are nevertheless serious. As alleged, Defendants devised a sophisticated, nearly decade-long conspiracy involving five different companies to defraud the United States government of "millions of dollars." *See generally* ECF No. 37; *see also* ECF No. 66 at PageID.282.

Second, as revealed throughout the indictments, pleadings, and hearings, the Government has significant evidence against Defendants. The Superseding Indictment quotes emails sent and agreements effectuated by Defendants, including their written signatures. ECF No. 37 at PageID.108–15. The Government also averred it uncovered significant evidence throughout the July 2019 search of Defendants' homes and business entities, including Defendants' own "damming statements" throughout post-search interviews. Indeed, the Government has produced *so* much evidence throughout discovery that Defendants have requested additional time to review the evidence before finalizing an updated scheduling order. *See* ECF Nos. 60.

Turning to Defendants' history and characteristics, the Pretrial Services Reports submitted to Judge Ivy and Judge Morris suggest all Defendants have strong family and community ties. No Defendant has a problematic criminal history nor a documented mental health or substance abuse

---

[8] These Reports are only to be used for the purposes of bail determinations, are not filed on the docket, and are not placed on the public record. 18 U.S.C. § 3153(c)(1).

concern. However, Defendants have a history of foreign travel and have the means to easily flee such as passports, enhanced forms of identification, and sizeable incomes. Thus, despite this third factor favoring pretrial release, Pretrial Services correctly concluded each Defendant posed at least some risk of nonappearance. This conclusion was not objected to by any Defendant during his detention hearing. *See* ECF Nos. 51; 68; 69.

Turning to the fourth § 3142(g) factor, each Defendants' release poses danger to the community if no conditions are put in place. All Defendants own firearms. Defendant Jeffrey Bartlett has one handgun. Defendant Semenchuk owns two handguns and has a concealed pistol license. Defendant Ball owns ten firearms. And Defendant Brian Bartlett owns multiple firearms, too. Aside from firearm possession and alleged criminal association, Pretrial Services concluded each Defendant posed a risk of danger because their alleged criminal activity involved economic harm, which Defendants could continue to affect throughout their pretrial release.[9] Again, Defendants did not object to these conclusions at the time of their detention hearings. *See* ECF Nos. 51; 68; 69.

Notably, this Court's conclusion that Defendants' pretrial release poses some risk of flight and endangers the community mirrors the conclusions of Pretrial Services. But this is not surprising. This Court was puzzled why, less than four months after each Defendants' detention hearing during which no Defendant objected to any conclusion or condition,[10] all Defendants were

---

[9] Notably, the Pretrial Services Reports were likely submitted before Defendants allegedly reorganized SSI to prevent Defendants from participating in federally-funded contracts. ECF No. 51 at 4:03–4:38. But, from the face of the Pretrial Service Reports, it is unclear if this conclusion also considered the fact that SSI continues to work on federally-funded transportation contracts.

[10] As explained *supra* Section I.F, Counsel for Defendant Brian Bartlett objected to the condition that Brian Bartlett refrain from possessing a firearm. ECF No. 51 at 4:03–4:38. And Counsel raised the objection again at this Court's April 11, 2024 Evidentiary hearing. But, for the same reasons Judge Morris overruled the objection during Defendant Brian Bartlett's initial detention hearing, this Court will overrule the objection at this juncture Id. at 4:46–5:35 ("I'm not sure what would

suddenly seeking to strike all pretrial release conditions. So, at the April 11, 2024 Evidentiary hearing, this Court asked each Defendant and their Counsel if anything in the Defendants' lives had *changed* since their initial detention hearings. No Defendant presented a compelling answer.

Defendant Semenchuk stated that he had new reasons for out-of-state travel because a family member is undergoing heart surgery in Alabama and his son is moving to Indianapolis for the upcoming summer. But he can file a request with Pretrial Services or the Court to approve out-of-state travel requests. Defendant Jeffrey Bartlett asserted he would have objected to the condition restricting unsupervised Codefendant communication about the case during his detention hearing had he known his brother—Defendant Brian Bartlett—would be indicted soon after. But the condition that Defendants refrain from communicating about the case without the presence of Counsel is reasonably necessary to prevent Defendants—who are all charged with a conspiracy involving eight years of colluding with one another behind closed doors—from further colluding as to their case. Codefendants can still talk amongst themselves, without Counsel present, about any topic other than the case. And Defendants can still talk about the case and defense strategies with one another, so long as Counsel is present.

Because Defendants' release does present some risk of nonappearance and danger, this Court will not strike the standard, statutory pretrial conditions currently in place. The combination of conditions placed on each Defendant is the least restrictive combination to ensure each Defendant's appearance and mitigate the danger each Defendant's pretrial release poses to the community. Defendants' Motion to modify these conditions will be denied.

---

take this case out of the usual realm of cases where in general we ask that people not possess firearms or other dangerous weapons in the home both for our own pretrial services officers' safety as well as the safety of the community.").

## IV.

Accordingly, it is **ORDERED** that the Government's Motion to Modify Conditions of Pretrial Release, ECF No. 38, is **DENIED.**

Further, it is **ORDERED** that Defendants' Motion to Amend/Correct Order Setting Conditions of Pretrial Release, ECF No. 46, is **DENIED.**

**This is not a final order and does not close the above-captioned case.**

Dated: April 22, 2024                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge