UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                        Case No. 1:23-cr-20676

v.                                    Honorable Thomas L. Ludington
                                    United States District Judge
JEFFREY BARTLETT, et al.,

          Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS**

      Defendants Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, Adam Ball, and Anthony Thelen allegedly entered into a "Secret Agreement" in February 2011, providing that each would equally own 20% of the "SSI Group"—a group of companies including Surveying Solutions Inc. (SSI); Southfield IT;  2SI Development, LLC; and 3SI Building and Leasing, LLC. After signing this agreement, Defendants allegedly went on to defraud the United States of hundreds of thousands of dollars from 2011 through 2019 by artificially creating and inflating reimbursable "costs" throughout federally-funded transportation contracts that the Michigan Department of Transpiration awarded to SSI.

      The investigation into this alleged decade-long conspiracy began in March 2019. On July 24, 2019, FBI Special Agent Bryan Butler applied for warrants to search corporate offices associated with various SSI Group entities, as well as the personal residences of various Defendants. That same day, United States Magistrate Judges Patricia T. Morris and Timothy P. Greeley found probable cause to search each target location and issued at least seven separate search warrants. Law enforcement searched all target locations the next day. Four of the five Defendants—Jeffrey Bartlett, Brian Bartlett, Andrew Semenchuk, and Adam Ball—seek to

suppress evidence seized throughout these searches, collectively arguing the warrants were overbroad—in violation of the Fourth Amendment's particularity requirement—and lacked probable cause.

But all motions will be denied. As explained below, Defendants largely lack standing to challenge the searches of SSI Group offices and headquarters. And even if all Defendants had standing to challenge all warrants, suppression is not warranted because all warrants provided probable cause and were sufficiently particular.

## I.

### A. Factual Background

Defendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, Brian Bartlett, and Anthony Thelen are charged with conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count I); conspiracy to defraud the United States, 18 U.S.C. § 371 (Count II); and wire fraud/aiding and abetting, 18 U.S.C. § 1342/18 U.S.C. § 2 (Counts III–XV). ECF No. 132. All charges stem from Defendants' alleged conduct involving Surveying Solutions Inc. (SSI)[1] and related companies, which the Government generally alleges defrauded the United States of hundreds of thousands of dollars through transportation contracts with the Michigan Department of Transportation (MDOT) from early 2011 through mid-2019. *See generally id.*

Defendants' alleged fraudulent conduct is best considered in three parts. First, on the front end, the Government alleges Defendants conspired to fraudulently obtain and maintain SSI's certification as a Disadvantaged Business Enterprise to obtain preferential status when bidding on

---

[1] SSI currently advertises itself as Michigan's "premier consulting firm," which specializes in "geospatial/surveying services." *About*, SSI, https://ssi-mi.com/about/ (last accessed Oct. 11, 2024) [https://perma.cc/T2TW-EQVV]. Across three Michigan offices in Standish, St. Johns, and Saginaw, SSI has nearly 120 employees, including professional surveyors, engineers, CAD technicians, and field crew members. *See id.*

transportation contracts with MDOT. *See id.* at PageID.1513–16. Second, once awarded a contract, the Government alleges Defendants fraudulently misrepresented SSI's overhead and labor costs to artificially inflate MDOT's reimbursement.[2] *Id.* at PageID.1516–20. Third, on the back end, the Government alleges Defendants orchestrated a scheme to split all ill-gotten gains equally at the end of each fiscal year for each Defendant's personal benefit. *Id.* at PageID.1520–22. Each part of Defendant's alleged fraudulent conduct will be discussed in turn.

### 1. Defendant's Alleged DBE Scheme

In 1983, the United States Department of Transportation (USDOT) created the Disadvantaged Business Enterprise (DBE) Program to "remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide. The primary . . . objective of the DBE [P]rogram is to level the playing field by providing small businesses owned and controlled by socially and economically disadvantaged individuals a fair opportunity to compete for federally funded transportation contracts." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022),   https://www.transportation.gov/ civil-rights/disadvantaged-business-enterprise   [https://perma.cc/LAA6-WW9U].   The   DBE Program achieves this objective in part by certifying certain businesses as DBEs. Although USDOT largely delegates certification to state and local agencies, federal regulation explains that an entity may only be certified as a DBE if it is (1) a small business, as defined by the Small Business Administration's regulations; (2) independent; and (3) "at least 51% owned by a socially or economically disadvantaged individual[]." 49 C.F.R. §§ 26.65(a), 26.69(b), 26.71.

---

[2] As explained in the Second Superseding Indictment, approximately "80-90%" of the relevant contracts between SSI and MDOT were funded by the United States Department of Transportation through the Federal Highway Administration. ECF No. 132 at PageID.1508.

To determine whether a DBE applicant is sufficiently "independent," reviewers "scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, [and] financial . . . resources" and "consider whether present . . . employer/employee relationships" between the owner of the potential DBE and personnel from non-DBE firms "compromise the independence of the potential DBE firm." 49 C.F.R. § 26.71(b). Turning to ownership, "women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, [and] Subcontinent Asian Americans" are presumably socially disadvantaged. 49 C.F.R. § 26.67(a)(1). And an individual owner is presumably economically disadvantaged if the owner's net worth is less than $1.32 million. 49 C.F.R. § 26.67(a)(2)(i), (b)(1)(i).

Certification is crucial because "the integrity of [the] DBE [P]rogram depends upon systematic procedures to ensure that only *bona fide* small firms, owned and controlled by socially and economically disadvantaged individual(s), are certified to participate as DBEs in DOT federally assisted programs." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (emphasis added) [https://perma.cc/LAA6-WW9U]. Indeed, certifying agencies "must deny [DBE] applications based on sham transactions or false representations, and . . . must decertify DBEs that engage in or make them." 49 C.F.R. § 26.69(g)(2). Importantly, once certified, DBEs may receive more contract opportunities because the DBE Program requires state and local transportation agencies that receive federal funding—like MDOT—to set goals to increase DBE participation in the transportation contracting industry. *See* 49 C.F.R. § 26.39.

SSI was a certified DBE before 2011, when SSI was owned by non-party Guy Spreeman. *See* ECF No. 37 at PageID.102; Opinion Letter from Sheryl G. Williams, Acting Associate Director, External Civil Rights Programs Division, U.S. Dept. of Transp., to Franklin

Adams, Manager, Business and Administrative Services Division, Mich. Dep't of Transp. (July 2

7, 2015), https://www.transportation.gov/sites/dot.gov/files/14-0071-Surveying%20Solutions%2

C%20Inc..pdf [https://perma.cc/SU3Z-VUBV] [hereinafter USDOT Letter]. But Spreeman

passed away in January 2011, and majority ownership of SSI "passed by default" to Defendant

Jeffrey Bartlett. *Id.* Because Defendant Jeffrey Bartlett was a "non-disadvantaged individual,"

"MDOT removed SSI's DBE certification in July 2011." *Id.*

On February 25, 2011—just after Defendant Jeffrey Bartlett acquired control of SSI—the

Government alleges that all Defendants entered into a written "Secret Agreement" that provided

that all Defendants would be equal owners of the "SSI Group"—a group of companies including

(1) SSI, (2) Southfield IT, (3) 2SI Development, LLC ("2SI"), (4) 3SI Building and Leasing, LLC

("3SI"); and (5) Geo Precision Services, LLC ("Geo"). *See* ECF No. 132 at PageID.1511, 1514,

1520. This Secret Agreement read as follows:

> It is the intent of this agreement that the Buyers and Sellers will each own a *20 percent undivided interest in the above named companies* at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, Stock, Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have *equal ownership of the companies* at the completion of the "Buy In" period.[3]

---

[3] Notably, the Government alleges that Defendants defrauded the United States when Defendant Semenchuk repeatedly represented to MDOT that he owned 51% of SSI *stock*, in part because Defendants' 2011 Secret Agreement suggests otherwise. *See infra* Section I.A.1. And the Government alleges Defendants acted in accordance with this 2011 Secret Agreement as late as 2017 by equalizing the net *profits* of the SSI Group entities, such that each Defendant personally received an equal 20% share. *See infra* Section I.A.3. But, beyond these allegations, the Parties have not provided any SSI Group entity's accounting statements, balance sheets, tax filings, or any other information about each entity's ownership structure or capitalization.

*Id.* at PageID.1514 (emphasis added). Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen signed this agreement as the "Sellers," while Defendants Adam Ball and Andrew Semenchuk signed as the "Buyers."[4] *Id.* at PageID.1515.

On June 2, 2011, shortly after signing the alleged 2011 Secret Agreement, Defendant Semenchuk—an Asian Pacific Islander and the purported sole owner of Geo—applied to certify Geo as a DBE. *See id.* at PageID.1511, 1513. Geo became DBE certified soon after. *See* USDOT Letter, pg. 2. One year later, in June 2012, Geo purchased 51% of SSI and became its majority owner. *Id.*; *see also* ECF No. 37 at PageID.106–07. In October 2012, "MDOT revoked Geo's DBE status because, after purchasing control of SSI, "Geo was no longer [an] independent business." USDOT Letter, pg. 2. Defendant Semenchuk then dissolved Geo, transferred Geo's assets to SSI, and operated "solely under SSI's name[] because [SSI] had better name recognition and a more established credit history." *Id.* So, by December 2012, Semenchuk—rather than Geo as an entity— was SSI's purported majority owner. *Id.* But the Government cites Defendants' 2011 Secret Agreement and alleges that Semenchuk, in reality, only owned a 20% share of SSI equal to all other Defendants, and "never had ultimate managerial control[.]" ECF No. 132 at PageID.1514.

On April 19, 2013, Semenchuk applied to certify SSI as a DBE. ECF No. 132 at PageID.1524. But MDOT denied the application for three main reasons. USDOT Letter, pg. 2–3. First, MDOT concluded that SSI was insufficiently independent because (1) it leased two of its three offices from 3SI, and (2) leased surveying equipment and cars from 2SI when 2SI was

---

[4] Less than two months after signing the alleged 2011 Secret Agreement, Defendant Brian Bartlett emailed Defendants Jeffrey Bartlett, Adam Ball, Anthony Thelen, and Andrew Semenchuk with the suggestion that all Defendants "sit down" and come up with a "better structure to the [SSI Group] org chart" so they could "easi[ly] keep [their] stories straight" when discussing the entities. ECF No. 113-2 at PageID.1138 (sealed). After Defendant Jeffrey Bartlett responded, Defendant Brian Bartlett replied to all Defendants, highlighting the need to "keep all of [their] lies straight so [they] don't look like idiots." *Id.* at PageID.1142.

partially owned by SSI executives Defendants Brian Bartlett and Anthony Thelen. *See id.* When pressed for more information, Semenchuk told MDOT officials—contrary to the 2011 Secret Agreement—that "neither he nor any owners of SSI possessed *any* ownership interest in" 2SI or 3SI, and that all were "totally separate and distinct entities." *Id.* (emphasis added). However, Semenchuk did not provide tax returns or outside lease agreements MDOT requested to corroborate his claims. *Id.* Second, MDOT "concluded that SSI could not prove by clear and convincing evidence that the transfer of ownership [to Semenchuk] occurred for reasons other than obtaining DBE certification[.]" *Id.*, pg. 5. Third, MDOT concluded that Defendant Semenchuk had not proven he controlled SSI. *Id.* at pg. 5–6. Indeed, MDOT noted that SSI may have actually been controlled by Defendant Jeffrey Bartlett, an experienced surveyor who owned SSI just before Semenchuk and Geo's purchase, and owned 48% of SSI after this purchase. *See id.*, pg. 6.

On July 27, 2015, the USDOT ultimately reversed MDOT's decision and directed MDOT to certify SSI as a DBE "without delay[.]" *Id.*, pg. 7; ECF No. 132 at PageID.1516. The USDOT found "nothing in the record" to suggest Defendant Brian Bartlett and Anthony Thelen's dual-status as SSI employees and owners of 2SI and 3SI compromised SSI's independence. USDOT Letter, pg. 4. Although "70% of SSI's business account payments (excluding personnel costs) were paid to [2SI and 3SI], the evidence in the record indicate[d] that the transactions between SSI and 2SI/3SI were arms-length transactions." *Id.* USDOT disagreed with MDOT's conclusion that Defendant Semenchuk purchased SSI solely to obtain SSI's DBE certification because, "in [his] words, he purchased SSI because he 'wanted to expand [Geo], eliminate competition, and . . . make a profit.'" *Id.*, pg. 6. Although Defendant Jeffrey Bartlett owned 48% of SSI and was an experienced surveyor, the USDOT found no evidence that he had "the power or authority to control" SSI after Defendant Semenchuk's purchase. *Id.*

On August 28, 2014, seemingly in celebration of SSI's DBE certification, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Adam Ball, Andrew Semenchuk, and Anthony Thelen the following email:

> Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure.

ECF No. 132 at PageID.1516 (emphasis in original).

Defendant Semenchuk submitted annual "No Change Affidavits" to MDOT to maintain SSI's DBE certification in July of 2016, 2017, and 2018. *Id.* at PageID.1515. Through these affidavits, Semenchuk affirmed that he—a "socially disadvantaged" individual—was still SSI's majority owner. *See* 49 C.F.R. § 26.83(j). The Government alleges these representations were fraudulent because, per the 2011 Secret Agreement, Semenchuk was not SSI's majority owner and, like all other Defendants, only owned a 20% share of the SSI Group. ECF No. 132 at PageID.1515.

At bottom, the Government characterizes Defendants' alleged DBE misrepresentations and omissions as an *object* of Defendants' conspiracy to defraud the United States, charged in Count II of the Second Superseding Indictment.[5] *See* ECF No. 132 at PageID.1523.

### 2. Defendants' Alleged Overbilling Scheme

The Government also alleges that, after MDOT awarded SSI various transportation contracts, Defendants artificially created and inflated costs subject to MDOT reimbursement through a series of fraudulent misrepresentations about SSI's relationship with the other SSI Group companies and its own employees. *See id.* at PageID.1516–22.

---

[5] Accordingly, the Government need not necessarily prove at trial that SSI's DBE status actually increased the amount of contracts MDOT awarded to SSI. *See United States v. Thompson*, 366 F.2d 167, 171 (6th Cir.1966) ("Success in defrauding the United States is not an element of [18 U.S.C. § 371], nor is it required that the government actually have been cheated out of money or property." (internal quotations omitted)) *accord United States v. Ferguson*, 844 F. Supp. 2d 810, 819 (E.D. Mich. 2012).

Before turning to Defendants' alleged overbilling, it is necessary to explain how MDOT paid SSI on each awarded contract. According to the Government, MDOT paid SSI by multiplying SSI's "direct labor costs" by an "indirect overhead rate" and then applying a fixed 11% incentive fee, intended to provide SSI with a profit. *See id.* at PageID.1509–10; *see also* ECF No. 88-1 at PageID.461–62 (sealed). SSI's "direct labor costs" were calculated on a contract-by-contract basis, by considering the number of SSI employees who worked on a contract, the number of hours each employee worked, and each employee's hourly rate. *See* ECF Nos. 132 at PageID.1509; 88-1 at PageID.461–62 (sealed)*.* SSI's "indirect overhead rate," on the other hand, was calculated through an annual "pre-qualification process" which considered  SSI's overhead and labor expenses throughout the prior fiscal year. *See id.* Generally, contractors may include rental costs in purported overhead expenses, subject to reimbursement. *See* 48 C.F.R. § 31.205-36. But, critical to the Government's case, if the contractor rents real or personal property from a *commonly-controlled entity*, federal regulations prohibit the contractor from seeking full reimbursement. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the *normal costs of ownership*, such as "depreciation, taxes . . . and maintenance" for the specific piece of rented property. 48 C.F.R. § 31.205–36(b)(3); *see also* ECF Nos. 132 at PageID.1518; 88-1 at PageID.467–68 (sealed).

Ultimately, to pay and reimburse SSI for awarded contracts, MDOT wired funds from its financial institution in Auburn Hills, Michigan, to SSI's Huntington National Bank account in Columbus, Ohio. ECF No. 132 at PageID.1522. The Government identified thirteen wire transfers from MDOT to SSI throughout 2018 and 2019:

| DATE | AMOUNT |
|---|---|
| December 7, 2018 | $6,824.16 |
| December 7, 2018 | $74,570.94 |
| December 10, 2018 | $19,545.10 |

| December 12, 2018 | $73,038.61 |
|---|---|
| December 12, 2018 | $116,353.50 |
| December 12, 2018 | $26,139.49 |
| December 19, 2018 | $125,351.21 |
| December 19, 2018 | $80,238.15 |
| June 21, 2019 | $75,451.26 |
| June 27, 2019 | $120,391.62 |
| July 25, 2019 | $105,143.78 |
| July 25, 2019 | $65,103.49 |
| July 29, 2019 | $61,935.75 |
| **TOTAL:** | $950,087.06 |

*See id.* at PageID.1525–27. Accordingly, as alleged, Defendants' overbilling is *both* an object of their conspiracy to defraud the United States (Count II) *and* forms the factual basis for thirteen separate counts of wire fraud (Counts III—XV). *See id.* at PageID.1512–13, 1525–27.

With this context in mind, the Government alleges Defendants defrauded MDOT through two separate schemes flush with fraudulent misrepresentations and omissions. *See* ECF No. 132 at PageID.1523. The first concerned SSI's relationship to other companies. *Id.* The second concerned SSI's relationship to its own employees. *Id.*

### a. Costs Attributable to Commonly-Controlled SSI Group Companies

First, the Government alleges that, despite Defendants' 2011 Secret Agreement and other evidence indicative of common control, Defendants fraudulently represented that the other SSI Group companies—2SI, 3SI, and Southfield IT—were independent such that Defendants could charge MDOT artificially-inflated prices for fictitious rental "costs." *See id.* at PageID.1516–19. As alleged, each SSI Group company had a distinct role to play.

### i. 2SI

2SI was SSI's equipment supplier. According to the Second Superseding Indictment, SSI rented surveying equipment and company cars from 2SI and sought MDOT's reimbursement for these rental costs in full because Defendants represented that 2SI was independent from SSI. *See*

ECF Nos. 132 at PageID.1517–18; 88-1 at PageID.471–76 (sealed). But all Defendants signed the 2011 Secret Agreement, providing that 2SI and SSI were equally owned by all five Defendants. ECF No. 132 at PageID.1514. Separate from the alleged Secret Agreement, "2SI was organized in 2004 by [Defendant] Brian Bartlett." ECF No. 88-1 at PageID.471 (sealed). At all relevant times, Defendant Jeffrey Bartlett was held out as 2SI's owner, and he, Defendant Brian Bartlett, and Defendant Anthony Thelen were authorized signers on 2SI's bank account. *Id.* Moreover, 2SI's registered agent was SSI's certified public accountant. *Id.* at PageID.472. And, from January 2016 through February 2019, 99.2% of 2SI's funding came from SSI. *Id.* at PageID.478.

By fraudulently misrepresenting SSI's relationship to 2SI, MDOT auditors estimated that Defendants overbilled MDOT by nearly $6,000,000 from 2016 through 2018. *See id.* at PageID.475–76. For example, in 2017, SSI leased a mobile surveying scanner from 2SI. *Id.* at PageID.472. Under the terms of the lease agreement, SSI paid 2SI $13,000 per month to rent the scanner. *Id.* However, SSI could only use the scanner on "26 days" throughout the year and owed 2SI $6,000 each day it used the scanner in excess of this limitation. *Id.* According to a spreadsheet Defendant Semenchuk provided MDOT auditors in 2018, later obtained by the FBI, *see supra* Section I.B., SSI used the mobile scanner on 40 days throughout 2017, such that SSI "should have paid no more than *$84,000*" for its excessive use. *Id.* at PageID.472–73 (emphasis added). But SSI billed MDOT *$1,398,045* for its excessive scanner use that year. *Id.* at PageID.473. Aside from this inflated excessive-use bill, the Government alleges that, since 2SI and SSI were commonly controlled, SSI was only entitled to recover the depreciation of the two scanners it rented from 2SI—totaling "approximately *$200,000*" per year. *Id.* (emphasis added). Yet, SSI billed MDOT *$1,553,045* for the annual use of the rented scanners. *Id.* In total, MDOT auditors estimate that, as

a result of Defendants' fraudulent misrepresentations, MDOT overpaid SSI for mobile-scanner-rentals by $3,893,631 from 2016 through 2018. *Id.* at PageID.475.

Similarly, from 2013 through 2017, SSI entered into five rental agreements with 2SI for company cars. *Id.* According to rental agreements, SSI paid 2SI $1,700 per month for new cars and $1,000 per month for used cars. *Id.* SSI paid 2SI nearly $1,000,000 to rent 56 separate cars throughout FY 2017 alone, and billed MDOT for this cost. *See id.* But the FBI's investigation, *see supra* Section I.B., revealed that SSI paid "above-market . . .rates" for these cars. *Id.* For example, the FBI found that one of the 56 cars SSI rented from 2SI was a truck that SSI rented from 2014 through 2018. *Id.* The "four year total" of SSI's rental costs for this truck, billed to MDOT, was *$81,600*. *Id.* But, according to the Government, "the MSRP" of the truck is only *$35,310*. *Id.* Aside from market value, the Government alleges that, because 2SI and SSI were commonly controlled, SSI was only entitled to reimbursement for the "actual cost of [each car's] ownership." *Id.*; *see also* ECF No. 132 at PageID.1518. On this point, and as a further example of Defendants' overbilling, the FBI concluded that depreciation for the specific truck would have been approximately *$7,062* per year, less than half of the *$20,400* SSI included in its overhead rate subject to MDOT reimbursement. ECF No. 88-1 at PageID.475 (sealed) ("Additional . . . taxes and maintenance would not justify the total of $20,400 paid to 2SI and included in overhead."). In total, MDOT estimates that SSI overbilled MDOT on rental car costs by $2,038,528.70 from 2016 through 2018. *Id.* at PageID.476.

### ii. 3SI

3SI served as SSI's landlord. Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen co-founded 3SI in 2009 and were, at all relevant times, authorized signers on 3SI's bank

account. *Id.* at PageID.468. From January 2016 through February 2018, 99.8% of the deposits to 3SI's bank account "were from accounts controlled by SSI or 2SI[.]" *Id.* at PageID.478.

Yet the Government alleges Defendants "agreed to and did submit fraudulent claims to MDOT for rent payments from SSI to 3SI, [hiding] from MDOT the fact that SSI and 3SI" were commonly controlled. ECF No. 132 at PageID.1519. Had Defendants disclosed that SSI and 3SI were commonly controlled, the Government notes, they would have only received MDOT's reimbursement for the normal costs of ownership (taxes, depreciation, maintenance). *Id.* But the Government alleges SSI billed MDOT for the full amount SSI paid 3SI to rent office space in Standish and St John's, Michigan. *See* ECF No. 88-1 at PageID.468–69. For example, in 2017, SSI paid 3SI *$217,720* to rent its Standish Headquarters and was reimbursed by MDOT accordingly. *See id.* at PageID.469. But, the FBI estimated that "the normal cost of ownership" for this building in 2017 was just over *$20,538. Id.* (noting the building had a "conservative" initial value of $450,000, such that, considering a 39-year useful life, annual depreciation would total approximately $11,538 and annual taxes would total $9,000). In total, MDOT auditors estimate that, from 2016 through 2018,  SSI overbilled MDOT by $518,550.58 for its rental costs to 3SI. *Id.* at PageID.471.

### iii. Southfield IT

As its name suggests, Southfield IT was SSI's IT provider.[6] Southfield IT was founded by Defendant Ball. *Id.* at PageID.463. Southfield IT's P.O. Box was allegedly obtained by SSI office manager Courtney Stodolak. *Id.* at PageID.464; *see also United States v. Bartlett*, No. 1:23-CR-

---

[6] Southfield IT was the registered trade  name for National Elevation Certificates, LLC ("NEC"). *See* ECF Nos. 132 at PageID.1510; 88-1 at PageID.463 (sealed). Although some portions of the record refer to Southfield IT as "NEC," this Opinion and Order will use only the former for consistency.

20676, 2024 WL 1715397, at *3 (E.D. Mich. Apr. 22, 2024) (noting Stodolak was "the longest-serving SSI employee" and attempted to—but did not—purchase majority ownership of SSI when Spreeman passed away in 2011). In February 2015, Southfield IT opened a bank account and listed Defendant Ball as one of its signers. ECF No. 132 at PageID.1517. Other signers included Defendants Thelen and Brian Bartlett. ECF No. 88-1 at PageID.465 (sealed). Once Southfield IT's account was opened, the Government alleges 99.2% of its funding was furnished through SSI and that 95.9% of these funds were "ultimately transferred back" to Defendants and their spouses. ECF No. 132 at PageID.1517. Indeed, the following withdraws were made from Southfield IT's bank account from January 2016 through 2019:

| DESCRIPTION | AMOUNT | % OF WITHDRAWAL |
|---|---|---|
| Defendant Adam Ball | $3,955,057 | 71% |
| Tara Semenchuk | $776,601 | 14% |
| Sarah Ball | $602,674 | 11% |
| Martin Chevrolet[7] | $62,920.64 | 1% |
| Network Services Group | $53,118.15 | 1% |
| Internet Service Providers | $52,689.58 | 1% |
| Other Expenditures | $39,377 | 1% |
| **Total:** | **$5,566,909.97** | **100%** |

*See* ECF No. 88-1 at PageID.465 (sealed).

Despite this evidence of common control, the Government alleges Defendants represented to MDOT that Southfield IT was independent from SSI, and created "fictitious contracts and invoices" between the two companies to "fraudulently inflate their overhead costs which were then reimbursed by MDOT." ECF No. 132 at PageID.1516. SSI billed MDOT a total of *$1,575,304.30*

---

[7] The FBI uncovered that, on August 30, 2016, Southfield IT issued a $62,920.64 check to Martin Chevrolet that Defendant Adam Ball signed. ECF No. 88-1 at PageID.465, n. 6 (sealed). But, on July 11, 2019, FBI agents "observed Sarah Ball"—Defendant Ball's wife—driving a 2016 Chevrolet Suburban, registered to Southfield IT on August 31, 2016. *Id.* Despite the car's registration, FBI agents observed Sarah driving the car for personal purposes, such as dropping her children off at daycare and going to the gym. *Id.*

for IT services it purchased from Southfield IT  throughout FY 2015, 2016, and 2017. ECF No. 88-1 at PageID.463 (sealed). But the FBI's investigation, discussed in detail *infra* Section I.B., concluded, that SSI spent "less than *$145,184.73* on IT services . . . from January 2016 through February 2019." *Id.* (emphasis added). MDOT ultimately estimates that, from 2016 through 2018, it overpaid SSI nearly $2,000,000 "as a result of [Defendants'] fraudulent representations regarding IT expenditures. *Id.* at PageID.467.

Notably, the Government's investigation uncovered evidence suggesting that Southfield IT was not SSI's real IT provider. As explained *infra* Section I.B., investigating agents interviewed "Individual A," the owner of Network Services Group (NSG). *Id.* at PageID.466. Individual A told the FBI that NSG—rather than Southfield IT—provided SSI with IT services as early as 2009. *Id.* Indeed, on December 31, 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian Bartlett, and Jeffrey Bartlett  an email entitled "SSI IT Company," which noted all Defendants discussed "forming an IT company for OH reasons"[8] and suggested "all of [NSG']s bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." ECF No. 113-1 at PageID.1007 (sealed). Defendant Jeffrey Bartlett replied, "I Like it!" *Id.* at PageID.1008. Defendant Adam Ball replied, "Sounds good to me. Creative." *Id.* at PageID.1010. Defendant Brian Bartlett replied, "I think it sounds pretty crafty—I like it[.]" *Id.* at PageID.1012. Defendant Thelen replied, "[s]ounds legit." *Id.* at PageID.1013. In accordance with these emails, Individual A reported that, in early 2016, Defendant Semenchuk "began directing [him] to re-issue certain SSI invoices to Southfield IT," such that he "understood that NSG's work always supported SSI

---

[8] The Government seemingly alleges that "OH" referred to SSI's reimbursable overhead rate. *See* ECF No. 113-1 at PageID.974–75.

regardless of [whether] it was billed to SSI or Southfield IT[.]" ECF No. 88-1 at PageID.467 (sealed).

### b. Direct Labor Costs and Payroll Representations

In addition to fraudulently misrepresenting SSI's relationship to 2SI, 3SI, and Southfield IT to artificially inflate SSI's reimbursable *overhead rate*, the Government alleges Defendants artificially inflated SSIs reimbursable *direct labor costs* by billing MDOT for the work of "ghost employees," including their spouses. ECF No. 132 at PageID.1510, 1519–20.

On September 25, 2015, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Anthony Thelen, Adam Ball, and Andrew Semenchuk an email entitled "Our Hours," which stated the Defendants would "have a tough time billing out projects if [they] d[id] not have more time to put on them that is *semi-legitimate*." ECF No. 113-2 at PageID.1352 (sealed) (emphasis added). In addition to suggesting Defendants "come up with additional scanner charges" from 2SI, Defendant Ball asked the group whether Defendants could "raise hours/wages for [their] wives." *Id.* Defendant Jeffrey Bartlett responded that Defendants "may have to give [their wives] bigger raises to *help out on overhead*[.]" *Id.* (emphasis added). And, in May 2016, Defendant Semenchuk emailed all Defendants suggesting they represent to MDOT that their wives "performed marketing duties" because Defendants gave their wives "large bonuses" which "need[ed] to [be] justif[ied]." ECF No. 113-3 at PageID.1387.

In accordance with these emails, SSI's 2017 payroll identified that four of the five Defendants' spouses—Sarah Ball, Jenny Bartlett, Celena Thelen, and Jessica Bartlett—worked on various MDOT contracts as "project assistants." ECF No. 88-1 at PageID.480 (sealed). But MDOT auditors concluded that "none" of these spouses "appear[ed] to have assisted on projects." *Id.* The

FBI's investigation reached the same conclusion.[9] *See id.* According to investigating FBI agents, the timesheets Defendants provided MDOT to corroborate their wives' work contained "differing signatures." *Id.* at PageID.481. Yet, Defendants' spouses were among the highest-paid "employees" at SSI, and received hundreds of thousands of dollars in annual bonuses. *Id.* In FY 2017 alone, SSI included $130,156 in its reimbursable direct labor costs to compensate Defendants' spouses. *Id.* Ultimately, MDOT estimates that, from 2016 through 2018, it overpaid SSI approximately $850,360.14 as a result of Defendants' alleged fraudulent payroll misrepresentations. *Id.*

### 3.  Defendants' Alleged Equalization Scheme

The Government alleges Defendants *personally* benefited from the fruits of their alleged fraudulent overbilling labor by "equalizing" the income of all SSI Group companies, such that each Defendant received, pursuant to the 2011 Secret Agreement, their 20% share of the Groups' net income at the end of each fiscal year. ECF No. 132 at PageID.1520–22.  To do so, the Government alleges Defendants would offer fictitious "loans" to one another and take fake loans from the SSI Group entities, with the expectation that the loans would never be paid.[10] *Id.* For

---

[9] The FBI's investigation revealed that at least two of Defendants' spouses had other full-time jobs. ECF No. 88-1 at PageID.481 (sealed). In 2019, local news covered the opening of Jenny Bartlett's spa in Midland, Michigan, and reported that she had previously owned spas in Michigan and California. ECF No. 88-1 at PageID.481 (sealed); *see also* Lori Qualls, *Swae' Spa Offers Relaxation-Naturally*, MIDLAND DAILY NEWS (Mar. 12, 2019, 7:33 AM), https://www.ourmidland.com/news/article/Swae-spa-offersrelaxation-nbsp-naturally-13681099. php. And Sarah Ball has purportedly taught at a high school in Saginaw, Michigan, since 2001. ECF No. 88-1 at PageID.481 (sealed).

[10] Evidence also suggests Defendants used fake "loans" to keep their "books clean" and avoid administrative or criminal investigation. In October 2016, SSI's office manager emailed all Defendants with a "breakdown" of SSI, 2SI, 3SI, and Southfield IT's bank accounts. ECF No. 113-1 at PageID.1032 (sealed). Defendant Ball responded, "[s]hould we take some out of [SSI's] account again? Probably a little risky keeping that much in there[.]" *Id.* Defendant Semenchuk replied:

example, according to the Second Superseding Indictment, on December 28, 2017, Defendant

Jeffrey Bartlett sent an email to SSI's accountant titled "SSI Equalization[]" stating:

> I guess I personally was thinking more on the lines of getting "loans" from SSI in the 2017 year that we know would never be paid back and keep us all equal from year to year.

*Id.* at PageID.1521. Three minutes later, Semenchuk sent Ball, Thelen, and Brian Bartlett an email

titled "Update & Question" stating:

> [E]xactly bonuses to keep me under $350 and the rest loans that will never be paid back.[]

*Id.* Five minutes later, Ball responded:

> I thought there was some discussion of doing the loans 1/1/2018 so that 2017 did not show monster loans on the books to the owners for DBE.

*Id.* Nine minutes later, Brian Bartlett responded:

> I thought the 2018 loans were for if we received a bunch more money and were not able to divert it to 2SI and [Southfield IT] because they are maxed out. Then we would do so after the first of the year for Adam [Ball], Brian [Bartlett], [Anthony Thelen] and Jeff [Bartlett]. Andy [Semenchuk] would get loans from SSI then . . .

*Id*. at PageID.1522.

---

> I think what we should do, is make a payment to 2SI for some days []of scanner use [s]o Brian [Bartlett] and [Anthony Thelen] [c]an take their loans/distributions from 2[SI] and do an IT payment as well (for Adam [Ball]) to [Southfield IT].
>
> This method keeps the SSI books clean. Jeff [Bartlett] and I will take loans from SSI. At the end of the year, Jeff and I will have to pay our loans back . . . [a]nd then [can] take the loans from 2SI/[Southfield IT] like we did last year.
>
> I know it is complicated and paranoia, but [] stay with the flow (clean books) . . .
>
> Or just all take loans from SSI and sort it out later…

*Id.* at PageID.1031.

**B. Investigative Background**

Four of the five Defendants—Brian Bartlett, Jeffrey Bartlett, Adam Ball, and Andrew Semenchuk—seek to suppress evidence seized during searches of their houses and SSI Group offices in July 2019. ECF Nos. 88 (sealed); 98 (sealed); 116; 128. These searches, the warrants that authorized them, and the investigation that led to them will be discussed in greater detail below.

On July 24, 2019, FBI Special Agent Bryan Butler filed seven separate applications for warrants to search the following seven "Target Locations:"[11]

1.  SSI's Standish Headquarters, located at 4471 M-61 in Standish, Michigan, ECF No. 88-1 at PageID.457–87 (sealed);

2.  SSI's St. Johns Office, located at 10000 South U.S. 27 in St. Johns, Michigan, *id.* at PageID.494–524;

3.  SSI's Saginaw Office, located at 3734 Fortune Blvd. in Saginaw, Michigan, *id.* at PageID.525–55;

4.  NSG's Office, located in Suites 405 and 406 at 100 South Jefferson in Saginaw, Michigan,[12] *id.* at PageID.558–88;

5.  Defendant Brian Bartlett's Residence in Bentley, Michigan, *id.* at PageID.591–623;

6.  Defendant Adam Ball's Residence in Saginaw, Michigan, ECF No. 98-1 at PageID.691–723 (sealed); and

---

[11] Through their collective motions to suppress, Defendants only challenge these seven warrants. *See generally* ECF Nos. 88 (sealed); 98 (sealed); 116; 128. This Court does not know, because the Parties do not discuss, whether Agent Butler applied for additional warrants to search other SSI Group corporate offices, or the residences of other Defendants.

[12] Agent Butler's affidavit in support of this warrant explained that NSG "maintain[ed] two servers" at this address which "were sold to SSI executives." ECF No. 88-1 at PageID.567 (sealed). But "one was invoiced to SSI and the other was invoiced to Southfield IT." *Id.* Further, Agent Butler's affidavit noted NSG maintained a third server at this address which stored "emails and other data from the SSI owned servers." *Id.* And Agent Butler explained that "[a]ll SSI employees c[ould] access these servers through a [v]irtual [p]rivate [n]etwork . . . connection," and could "sent and receive files" through these servers "using software." *Id.*

7.  Defendant Andrew Semenchuk's Residence in Rives Junction, Michigan, *see* ECF No. 116 at PageID.1393.

Each warrant application expressly incorporated Agent Butler's affidavit in support of probable cause, *see, e.g.*, ECF No. 88-1 at PageID.457 (sealed), and—as the Parties agree—each affidavit is identical except for some unique descriptions of each Target Location. *See generally id.* at PageID.457–588; *see also* ECF Nos. 88-1 at PaqgeID.440 (sealed); 116 at PageID.1395.

Agent Butler's investigation began in March 2019. ECF No. 88-1 at PageID.458 (sealed). Importantly, this criminal investigation occurred parallel to an investigation by the USDOT—both of which were prompted by MDOT's 2018 routine audit of SSI's billings which, in Agent Butler's words, "identified procedures, conduct, and statements that were indicative of fraudulent billing practices by SSI and its executives" and concluded that "SSI overbilled MDOT by as much as $9.2 million during fiscal years 2016 to 2018." *Id.* at PageID.458–59; 60–61; *see also United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 1715397, at *7–9 (E.D. Mich. Apr. 22, 2024) (detailing MDOT and USDOT administrative investigations, noting SSI paid over $3,000,000 to settle MDOT's administrative overbilling claims, and further noting USDOT suspended Defendants from participating in federal transportation contracts pending the conclusion of these criminal proceedings). So, Agent Butler's investigation included reviewing "records maintained by MDOT" throughout its investigation—which included SSI's payroll records, employee timecards, and rental agreements with the other SSI Group companies. *Id.* at PageID.460–61. Further, Agent Butler reviewed all relevant representations Defendants made to MDOT about SSI Group ownership, some of which date back to 2010. *See id.* at PageID.463, 470. Agent Butler also reviewed the banking activity of SSI, 2SI, 3SI, Defendants, and Defendants' spouses, dating back to at least 2016. *See id.* at PageID.460, 463–65, 467, 471. Moreover, Agent Butler reviewed relevant corporate records maintained by the Michigan Secretary of State and considered

- 20 -

numerous public news articles about SSI, 2SI, Defendants, and their spouses. *See id.* at PageID.471–74, 481.

Agent Butler's investigation also included two witness interviews. As discussed, Butler interviewed "Individual A," who reported that their company, NSG, provided IT services to SSI instead—and under the guise—of Southfield IT. *See id.* at PageID.466. But Individual A also reported that, around March 2011, Defendant Semenchuk was precluded from working with SSI because he had recently "left his position as Chief Professional Surveyor" with MDOT. *Id.* at PageID.476. Yet, Semenchuk directed Individual A to "create[] an email extension," which allowed Semenchuk to communicate and work with SSI. *Id.* (noting "Individual A understood that[,] although Semenchuk used the Geo email extension, he worked for SSI the entire time"). Agent Butler also interviewed "Individual B"—a senior MDOT auditor—who opined that SSI and 3SI were commonly controlled as late as 2010, yet reportedly received an email from Defendant Jeffrey Bartlett in February 2011 in which Defendant Jeffrey Bartlett expressly denied common control. *Id.* at PageID.470–71 ("[P]lease consider this letter my sworn statement that I do not in any way own any part of the [SSI Standish Headquarters] that we lease.").

Ultimately, based on his investigation and his nine years of experience working for the FBI, Agent Butler proffered "there [was] probable cause to believe that [Defendants] have participated in a fraud scheme in violation of 18 U.S.C. §§ 1343 and 1349, and money laundering in violation of . . . 18 U.S.C. § 1956 and 195, and that evidence of [these] offenses may be found" at each of the seven Target Locations. *See, e.g.*, *id.* at PageID.482.

On July 24, 2019—the same day Agent Butler filed his warrant applications and supporting affidavits—Magistrate Judges Patricia T. Morris and Timothy P. Greeley found probable cause and

issued warrants authorizing the searches of all Target Locations on or before August 7, 2019.[13] *See* ECF Nos. 88-1 at PageID.488, 520, 556, 589, 624 (sealed); 98-1 at PageID.724 (sealed); 116 at PageID.1395.

Law enforcement searched all Target Locations on July 25, 2019. *See* ECF Nos. 126-3 at PageID.1493–96;. 88-1 at PageID.436–37 (sealed); 98 at PageID.671 (sealed). Throughout the search of SSI's Standish Headquarters, law enforcement seized 60 individual "items," some of which encompassed multiple documents or pieces of property. *See* ECF 126-3 at PageID.1493–96. This Court largely does not know—because the Parties have not identified—what evidence was specifically seized throughout the searches of the other six Target Locations. Yet Defendants Brian Bartlett, Jeffrey Bartlett, Adam Ball, and Andrew Semenchuk seek broad suppression of this largely unidentified evidence, collectively arguing that all warrants violated the Fourth Amendment. *See generally* ECF No. 88 (sealed); 98 (sealed); 116; 128.

## II.

The Fourth Amendment guarantees that "no [w]arrants shall issue, but upon *probable cause*, supported by [o]ath or affirmation, and *particularly* describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV (emphasis added). Fourth Amendment violations may result in suppression of tainted evidence under the exclusionary rule, absent attenuation or exception. *United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011); *see also United States v. Waide*, 60 F.4th 327, 338 (6th Cir. 2023) ("Courts are required to suppress evidence that is directly or indirectly 'the tainted fruit' of unlawful government conduct.'" (quoting *Nix v. Williams*, 467 U.S. 431, 441 (1984))).

---

[13] Judge Greeley issued the warrant to search SSI's St. Johns Office, which is geographically located in the Western District of Michigan. Judge Morris issued all other warrants. *Compare* ECF No. 88-1 at PageID.520 (sealed) *with id.* at PageID.488, 556, 589, 624.

### III.

Defendants Brian Bartlett, Jeffrey Bartlett, Adam Ball, and Andrew Semenchuk collectively seek to suppress evidence seized from the searches of all Target Locations, arguing (1) all warrants were constitutionally overbroad in violation of the Fourth Amendment's particularity requirement, and (2) the warrants to search their respective residences (the "Residential Warrants") lacked probable cause.[14] *See generally* ECF Nos. 88 (sealed); 98 (sealed); 116; 128. The Government responds that, as a threshold matter, Defendants lack standing to challenge the warrants to search SSI and NSG offices (the "Corporate Warrants"). *See generally* ECF Nos. 106; 118; 121; 126.  Regardless, the Government argues that no warrant was overbroad, and all Residential Warrants were supported by probable cause. *See generally id.*

### A. Standing

The first issue is, therefore, whether Defendants have standing to challenge the search warrants and, if so, which ones. As explained below, (1) no Defendant has standing to challenge the Corporate Warrants, (2) Defendant Jeffrey Bartlett has not demonstrated suppression standing whatsoever, and (3) Defendants Brian Bartlett, Andrew Semenchuk, and Adam Ball each have standing to challenge the warrant authorizing the search of their specific residence.

Technically, the term "standing" is "somewhat imprecise" in the context of Fourth Amendment suppression. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "But the Sixth Circuit continues to use the term 'standing' to refer to whether a Defendant has an objectively reasonable

---

[14] Notably, only Defendants Brian Bartlett and Jeffrey Bartlett appear to challenge *all* warrants as unconstitutionally overbroad. *See* ECF Nos. 88 at PageID.439 (sealed); 128. Although Defendant Adam Ball notes that he "joins" Defendant Brian Bartlett's motion in full, the substance of Defendant Ball's motion challenges only the warrant authorizing the search of his residence as both overbroad and lacking probable cause. *See* ECF No. 98 at PageID.674 (sealed). And Defendant Andrew Semenchuk concedes he lacks standing to challenge any warrant other than the one authorizing the search of his own residence. *See* ECF No. 116 at PageID.1395–96.

expectation of privacy in the place searched or the things seized to assert a cognizable Fourth Amendment challenge." *United States v. Andrews*, No. 1:22-CR-20114-2, 2024 WL 578571, at *3 (E.D. Mich. Feb. 13, 2024); *see also United States v. Russell*, 26 F.4th 371, 374 (6th Cir. 2022) (noting "standing" is "shorthand" for a suppression movant's showing that their personal Fourth Amendment rights were violated throughout a search or seizure). Each Defendant seeking suppression has the burden of demonstrating standing. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *United States v. Noble*, 762 F.3d 509, 526 (6th Cir. 2014).

### 1.  Residential Warrants

The Government does not dispute that each Defendant seeking suppression has standing to challenge the specific search of their respective residence. *See* ECF Nos. 106; 118; 126; 121. Nor could it.  "Home owners . . . of course have a reasonable expectation of privacy in their homes and in their belongings . . . inside the home." *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001).  But—unlike all other Defendants seeking suppression—Defendant Jeffrey Bartlett has not averred that his residence was ever searched. Instead, Defendant Jeffrey Bartlett broadly "moves for an order suppressing the fruits of *the search* in this matter for the same reasons pressed by [Defendants] Brian Bartlett[] . . . and . . . Andrew Semenchuk[.]" ECF No. 128 at PageID.1499 (emphasis added). What search? Defendant Jeffrey Bartlett does not say. Although Defendants Brian Bartlett and Andrew Semenchuk have standing to challenge the warrants authorizing the searches of their respective residences, Defendant Jeffrey Bartlett has not even attempted to demonstrate how he has a subjectively reasonable expectation of privacy in either of his Codefendant's homes. *See* ECF No. 128; *see also United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) ("A defendant's standing is determined independently from his co-defendant's standing with regard to the same items and places that are searched.").

So, with the exception of Jeffrey Bartlett—who has not even averred that his residence was ever searched—all Defendants have standing to challenge the respective Residential Warrant authorizing the search of their house.

### 2. Corporate Warrants

But no Defendant has standing to challenge the Corporate Warrants—those authorizing the searches of SSI's Standish Headquarters, SSI's St. Johns Office, SSI's Saginaw Office, and NSG's Office. Each Defendants' standing will be addressed in turn.

*Defendants Andrew Semenchuk and Jeffrey Bartlett.* Defendant Semenchuk readily concedes his lack of standing. ECF No. 116 at PageID.1395–96 ("Defendant Semenchuk has no personal privacy interest" in any search other than that of "his own residence.") And Defendant Jeffrey Bartlett's one-sentence suppression "motion" does not even attempt to articulate his reasonable expectation of privacy in any place searched under the Corporate Warrants. *See* ECF No. 128 at PageID.1499.

*Defendant Brian Bartlett.* Defendant Brian Bartlett contends that he has a reasonable expectation of privacy in the SSI Headquarters and Offices because he (1) was both an "owner" and an "executive" of the SSI-related entities, and (2) worked with these entities "on a daily basis." ECF No. 120 at PageID.1436 (internal quotations and citations omitted). Not so. Fourth Amendment rights are *personal. Rakas v. Illinois*, 439 U.S. 128, 133 (1978). Corporate officers and executives, therefore, do not "vicariously take on the privilege of the corporation under the Fourth Amendment." *United States v. Mohney*, 949 F.2d 1397, 1404 (6th Cir. 1991) (internal quotations omitted). True, corporate officers *may* have reasonable expectations of privacy in specific pieces of evidence seized from corporate buildings, such as documents they prepared or stored in their personal offices. *See id.*; *United States v. Bli*, 147 F. Supp. 2d 734, 740 (E.D. Mich.

2001); *see also United States v. Smith*, 898 F. Supp. 464, 468 (W.D. Ky. 1995) (citing *Mohney* and noting "an officer or a corporation has standing to challenge a corporate search and seizure if he has a reasonable expectation of privacy in the seized materials"); *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012), *aff'd*, No. 12-5328, 2013 WL 1164502 (D.C. Cir. Feb. 20, 2013) (same). But Defendant Brian Bartlett has not identified *any* specific evidence seized throughout the search of SSI's Headquarters and Offices, let alone attempted to argue that he had a reasonable expectation of privacy in such seized evidence.[15] *See* ECF No. 120 at PageID.1436–37.

Defendant Brian Bartlett next argues—without citing any legal authority—that he has a reasonable expectation of privacy in NSG's Office because "SSI entrusted [its] information to NSG with the understanding and expectation that it would . . . be kept private." ECF No. 120 at PageID.1437. As the Government aptly characterizes, this argument is "even more tenuous" than his first. ECF No. 126 at PageID.1481 ("SSI might have an expectation of privacy to assert if any of its property was seized from NSG [but] [t]hat would be an issue for SSI to litigate."). Indeed, by Defendant Brian Bartlett's own description, the "information" seized at NSG's Office belonged to SSI, not Defendant Brian Bartlett. ECF No. 120 at PageID.1437. And, as discussed, the mere fact that Defendant Brian Bartlett was employed as an SSI executive does not provide *him* with a reasonable expectation of privacy in the information *SSI* stored at NSG's Office or in NSG servers. *See United States v. Powell*, 943 F. Supp. 2d 759, 765 (E.D. Mich. 2013), *aff'd*, 847 F.3d 760 (6th

---

[15] The Government provided an itemized list of all evidence seized throughout the search of SSI's Standish Headquarters which, when cross-referenced with seizing officers' hand-drawn diagrams of the Headquarters' layout, reveal the precise location where each piece of seized evidence was found. Although Defendant Brian Bartlett seemingly had a personal office within SSI's Standish Headquarters, *see* ECF No. 126-2 at PageID.1488 (labeling room "Q" as "Brian Bartlett"), the *only* pieces of evidence seized from this office were an "appointment book" and a "lidar sheet." ECF No. 126-3 at PageID.1496.

Cir. 2017) ("Fourth Amendment Rights may not be vicariously asserted." (internal quotations omitted)). Defendant Brian Bartlett thus lacks standing to challenge the Corporate Warrants.

    *Defendant Adam Ball*. Conceding he has no standing to challenge the Corporate Warrants authorizing the search of SSI's St. Johns Office, SSI's Saginaw Office, and NSG's Office, Defendant Adam Ball argues only that he has a reasonable expectation of privacy in (1) his personal office within SSI's Standish Headquarters; and (2) "the laptop [he] used at work and additionally at home." ECF No. 125 at PageID.1468–69. The Government does not disagree.[16] ECF No. 126 at PageID.1476.

    In sum, no Defendant has standing to challenge the Corporate Warrants. Defendant Jeffrey Bartlett has not shown suppression standing whatsoever. Defendant Ball has standing to challenge the search of his residence, his office within SSI's Standish Headquarters, and his personal laptop. Defendants Brian Bartlett and Andrew Semenchuk have standing to challenge the searches of their respective residences.

### B. Alleged Fourth Amendment Violations

    But the significant ink spilled on standing is largely inconsequential. Even if all Defendants had standing to challenge all Corporate and Residential warrants, suppression is not warranted

---

[16] But "the only item seized from [Defendant Ball's office] was an employee roster." ECF No. 126 at PageID.1476; *see also* ECF Nos. 126-2 at PageID.1488 (labeling Ball's office as room "R"); ECF No. 126-3 at PageID.1496 (noting seizure of "employee roster" from "room R"). And the Government notes it "has no intention of offering that roster in evidence." ECF No. 126 at PageID.1477. As to Defendant Ball's laptop, the Government argues that all evidence derived from this search "were also seized as a result of other search warrants, including the SSI offices beyond his workstation and those other warrants Ball lacks standing to challenge," such that—even if the warrant authorizing this search violated the Fourth Amendment—suppression of any seized evidence is precluded "under the independent source doctrine." *Id.* at PageID.1477. As discussed *infra* Section III.B, this Court need not address the Government's exclusionary rule exception arguments because it concludes no warrant violated the Fourth Amendment in the first instance.

because no warrant violated the Fourth Amendment. Defendants collectively raise two arguments to the contrary. Both are without merit.

### 1. Particularity

First, the Defendants seeking suppression collectively argue that the Corporate and Residential warrants are constitutionally overbroad, in violation of the Fourth Amendment's particularity requirement.[17] *See* ECF Nos. 88 at PageID.446–50 (sealed); 98 (sealed); 116; 128.

### a.

The Fourth Amendment particularity requirement demands that warrants describe with particularity the place to be searched and the things to be seized "to prevent the seizure of one thing under a warrant describing another in violation of the Fourth Amendment." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003)). "The chief purpose of the particularity requirement [is] to prevent general searches by requiring a neutral judicial officer to cabin the scope of the search to those areas and items for which there exists probable cause that a crime has been committed." *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 441 (6th Cir. 2006) (emphasis added). If the particularity requirement is not satisfied, the warrant is unconstitutionally overbroad in violation of the Fourth Amendment.

---

[17] Defendant Brian Bartlett argues *both* the Corporate Warrants and the warrant authorizing the search of his residence were constitutionally overbroad. ECF No. 88 at PageID.446–50 (sealed). Defendant Adam Ball "joins" Brian Bartlett's Motion but argues only that the warrant to search his residence was constitutionally overbroad. ECF No. 98 (sealed). Defendant Andrew Semenchuk "adopts" Brian Bartlett's motion but argues only that the search of his residence was overbroad. ECF No. 116. And, although he has not shown standing, Defendant Jeffrey Bartlett "join[s]" Defendant Brian Bartlett's motion, too. ECF No. 128. For completeness, and standing issues aside, this Court will assess the particularity of *both* the Corporate and Residential warrants.

The "degree of specificity required" to satisfy the particularity requirement is "flexible and will vary depending on the crime involved and the types of items sought." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001)). "Consequently, a description is 'valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'" *Greene*, 250 F.3d at 477 (quoting *United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999)). Importantly, this specificity may be satisfied by a search warrant affidavit, which the warrant itself expressly incorporates. *Richards*, 659 F.3d at 537; *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

**b.**

All warrants issued in the above-captioned case were as specific as the circumstances and nature of Defendants' alleged, complex, financial criminal conduct allowed. Defendants argue to the contrary because the warrants did not place "subject-matter nor temporal limitations on the records to be seized," such that all warrants authorized overbroad and unconstitutional "all records" searches. ECF Nos. 88 at PageID.446–47 (sealed). Defendants are mistaken.

All *Corporate Warrants* incorporated Agent Butler's affidavits, which described the things to be seized as "the following records, whether stored in paper or digital format, for [SSI, 2SI, 3SI, and Southfield IT] (hereinafter referred to as "Companies"):

1. Records pertaining to work proposed, contracted or performed for [MDOT] or other state or federal agencies, as a contractor or sub-contractor;
2. Records pertaining to the Companies;
3. Records pertaining to Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Anthony Thelen, Adam Ball and Courtney Stodolak;
4. Locked containers or safes wherein any of the above items may be located;
5. Records identifying the location of safety deposit boxes or storage lockers wherein any of the above items may be located. Keys or other instruments necessary to gain access to the safety deposit boxes or storage lockers.
6. All electronic equipment, including cellular telephone, smartphones, desktop computers, laptop computers and tablets used principally for the operation of Companies;

*Id.* at PageID.485.

Similarly, all *Residential Warrants* also incorporated Agent Butler's affidavits which described the things to be seized as "the following records, whether stored in paper or digital format, for [SSI, 2SI, 3SI, and Southfield IT] (hereinafter referred to as "Companies"), Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Anthony Thelen, Adam Ball, Courtney Stodolak, Celena Thelen, Jessica Bartlett, Jenny Bartlett, and Sarah Ball:

1. Records pertaining to work proposed, contracted or performed for the Michigan Department of Transportation, or other state or federal agencies, as a contractor or sub-contractor;
2. Records pertaining to the Companies;
3. Any personal financial records relating to the above listed individuals;
4. Records pertaining to the schedule or location of any of the above listed individual.
5. Locked containers or safes wherein any of the above items may be located;
6. Records identifying the location of safety deposit boxes or storage lockers wherein any of the above items may be located. Keys or other instruments necessary to gain access to the safety deposit boxes or storage lockers.
7. All electronic equipment, including cellular telephone, smartphones, desktop computers, laptop computers and tablets used principally for the operation of Companies or used by any of the above listed individuals;

*Id.* at PageID.620.

Thus, contrary to Defendants characterization, all warrants contained significant "subject-matter" limitations on the records law enforcement could permissibly seize. *Cf. United States v. Demasi,* No. 1:22-CR-20670, 2024 WL 492689, at *5 (E.D. Mich. Feb. 7, 2024) (finding no subject-matter limitation when bare-bones warrant literally authorized the seizure of all "records kept on paper and on digital devices"). Although the warrants did not specifically define the precise *types* of "records" officers could seize, this level of particularity is unnecessary here. Indeed, "[i]n a business fraud case, the authorization to search for general business records is not overbroad." *United States v. Abboud*, 438 F.3d 554, 575 (6th Cir. 2006). In *United States v. Henson,* for

example, the Sixth Circuit found sufficient particularity in a warrant authorizing the seizure of "any and all records" concerning the "individuals and companies" alleged to have participated in a conspiracy to commit mail fraud. *United States v. Henson*, 848 F.2d 1374, 1382–83 (6th Cir. 1988). Although that warrant "use[d] generic terms," the Sixth Circuit noted law enforcement "could not have known . . . what precise records and files would contain information concerning the [alleged] scheme." *Id.* at 1383. Because the warrant nevertheless authorized the seizure of items "likely to provide information concerning [defendant]s' involvement in the . . . scheme," the Court held that it "did not authorize . . . officers to seize more than was reasonable under the circumstances." *Id.* The same result here. The Corporate Warrants limited records subject to seizure to those records directly related to the SSI Group companies. The Residential Warrants additionally authorized the seizure of personal records related to Defendants and their spouses. In this way, all warrants authorized—in the most specific way possible under the circumstances—the seizure of only those records which would likely provide information "related" to Defendants' overbilling scheme, which, as Agent Butler's investigation revealed, involved SSI's relationship to all SSI Group entities *and* SSI's employees—importantly including Defendants and their spouses. *See United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003).

True, no warrant included a temporal limitation on the records subject to seizure. But temporal limitations are not necessary in every case. Indeed, warrants need not contain specific dates in at least two specific circumstances. First, understandably, a warrant is not unconstitutionally overbroad for failure to include relevant dates when "such dates are [un]available" or unknown to investigating officials. *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999). Second, warrants need not include temporal limitations when "'evidence that date[s] from outside of the time period' described in a warrant affidavit 'may be relevant to the activity

within the time period." *United States v. Manafort*, 313 F. Supp. 3d 213, 235 (D.D.C. 2018)

(quoting *United States v. Abboud*, 438 F.3d 554, 576, n.7 (6th Cir. 2006)).

      Both circumstances are present here. First, Agent Butler did not know—when he filed the

warrant applications—just how old Defendants' alleged schemes were. Although Agent Butler's

affidavits largely discuss developments from early 2016 through 2019, all affidavits proffer

probable cause that Defendants' criminal activity dates back to at least 2010. *See, e.g.*, ECF No.

88-1 at PageID.468 (noting Defendants Thelen, Jeffrey Bartlett, and Brian Bartlett organized 3SI

in February 2009), PageID.469 (noting SSI's general ledger reflect rental property payments to

3SI as early as 2015); PageID.470 (alleging that, in response to an MDOT audit in 2010, an

unknown SSI employee fraudulently omitted Defendants Thelen and Brian Bartlett's ownership

interest in 3SI), PageID.471 (discussing 2011 email from Defendant Jeffrey Bartlett to MDOT in

which he disavowed ownership interest in 3S1 and, separately, noting Defendant Brian Bartlett

organized 2SI in 2004), PageID.473–74 (noting news coverage that, in 2011, SSI purchased the

scanners it later told MDOT were "rented" through 2SI), PageID.476–79 (discussing Defendants'

alleged DBE scheme, dating back to 2011). Second, as the Government emphasizes, the affidavit

alleged Defendants—through SSI Group entities—submitted "fictitious expenses" such that law

enforcement needed to investigate the "absence of a record"—that is, investigators "needed to

know [which] expenses were actually legitimate and [which] were made up." ECF No. 106 at

PageID.827. In this way, when Agent Butler filed his warrant applications, pre-2010 records would

likely have been squarely relevant to the Defendants' schemes as detailed in Agent Butler's

affidavits. *See id.*; *see also United States v. Manafort*, 313 F. Supp. 3d 213, 235 (D.D.C. 2018)

(denying suppression when warrant lacked temporal limitation, noting "earlier conduct can inform

the assessment of later alleged violations" in comparable tax fraud case, noting "evidence predating conduct can," additionally, "shed light on a defendant's intent").

Regardless, even if the warrants could be faulted for not placing temporal limitations on the records subject to seizure, such fault is not fatal. Courts within the Sixth Circuit recognize that a warrant is invalid *only* if it lacks *both* a temporal and a subject-matter limitation. *See Libretti v. Woodson*, No. 1:13 CV 932, 2013 WL 6634249, at *8 (N.D. Ohio Dec. 17, 2013), *aff'd*, 600 F. App'x 367 (6th Cir. 2015) ("Because the warrant in the instant case contains a subject-matter limitation . . . its failure to contain a time limitation does not violate the Fourth Amendment."); *United States v. Demasi*, No. 1:22-CR-20670, 2024 WL 492689, at *5 (E.D. Mich. Feb. 7, 2024) (finding overbreadth because warrant did not contain temporal nor subject-matter limitations on records subject to seizure). Moreover, the Sixth Circuit repeatedly recognizes that overbreadth "does not require suppression of all of the items seized pursuant to the" violative warrant. *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991)). Instead, the "proper approach to this dilemma is to sever the infirm portion of the search warrant from the remainder which passes constitutional muster." *Id.* (finding overbreadth but refusing to suppress evidence seized relevant to the time period the affidavit described as indicative of defendant's criminal activity, instead suppressing the seized evidence irrelevant to this time period). So, even if Defendants had standing to challenge all warrants—they do not—and even if all warrants were overbroad for failure to include specific temporal limitations on records subject to seizure—they were not—the *most* Defendants could seek to suppress are those *specific* pieces of seized evidence which *predated* 2010. But no Defendant has shown that any such evidence was ever seized. *See generally* ECF Nos. 88 (sealed); 98 (sealed); 116; 120; 125; 128.

At bottom, all warrants placed specific subject-matter limitations on the records subject to seizure, providing a sufficient nexus between the evidence to be seized and the alleged criminal activity outlined in Agent Butler's incorporated affidavits. Although the warrants did not include temporal limitations on the records subject to seizure, they need not have given the circumstances of this case, where Defendants allegedly created and inflated fictitious "costs" subject to MDOT reimbursement and law enforcement did not know how early this alleged scheme began. Given the facts alleged in Agent Butler's affidavit, all warrants authorized a reasonably specific search and seizure, in accordance with the Fourth Amendment's particularity requirement.

## 2. Probable Cause

Defendants next seek suppression for lack of probable cause. Although Defendants concede that the *Corporate Warrants* were supported by probable cause, *see* ECF No. 88 at PageID.441 (sealed),[18] they nevertheless argue the *Residential Warrants* lacked probable cause because Agent Butler's affidavits did not sufficiently suggest that evidence of Defendants' alleged criminal conduct would be found in their homes.[19] *Id.* at PageID.450–53; ECF No. 98 at PageID.678–81 (sealed); ECF No. 116 at PageID.1396–1400. As explained below, this argument lacks merit.

Although "incapable of precise definition," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Indeed, probable cause supporting a search warrant exists when there is a "fair probability," under the

---

[18] All Defendants lack standing to challenge the Corporate Warrants in the first instance. *See supra* Section III.A.

[19] As discussed, Defendant Jeffrey Bartlett filed a motion seeking, among other things, suppression "for the same reasons pressed by [Defendant] Brian Bartlett [and Defendant] Andrew Semenchuk." ECF No. 128. But neither Brian Bartlett nor Semenchuk's pleadings discussed the search of Jeffrey Bartlett's residence, and Defendant Jeffrey Bartlett has not averred that his home was ever searched. *See id.*; *see also supra* Section III.A.

"totality of the circumstances," that contraband or evidence of a crime will be found in a particular place. *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) (noting supporting affidavits are construed "in a commonsense" manner and are not subject to "line-by-line scrutiny"). Reviewing courts "give great deference to a magistrate judge's probable cause determination" and should only "reverse that decision" if "it was arbitrarily made." *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009).

Far from arbitrary, Magistrate Judge Morris's probable-cause determinations for all Residential Warrants were supported by several facts—within the four corners of Agent Butler's incorporated affidavits—suggesting a "fair probability" that evidence of Defendants' alleged criminal overbilling schemes would be found within their homes.

First, Agent Butler noted that, when interviewed, Individual A reported that all SSI employees—including all Defendants—had "remote access capability on their work laptops and mobile phones" such that they could "work from anywhere wirelessly, including their residence[s]." ECF Nos. 88-1 at PageID.616 (sealed); 98-1 at PageID.716 (sealed); 116 at PageID.1397. Second, Agent Butler noted that, based on his training and experience, "it is common for owners and executives to work extensive hours and to do so from their residence on nights, weekends, and holidays." *Id.* Third, based on his experience, Agent Butler proffered that "individuals typically keep financial records and property tax bills in their personal residences," and explained that these records "can show were [Defendants' and the SSI Group's] criminal proceeds are currently located, transferred to, and/or used for." *Id.*; *see also United States v. Sanders*, 106 F.4th 455, 462 (6th Cir. 2024) (collecting cases and explaining probable cause is generally satisfied when the warrant affiant "indicate[s] that the proceeds of a crime will be found in the place to be searched"). Fourth, Agent Butler noted that the Defendants' residences likely

contained personal records (like schedules and photographs) which—relevant to Defendants' alleged overbilling scheme—would substantiate whether their spouses actually worked for SSI.[20] *Id.*

Defendants take issue with Agent Butler's reliance on his training and experience to proffer probable cause, chalking his affidavit up as mere "speculation" and "assumption." ECF Nos. 88 at PageID.452 (sealed); 98 at PageID.680–81 (sealed). But Agent Butler relied on more than his training and experience to proffer probable cause—including witness testimony that Defendants could work from their residences, which bolsters a "fair probability" that evidence of Defendants' alleged overbilling through the SSI Group entities would be found there. *See* ECF Nos. 88-1 at PageID.616 (sealed). And the Sixth Circuit routinely recognizes that an investigating agent's training and experience is a permissible—and helpful—consideration throughout the probable cause analysis, especially in cases involving complex financial crimes. *See United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) (finding probable cause to search defendant's home for evidence of tax fraud because affiant was a "seasoned FBI Special Agent whose primary concentration is in financial crimes"). Here, Agent Butler had nearly a decade of experience as an FBI Special Agent when he applied for the warrants to search Defendants' residences, and he specifically noted his experience in investigating financial crimes including wire fraud and money laundering. ECF No. 88-1 at PageID.458 (sealed). Thus, Judge Morris "correctly" relied on his

---

[20] Defendant Semenchuk argues that his spouse—unlike the other Defendants' spouses—was "not on the company payroll." ECF No. 116 at PageID.1398. Fair enough. But Agent Butler's affidavit noted that Southfield IT nevertheless paid "Tara Semenchuk" $776,601—14% of the funds within Southfield IT's bank account—from 2016 through 2019. *See* ECF No. 88-1 at PageID.463, 465. So, even if Tara Semenchuk was not involved in Defendants' alleged *payroll* overbilling scheme, she was specifically identified throughout Defendants' alleged *indirect overhead rate* overbilling scheme, such that Agent Butler's explanation that evidence of Defendants' alleged criminal activity would probably be located in the home she shared with Defendant Semenchuk applies with equal force.

"insights as to the probable location of the evidence of the crimes in this case" when concluding probable cause supported a search of Defendants' residences. *Abboud*, 438 F.3d at 572.

In sum, Defendants' argument that there was no probable cause to support the searches of their residences misses the mark. The Residential Warrants were flush with information suggesting a fair probability that evidence of Defendants' alleged overbilling schemes—partially involving their spouses—would be found in the homes they shared with their spouses. Indeed, "[o]ne does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept . . . at [a] defendant's home." *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006).

Because all warrants accorded with the Fourth Amendment, all Defendants' motions to suppress will be denied.[21]

## C.  Defendant Ball's Request for a *Franks* Hearing

One last issue must be addressed. Buried within his motion to suppress, Defendant Adam Ball—unlike all other Defendants—seeks a *Franks* hearing and argues that Agent Butler's affidavit—incorporated in the specific warrant to search Defendant Ball's residence—included false statements or material omissions which Agent Butler made with "reckless disregard for the truth." ECF No. 98 at PageID.682–85. But a *Franks* hearing is wholly unwarranted.

A defendant seeking a *Franks* hearing has a twofold initial burden. First, the defendant must "make a substantial showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit." *United*

---

[21] Having concluded that all warrants were supported by probable cause and were sufficiently particularized, this Court need not consider the Governments' alternative arguments that, even if the warrants ran afoul of the Fourth Amendment, three separate exceptions to the exclusionary rule would preclude suppression. *See, e.g.*, ECF No. 106 at PageID.837–57 (arguing the good faith, inevitable discovery, and independent source exceptions apply).

*States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019). Notably, for an affiant's statement to be made in "reckless disregard for the truth," the defendant must show that the affiant "subjectively entertained serious doubts as to the truth of his or her allegations." *Id.* (cleaned up). Second, the defendant must "prove that the false statement or material omission [was] necessary to the probable cause finding in the affidavit." *Id.* If the defendant satisfies this "heavy burden," *id.*, then the falsity or omission is set aside for the court to reevaluate whether the remaining content in the affidavit is "sufficient . . . to support a finding of probable cause." *Franks*, 438 U.S. at 171–72. If not, the defendant is entitled to a *Franks* hearing under the Fourth Amendment. *Id*. at 172.

Defendant Ball's request for a *Franks* hearing fails at the first step because he has not shown that Agent Butler made false statements or material omissions within his affidavit intentionally, knowingly, or with a reckless disregard for the truth.[22]

Ball first argues that a *Franks* hearing is warranted because Agent Butler, with a reckless disregard for the truth, "repeatedly relie[d] on generalized assertions based on his 'training and experience' without providing any factual basis for believing that evidence of criminal activity would be found in [Defendant] Ball's home." ECF No. 98 at PageID.682 (sealed). But Agent Butler's permissible, and encouraged, reliance on his training and experience as an FBI Special Agent is not a "false statement or material omission" which would warrant a *Franks* hearing. And, even if it was, Defendant Ball has not even attempted to show that Agent Butler's reliance on his own experience was accompanied by "serious doubts as to the truth" of his conclusions. *See* ECF No. 98 (sealed); *Bateman*, 945 F.3d at 1008.

---

[22] Although Defendant Ball does not have standing to seek a *Franks* hearing relative to any Corporate Warrant, he has standing to request a *Franks* hearing relative to the warrant to search his residence. *See supra* Section III.A; *see also United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) ("Determining that a defendant has Fourth Amendment standing is a prerequisite to granting a motion for a *Franks* hearing.")

Second, Ball argues a *Franks* hearing is warranted because Agent Butler's "claim that employees can work remotely and therefore evidence is likely to be found in [Defendant] Ball's residence is a broad, unsupported generalization that fails to establish any specific connection between the alleged crimes and [Defendant] Ball's home." ECF No. 98 at PageID.682. But a "broad, unsupported generalization"[23] is not a "false statement or material omission," which may warrant a *Franks* hearing. And, again, even if it was, Defendant Ball has not shown how this statement was made with "serious doubts" about its truth value. *See* ECF No. 98 (sealed); *United States v. Bateman,* 945 F.3d 997, 1008 (6th Cir. 2019).

The same result for Ball's third argument, that a *Franks* hearing is warranted because Agent Butler's "affidavit fails to provide any temporal limitations on the alleged criminal activity[.]" ECF No. 98 at PageID.682 (sealed). To the extent this could be considered an "omission," Defendant Ball has not shown the omission was material, and this Court already concluded it was not. *See supra* Section III.B.1 (holding warrants were particularized despite lacking a temporal limitation). And, again, Defendant Ball has not shown this lack of temporal limitation was accompanied by Agent Butler's reckless disregard for the truth. *See* ECF No. 98 (sealed); *Bateman,* 945 F.3d at 1008; *see also United States v. Graham,* 275 F.3d 490, 506 (6th Cir. 2001) (noting *Franks* hearings for omissions are only merited in "rare instances" for fear that allegations of omissions "potentially open[] officers to endless conjecture about investigative leads, fragments of information or other matter that might, if included, have rebounded to defendant's benefit").

---

[23] Contrary to Defendant Ball's characterization, Agent Butler's remote-work claims were not unsupported. To the contrary, "Individual A"—who provided SSI and Southfield IT with technology services beginning in 2009—told Agent Butler that all Defendants could work for SSI, and all SSI Group entities from their residences. ECF No. 98-1 at PageID.716 (sealed).

Lastly, Defendant Ball seeks a *Franks* hearing because Agent Butler's affidavit referred to Defendant Ball as "an executive multiple times." ECF No. 98 at PageID.683 (sealed). Defendant Ball argues this "demonstrate[s] a reckless disregard for the truth" because he was "subject to a 'buy out' in late 2018" before Agent Butler applied to search his residence. *Id.* at PageID.682–83. (arguing that, by labeling him as an "executive," Agent Butler was "trying to paint [him] as something he was not"). But Defendant Ball has not shown that his "executive" label was false. Indeed, Agent Butler's affidavit expressly noted—and Defendant Ball has not disputed—that, in June 2017, "SSI represented to MDOT" that Defendant Ball was one of its executives. ECF No. 98-1 at PageID.693 (sealed). To the extent Defendant Ball argues he was later stripped of his executive status through a buyout in 2018, he has not offered anything—beyond his own conclusory statements—to show this buyout ever occurred. *See United States v. Peoples*, 683 F.Supp.3d 673, 677 (E.D. Mich. 2023) (denying *Franks* hearing because, in part, defendant's only proof of affidavit falsity was his own "conclusory statements"). Moreover, even if the buyout did occur, Defendant Ball has not shown that Agent Butler *knew* about it, or otherwise labeled Ball as an executive with a subjectively serious doubt about the truth of this label. *See United States v. Bateman*, 945 F.3d 997, 1008 ("Allegations of an agent's negligence or innocent mistake are insufficient." (cleaned up)). And, at bottom, even if the four references to Ball as an "executive" were removed from Agent Butler's 32-page affidavit, *see* ECF No. 98-1 at PageID.693, 696, 698, 701 (sealed), the affidavit still provided probable cause to search the residence he shared with his spouse—Sarah Ball—for evidence of Defendants' alleged fraudulent overbilling schemes. For example, Agent Butler averred:

1. SSI represented to MDOT that Defendant Ball as one of its executives in June 2017. ECF No. 98-1 at PageID.693–94 (sealed).

2.  Defendant Ball "register[ed] Southfield IT with the State of Wyoming" sometime before 2016. *Id.* at PageID.698.

3.  Defendant Ball and Sarah Ball were both signatories on Southfield IT's bank account. *Id.*

4.  Defendant Ball personally withdrew $3,955,057 from Southfield IT's bank account from January 2016 through February 2019. *Id.* at PageID.698–99. Sarah Ball withdrew another $602,674 throughout the same timeframe. *Id.* Despite the Balls withdrawal of approximately 82% of Southfield IT's total funds from 2016 through 2019, a review of their personal bank accounts showed no "expenditures consistent with IT management." *Id.* at PageID.699.

5.  On August 30, 2016, Defendant Ball signed a check on behalf of Southfield IT for over $60,000 payable to a Chevrolet dealership. *Id.* In July 2019, investigating FBI agents observed Sarah Ball driving, for personal use, a 2016 Chevrolet Suburban registered to Southfield IT on August 31, 2016. *Id.*

6.  In 2017, Sarah Ball was paid $119,420 for her purported work as an SSI "project assistant" despite the fact that public records revealed she was working full-time as a high school at the same time. *Id.* at PageID.714–15.

In sum, Defendant Ball is not entitled to a *Franks* hearing. He has not shown that Agent Butler's affidavit included any false statements or material omissions, let alone that such statements or omissions were made knowingly, intentionally, or with a reckless disregard for the truth. And, even if Defendant Ball had made such showing, and the challenged portions were severed from Agent Butler's affidavit, the affidavit still proffered probable cause to search Defendant Ball's residence for evidence of Defendants' alleged overbilling scheme.

## IV.

Accordingly, it is **ORDERED** that Defendant Brian Bartlett's Motion to Suppress, ECF No. 88 (sealed), is **DENIED.**

Further, it is **ORDERED** that Defendant Adam Ball's Motion to Suppress, ECF No. 98 (sealed), is **DENIED.**

Further, it is **ORDERED** that Defendant Andrew Semenchuk's Motion to Suppress, ECF No. 116, is **DENIED.**

Further, it is **ORDERED** that Defendant Jeffrey Bartlett's Notice of Joinder/Concurrence, ECF No. 128, is **DENIED IN PART**, to the extent it joins Defendants Brian Bartlett and Andrew Semenchuk's motions to suppress, ECF Nos. 88 (sealed); 98 (sealed).

**This is not a final order and does not close the above-captioned case.**

Dated: October 21, 2024                    s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge