UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,                         Case No. 1:23-cr-20676

v.                                   Honorable Thomas L. Ludington
                                        United States District Judge
JEFFREY BARTLETT, et al.,

           Defendants.

_____/

**OPINION AND ORDER GRANTING, IN PART,  DEFENDANTS' MOTION FOR A BILL OF PARTICULARS**

As alleged, Defendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, Brian Bartlett, and Anthony Thelen defrauded the Michigan Department of Transportation of hundreds of thousands of dollars throughout a decade-long conspiracy. Specifically, the Government alleges Defendants fraudulently misrepresented Surveying Solutions Inc. (SSI)'s, relationship to commonly controlled companies and its own "employees," thus artificially inflating the amount SSI—equally controlled by all Defendants—received in reimbursements from MDOT  throughout federally funded transportation contracts. Accordingly, Defendants are charged with conspiracy to defraud the United States, conspiracy to commit wire fraud, and thirteen counts of wire fraud.

Defendants  Brian  Bartlett,  Jeffrey  Bartlett,  Adam  Ball,  and  Andrew  Semenchuk collectively seek a bill of particulars clarifying (1) the charged conspiracy to defraud the United States, and (2) the thirteen separate wire fraud counts. As explained below, Defendants' request will be granted in part, and the Government will be directed to file a bill of particulars clarifying how the thirteen identified wire transfers throughout 2018 and 2019 furthered Defendants' alleged fraudulent overbilling scheme.

# I.

## A. Factual Background

Defendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, Brian Bartlett, and Anthony Thelen are charged with conspiracy to commit wire fraud, 18 U.S.C. § 1349 (Count I); conspiracy to defraud the United States, 18 U.S.C. § 371 (Count II); and wire fraud/aiding and abetting, 18 U.S.C. § 1342/18 U.S.C. § 2 (Counts III–XV). ECF No. 132. All charges stem from Defendants' alleged conduct involving Surveying Solutions Inc. (SSI)[1] and related companies, which the Government generally alleges defrauded the United States of hundreds of thousands of dollars through transportation contracts with the Michigan Department of Transportation (MDOT) from early 2011 through mid-2019. *See generally id.*

Defendants' alleged fraudulent conduct is best considered in three parts. First, on the front end, the Government alleges Defendants conspired to fraudulently obtain and maintain SSI's certification as a Disadvantaged Business Enterprise to obtain preferential status when bidding on transportation contracts with MDOT. *See id.* at PageID.1513–16. Second, once awarded a contract, the Government alleges Defendants fraudulently misrepresented SSI's overhead and labor costs to artificially inflate MDOT's reimbursement.[2] *Id.* at PageID.1516–20. Third, on the back end, the Government alleges Defendants orchestrated a scheme to equally split the ill-gotten gains at the

---

[1] SSI currently advertises itself as Michigan's "premier consulting firm," which specializes in "geospatial/surveying services." *About*, SSI, https://ssi-mi.com/about/ (last accessed Oct. 11, 2024) [https://perma.cc/T2TW-EQVV]. Across three Michigan offices in Standish, St. Johns, and Saginaw, SSI has nearly 120 employees, including professional surveyors, engineers, CAD technicians, and field crew members. *See id.*

[2] As explained in the Second Superseding Indictment, approximately "80-90%" of the relevant contracts between SSI and MDOT were funded by the United States Department of Transportation through the Federal Highway Administration. ECF No. 132 at PageID.1508.

end of each fiscal year for each Defendant's personal benefit. *Id.* at PageID.1520–22. Each part of Defendant's alleged fraudulent conduct will be discussed in turn.

### 1. Defendant's Alleged DBE Scheme

In 1983, the United States Department of Transportation (USDOT) created the Disadvantaged Business Enterprise (DBE) Program to "remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide. The primary . . . objective of the DBE [P]rogram is to level the playing field by providing small businesses owned and controlled by socially and economically disadvantaged individuals a fair opportunity to compete for federally funded transportation contracts." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022),   https://www.transportation.gov/ civil-rights/disadvantaged-business-enterprise   [https://perma.cc/LAA6-WW9U].   The   DBE Program achieves this objective in part by certifying certain businesses as DBEs. Although USDOT largely delegates certification to state and local agencies, federal regulation explains that an entity may only be certified as a DBE if it is (1) a small business, as defined by the Small Business Administration's regulations; (2) independent; and (3) "at least 51% owned by a socially or economically disadvantaged individual[]." 49 C.F.R. §§ 26.65(a), 26.69(b), 26.71.

To determine whether a DBE applicant is sufficiently "independent," reviewers "scrutinize relationships with non-DBE firms, in such areas as personnel, facilities, equipment, [and] financial . . . resources" and "consider whether present . . . employer/employee relationships" between the owner of the potential DBE and personnel from non-DBE firms "compromise the independence of the potential DBE firm." 49 C.F.R. § 26.71(b). Turning to ownership, "women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, [and] Subcontinent

Asian Americans" are presumably socially disadvantaged. 49 C.F.R. § 26.67(a)(1). And an individual owner is presumably economically disadvantaged if the owner's net worth is less than $1.32 million. 49 C.F.R. § 26.67(a)(2)(i), (b)(1)(i).

Certification is crucial because "the integrity of [the] DBE [P]rogram depends upon systematic procedures to ensure that only *bona fide* small firms, owned and controlled by socially and economically disadvantaged individual(s), are certified to participate as DBEs in DOT federally assisted programs." *Disadvantaged Business Enterprise (DBE) Program*, U.S. DEP'T OF TRANSP. (last updated Nov. 25, 2022), https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (emphasis added) [https://perma.cc/LAA6-WW9U]. Indeed, certifying agencies "must deny [DBE] applications based on sham transactions or false representations, and . . . must decertify DBEs that engage in or make them." 49 C.F.R. § 26.69(g)(2). Importantly, once certified, DBEs may receive more contract opportunities because the DBE Program requires state and local transportation agencies that receive federal funding—like MDOT—to set goals to increase DBE participation in the transportation contracting industry. *See* 49 C.F.R. § 26.39.

SSI was a certified DBE before 2011, when SSI was owned by non-party Guy Spreeman. *See* ECF No. 37 at PageID.102; Opinion Letter from Sheryl G. Williams, Acting Associate Director, External Civil Rights Programs Division, U.S. Dept. of Transp., to Franklin Adams, Manager, Business and Administrative Services Division, Mich. Dep't of Transp. (July 2 7, 2015), https://www.transportation.gov/sites/dot.gov/files/14-0071-Surveying%20Solutions%2 C%20Inc..pdf [https://perma.cc/SU3Z-VUBV] [hereinafter USDOT Letter]. But Spreeman passed away in January 2011, and majority ownership of SSI "passed by default" to Defendant Jeffrey Bartlett. *Id.* Because Defendant Jeffrey Bartlett was a "non-disadvantaged individual," "MDOT removed SSI's DBE certification in July 2011." *Id.*

On February 25, 2011—just after Defendant Jeffrey Bartlett acquired control of SSI—the Government alleges that all Defendants entered into a written "Secret Agreement" that provided that all Defendants would be equal owners of the "SSI Group"—a group of companies including (1) SSI, (2) Southfield IT, (3) 2SI Development, LLC ("2SI"), (4) 3SI Building and Leasing, LLC ("3SI"); and (5) Geo Precision Services, LLC ("Geo"). *See* ECF No. 132 at PageID.1511, 1514, 1520. This Secret Agreement read as follows:

> It is the intent of this agreement that the Buyers and Sellers will each own a *20 percent undivided interest in the above named companies* at the completion of the "Buy In" period. Regardless of how the Articles of Incorporation, Stock, Ownership, By Laws, etc. are written/retained; the intent is for all 5 parties to have *equal ownership of the companies* at the completion of the "Buy In" period.[3]

*Id.* at PageID.1514 (emphasis added). Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen signed this agreement as the "Sellers," while Defendants Adam Ball and Andrew Semenchuk signed as the "Buyers."[4] *Id.* at PageID.1515.

On June 2, 2011, shortly after signing the alleged 2011 Secret Agreement, Defendant Semenchuk—an Asian Pacific Islander and the purported sole owner of Geo—applied to certify Geo as a DBE. *See id.* at PageID.1511, 1513. Geo became DBE certified soon after. *See* USDOT

---

[3] Notably, the Government alleges that Defendants defrauded the United States when Defendant Semenchuk repeatedly represented to MDOT that he owned 51% of SSI *stock*, in part because Defendants' 2011 Secret Agreement suggests otherwise. *See infra* Section I.A.1. And the Government alleges Defendants acted in accordance with this 2011 Secret Agreement as late as 2017 by equalizing the net *profits* of the SSI Group entities, such that each Defendant personally received an equal 20% share. *See infra* Section I.A.3. But, beyond these allegations, the Parties have not provided any SSI Group entity's accounting statements, balance sheets, tax filings, or any other information about each entity's ownership structure or capitalization.

[4] Less than two months after signing the alleged 2011 Secret Agreement, Defendant Brian Bartlett emailed Defendants Jeffrey Bartlett, Adam Ball, Anthony Thelen, and Andrew Semenchuk with the suggestion that all Defendants "sit down" and come up with a "better structure to the [SSI Group] org chart" so they could "easi[ly] keep [their] stories straight" when discussing the entities. ECF No. 113-2 at PageID.1138 (sealed). After Defendant Jeffrey Bartlett responded, Defendant Brian Bartlett replied to all Defendants, highlighting the need to "keep all of [their] lies straight so [they] don't look like idiots." *Id.* at PageID.1142.

Letter, pg. 2. One year later, in June 2012, Geo purchased 51% of SSI and became its majority owner. *Id.*; *see also* ECF No. 37 at PageID.106–07. In October 2012, "MDOT revoked Geo's DBE status because, after purchasing control of SSI, "Geo was no longer [an] independent business." USDOT Letter, pg. 2. Defendant Semenchuk then dissolved Geo, transferred Geo's assets to SSI, and operated "solely under SSI's name[] because [SSI] had better name recognition and a more established credit history." *Id.* So, by December 2012, Semenchuk—rather than Geo as an entity— was SSI's purported majority owner. *Id.* But the Government cites Defendants' 2011 Secret Agreement and alleges that Semenchuk, in reality, only owned a 20% share of SSI equal to all other Defendants, and "never had ultimate managerial control[.]" ECF No. 132 at PageID.1514.

On April 19, 2013, Semenchuk applied to certify SSI as a DBE. ECF No. 132 at PageID.1524. But MDOT denied the application for three main reasons. USDOT Letter, pg. 2–3. First, MDOT concluded that SSI was insufficiently independent because (1) it leased two of its three offices from 3SI, and (2) leased surveying equipment and cars from 2SI when 2SI was partially owned by SSI executives Defendants Brian Bartlett and Anthony Thelen. *See id.* When pressed for more information, Semenchuk told MDOT officials—contrary to the 2011 Secret Agreement—that "neither he nor any owners of SSI possessed *any* ownership interest in" 2SI or 3SI, and that all were "totally separate and distinct entities." *Id.* (emphasis added). But, when MDOT requested tax returns or outside lease agreements to corroborate these claims, Semenchuk refused to comply. *Id.* Second, MDOT "concluded that SSI could not prove by clear and convincing evidence that the transfer of ownership [to Semenchuk] occurred for reasons other than obtaining DBE certification[.]" *Id.*, pg. 5. Third, MDOT concluded that Defendant Semenchuk had not proven he controlled SSI. *Id.* at pg. 5–6. Indeed, MDOT noted that SSI may have actually been

controlled by Defendant Jeffrey Bartlett, an experienced surveyor who owned SSI just before Semenchuk and Geo's purchase, and owned 48% of SSI after this purchase. *See id.*, pg. 6.

On July 27, 2015, the USDOT ultimately reversed MDOT's decision and directed MDOT to certify SSI as a DBE "without delay[.]" *Id.*, pg. 7; ECF No. 132 at PageID.1516. The USDOT found "nothing in the record"[5] to suggest Defendant Brian Bartlett and Anthony Thelen's dual-status as SSI employees and owners of 2SI and 3SI compromised SSI's independence. USDOT Letter, pg. 4. Although "70% of SSI's business account payments (excluding personnel costs) were paid to [2SI and 3SI], the evidence in the record indicate[d] that the transactions between SSI and 2SI/3SI were arms-length transactions." *Id.* USDOT disagreed with MDOT's conclusion that Defendant Semenchuk purchased SSI solely to obtain SSI's DBE certification because, "in [his] words, he purchased SSI because he 'wanted to expand [Geo], eliminate competition, and . . . make a profit.'" *Id.*, pg. 6. Although Defendant Jeffrey Bartlett owned 48% of SSI and was an experienced surveyor, the USDOT found no evidence that he had "the power or authority to control" SSI after Defendant Semenchuk's purchase. *Id.*

On August 28, 2014, seemingly in celebration of SSI's DBE certification, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Adam Ball, Andrew Semenchuk, and Anthony Thelen the following email:

> Not bad for a bunch of white guys trying to be a minority-owned business . . . And we will be billing the FUCK out of August thru November for sure.

ECF No. 132 at PageID.1516 (emphasis in original).

---

[5] The "record" the USDOT reviewed in 2015 is not the same as the evidentiary record currently before the Court. Indeed, it is unclear whether USDOT's 2015 administrative investigation considered the evidence uncovered throughout the Government's criminal investigation in 2019, including Defendants' alleged 2011 Secret Agreement.

Defendant Semenchuk submitted annual "No Change Affidavits" to MDOT to maintain SSI's DBE certification in July of 2016, 2017, and 2018. *Id.* at PageID.1515. Through these affidavits, Semenchuk affirmed that he—a "socially disadvantaged" individual—was still SSI's majority owner. *See* 49 C.F.R. § 26.83(j). The Government alleges these representations were fraudulent because, per the 2011 Secret Agreement, Semenchuk was not SSI's majority owner and, like all other Defendants, only owned a 20% share of the SSI Group. ECF No. 132 at PageID.1515.

At bottom, the Government characterizes Defendants' alleged DBE misrepresentations and omissions as an *object* of Defendants' conspiracy to defraud the United States, charged in Count II of the Second Superseding Indictment.[6] *See* ECF No. 132 at PageID.1523.

### 2.   Defendants' Alleged Overbilling Scheme

The Government also alleges that, after MDOT awarded SSI various transportation contracts, Defendants artificially created and inflated costs subject to MDOT reimbursement through a series of misrepresentations about SSI's relationship with the other SSI Group companies and its own employees. *See id.* at PageID.1516–22.

Before turning to Defendants' alleged overbilling, it is necessary to explain how MDOT paid SSI on each awarded contract. According to the Government, MDOT paid SSI by multiplying SSI's "direct labor costs" by an "indirect overhead rate" and then applying a fixed 11% incentive fee, intended to provide SSI with a profit. *See id.* at PageID.1509–10; *see also* ECF No. 88-1 at PageID.461–62 (sealed). SSI's "direct labor costs" were calculated on a contract-by-contract basis,

---

[6] Accordingly, the Government need not necessarily prove at trial that SSI's DBE status actually increased the amount of contracts MDOT awarded to SSI. *See United States v. Thompson*, 366 F.2d 167, 171 (6th Cir.1966) ("Success in defrauding the United States is not an element of [18 U.S.C. § 371], nor is it required that the government actually have been cheated out of money or property." (internal quotations omitted)) *accord United States v. Ferguson*, 844 F. Supp. 2d 810, 819 (E.D. Mich. 2012).

by considering the number of SSI employees who worked on a contract, the number of hours each employee worked, and each employee's hourly rate. *See* ECF Nos. 132 at PageID.1509; 88-1 at PageID.461–62 (sealed)*.* SSI's "indirect overhead rate," on the other hand, was calculated through an annual "pre-qualification process" which considered SSI's overhead and labor expenses during the prior fiscal year. *See id.* Generally, contractors may include rental costs in purported overhead expenses, subject to reimbursement. *See* 48 C.F.R. § 31.205-36. But, critical to the Government's case, if the contractor rents real or personal property from a *commonly controlled entity*, federal regulations prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include—as part of their reimbursable overhead rate—the *normal costs of ownership*, such as "depreciation, taxes . . . and maintenance" for the specific piece of rented property. 48 C.F.R. § 31.205–36(b)(3); *see also* ECF No. 132 at PageID.1518.

Ultimately, to pay and reimburse SSI for awarded contracts, MDOT wired funds from its financial institution in Auburn Hills, Michigan, to SSI's Huntington National Bank account in Columbus, Ohio. ECF No. 132 at PageID.1522. And the Government has identified thirteen wire transfers from MDOT to SSI throughout 2018 and 2019. *See id.* at PageID.1525–27. Accordingly, as alleged, Defendants' overbilling is *both* an object of their conspiracy to defraud the United States (Count II) *and* forms the factual basis for thirteen separate counts of wire fraud (Counts III—XV). *See id.* at PageID.1512–13, 1525–27.

With this context in mind, the Government alleges Defendants defrauded MDOT through two separate schemes flush with fraudulent misrepresentations and omissions. *See* ECF No. 132 at PageID.1523. The first concerned SSI's relationship to other companies. *Id.* The second concerned SSI's relationship to its own employees. *Id.*

### a.   Costs Attributable to Commonly Controlled SSI Group Companies

First, the Government alleges that, despite Defendants' 2011 Secret Agreement and other evidence indicative of common control, Defendants fraudulently represented that the other SSI Group companies—2SI, 3SI, and Southfield IT—were independent such that Defendants could charge MDOT artificially inflated prices for fictitious rental "costs." *See id.* at PageID.1516–19. As alleged, each SSI Group company had a distinct role to play.

### i. 2SI

2SI was SSI's equipment supplier. According to the Second Superseding Indictment, SSI rented surveying equipment and company cars from 2SI and sought MDOT's reimbursement for these rental costs in full because Defendants represented that 2SI was independent from SSI. *See* ECF No. 132 at PageID.1517–18. But all Defendants signed the 2011 Secret Agreement, providing that 2SI and SSI were equally owned by all five Defendants. ECF No. 132 at PageID.1514. According to investigating FBI agents, "2SI was organized in 2004 by [Defendant] Brian Bartlett." ECF No. 88-1 at PageID.471 (sealed). At all relevant times, Defendant Jeffrey Bartlett was held out as 2SI's owner, and he, Defendant Brian Bartlett, and Defendant Anthony Thelen were authorized signatories on 2SI's bank account. *Id.* Moreover, 2SI's registered agent was SSI's certified public accountant. *Id.* at PageID.472. And, from January 2016 through February 2019, 99.2% of 2SI's funding came from SSI. *Id.* at PageID.478.

By fraudulently misrepresenting SSI's relationship to 2SI, MDOT auditors estimated that Defendants overbilled MDOT by nearly $6,000,000 from 2016 through 2018. *See id.* at PageID.475–76. For example, the FBI's investigation revealed that SSI leased a mobile surveying scanner from 2SI in 2017. *Id.* at PageID.472. Under the terms of the lease agreement, SSI paid 2SI $13,000 per month to rent the scanner, but could only use the scanner on "26 days" throughout the

- 10 -

year. *Id.* The lease agreement provided that SSI owed 2SI an additional $6,000 each day it used the scanner in excess of this limitation. *Id.* According to a spreadsheet Defendant Semenchuk provided MDOT auditors in 2018, SSI used the mobile scanner on 40 days throughout 2017, such that SSI "should have paid no more than *$84,000*" for its excessive use. *Id.* at PageID.472–73 (emphasis added). But SSI billed MDOT *$1,398,045* for its excessive scanner use that year. *Id.* at PageID.473. Aside from this inflated excessive-use bill, the Government alleges that, since 2SI and SSI were commonly controlled, SSI was only entitled to recover the depreciation for the two scanners it rented from 2SI—totaling "approximately *$200,000*" per year. *Id.* (emphasis added). Yet, SSI billed MDOT *$1,553,045* for the annual use of the rented scanners. *Id.* In total, MDOT auditors estimate that, as a result of Defendants' misrepresentations, MDOT overpaid SSI for mobile-scanner-rentals by $3,893,631 from 2016 through 2018. *Id.* at PageID.475.

Similarly, the FBI found that SSI entered into five rental agreements with 2SI for company cars from 2013 through 2017. *Id.* According to rental agreements, SSI paid 2SI $1,700 per month for new cars and $1,000 per month for used cars. *Id.* SSI paid 2SI nearly $1,000,000 to rent 56 separate cars throughout FY 2017 alone, and billed MDOT for this expense. *See id.* But the Government's investigation revealed that SSI paid "above-market . . .rates" for these cars. *Id.* For example, the FBI found that one of the 56 cars SSI leased from 2SI was a truck that SSI leased from 2014 through 2018. *Id.* The "four year total" of SSI's rental costs for this truck, billed to MDOT, was *$81,600*. *Id.* But, according to the Government, "the MSRP" of the truck is only *$35,310*. *Id.* Aside from market value, the Government alleges that, because 2SI and SSI were commonly controlled, SSI was only entitled to reimbursement for the "actual cost of [each car's] ownership." *Id.*; *see also* ECF No. 132 at PageID.1518. On this point, and as a further example of Defendants' overbilling, the FBI concluded that depreciation for the specific truck would have

been approximately *$7,062* per year, less than half of the *$20,400* SSI included in its overhead rate subject to MDOT reimbursement. ECF No. 88-1 at PageID.475 (sealed) ("Additional . . . taxes and maintenance would not justify the total of $20,400 paid to 2SI and included in overhead."). In total, MDOT estimates that SSI overbilled MDOT on rental car costs by $2,038,528.70 from 2016 through 2018. *Id.* at PageID.476.

### ii. 3SI

3SI served as SSI's landlord. Defendants Brian Bartlett, Jeffrey Bartlett, and Anthony Thelen co-founded 3SI in 2009 and were, at all relevant times, authorized signatories on 3SI's bank account. *Id.* at PageID.468. From January 2016 through February 2018, 99.8% of the deposits to 3SI's bank account "were from accounts controlled by SSI or 2SI[.]" *Id.* at PageID.478.

Yet the Government alleges Defendants "agreed to and did submit fraudulent claims to MDOT for rent payments from SSI to 3SI, [hiding] from MDOT the fact that SSI and 3SI" were commonly controlled. ECF No. 132 at PageID.1519. Had Defendants disclosed that SSI and 3SI were commonly controlled, the Government notes, they would have only received MDOT's reimbursement for the "normal costs of ownership" (taxes, depreciation, maintenance). *Id.* But the Government alleges SSI billed MDOT for the full amount SSI paid 3SI to rent office space in Standish and St John's, Michigan. *See* ECF No. 88-1 at PageID.468–69. For example, in 2017, SSI paid 3SI *$217,720* to rent its Standish Headquarters and was reimbursed by MDOT accordingly. *See id.* at PageID.469. But, the FBI estimated that "the normal cost of ownership" for this building in 2017 was just over *$20,538. Id.* (noting the building had a "conservative" initial value of $450,000, such that, considering a 39-year useful life, annual depreciation would total approximately $11,538 and annual taxes would total $9,000). In total, MDOT auditors estimate

that, from 2016 through 2018, SSI overbilled MDOT by $518,550.58 for its rental costs to 3SI. *Id.* at PageID.471.

### iii. Southfield IT

As its name suggests, Southfield IT was SSI's IT provider.[7] Southfield IT was founded by Defendant Ball. *Id.* at PageID.463. Southfield IT's P.O. Box was allegedly obtained by SSI office manager Courtney Stodolak. *Id.* at PageID.464; *see also United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 1715397, at *3 (E.D. Mich. Apr. 22, 2024) (noting Stodolak was "the longest-serving SSI employee" and attempted to—but did not—purchase majority ownership of SSI when Spreeman passed away in 2011). In February 2015, Southfield IT opened a bank account and listed Defendant Ball as one of its signatories. ECF No. 132 at PageID.1517. Other signatories included Defendants Thelen and Brian Bartlett. ECF No. 88-1 at PageID.465 (sealed). Once Southfield IT's bank account was opened, the Government alleges 99.2% of its funds were furnished through SSI and that 95.9% of these funds were "ultimately transferred back" to Defendants and their spouses. ECF No. 132 at PageID.1517. Indeed, the following withdraws were made from Southfield IT's bank account from January 2016 through 2019:

| DESCRIPTION | AMOUNT | % OF WITHDRAWAL |
|---|---|---|
| Defendant Adam Ball | $3,955,057 | 71% |
| Tara Semenchuk | $776,601 | 14% |
| Sarah Ball | $602,674 | 11% |
| Martin Chevrolet[8] | $62,920.64 | 1% |

---

[7] Southfield IT was the registered trade name for National Elevation Certificates, LLC ("NEC"). *See* ECF Nos. 132 at PageID.1510; 88-1 at PageID.463 (sealed). Although some portions of the record refer to Southfield IT as "NEC," this Opinion and Order will use only the former for consistency.

[8] The FBI uncovered that, on August 30, 2016, Southfield IT issued a $62,920.64 check to Martin Chevrolet that Defendant Adam Ball signed. ECF No. 88-1 at PageID.465, n. 6 (sealed). But, on July 11, 2019, FBI agents "observed Sarah Ball"—Defendant Ball's wife—driving a 2016 Chevrolet Suburban, registered to Southfield IT on August 31, 2016. *Id.* Despite the car's registration, FBI agents observed Sarah driving the car for personal purposes, such as dropping her children off at daycare and going to the gym. *Id.*

| Network Services Group | $53,118.15 | 1% |
|---|---|---|
| Internet Service Providers | $52,689.58 | 1% |
| Other Expenditures | $39,377 | 1% |
| **Total:** | **$5,566,909.97** | **100%** |

*See* ECF No. 88-1 at PageID.465 (sealed).

Despite this evidence of common control, the Government alleges Defendants represented to MDOT that Southfield IT was independent from SSI, and created "fictitious contracts and invoices" between the two companies to "fraudulently inflate their overhead costs which were then reimbursed by MDOT." ECF No. 132 at PageID.1516. According to the FBI's investigation, SSI billed MDOT a total of *$1,575,304.30* for IT services it received from Southfield IT throughout FY 2015, 2016, and 2017. ECF No. 88-1 at PageID.463 (sealed). But the FBI concluded that SSI spent "less than *$145,184.73* on IT services . . . from January 2016 through February 2019." *Id.* (emphasis added). MDOT ultimately estimates that, from 2016 through 2018, it overpaid SSI nearly $2,000,000 as a result of Defendants' fraudulent representations regarding IT expenditures. *Id.* at PageID.467.

Notably, the Government's investigation also uncovered evidence suggesting that Southfield IT was not SSI's actual IT provider. Investigating agents interviewed "Individual A," the owner of Network Services Group (NSG). *Id.* at PageID.466. Individual A informed the FBI that NSG—rather than Southfield IT—provided SSI with IT services beginning in 2009. *Id.* But, on December 31, 2014, Defendant Semenchuk sent Defendants Adam Ball, Brian Bartlett, and Jeffrey Bartlett an email entitled "SSI IT Company," which noted all Defendants discussed "forming an IT company for OH reasons"[9] and suggested "all of [NSG']s bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." ECF No.

---

[9] The Government seemingly alleges that "OH" referred to SSI's reimbursable overhead rate. *See* ECF No. 113-1 at PageID.974–75.

113-1 at PageID.1007 (sealed). Defendant Jeffrey Bartlett replied, "I Like it!" *Id.* at PageID.1008. Defendant Adam Ball replied, "Sounds good to me. Creative." *Id.* at PageID.1010. Defendant Brian Bartlett replied, "I think it sounds pretty crafty—I like it[.]" *Id.* at PageID.1012. Defendant Thelen replied, "[s]ounds legit." *Id.* at PageID.1013. In accordance with these emails, Individual A reported that, in early 2016, Defendant Semenchuk "began directing [him] to re-issue certain SSI invoices to Southfield IT," such that he "understood that NSG's work always supported SSI regardless of [whether] it was billed to SSI or Southfield IT[.]" ECF No. 88-1 at PageID.467 (sealed).

### b.  Direct Labor Costs and Payroll Representations

In addition to fraudulently misrepresenting SSI's relationship to 2SI, 3SI, and Southfield IT to artificially inflate SSI's reimbursable *overhead rate*, the Government alleges Defendants artificially inflated SSIs reimbursable *direct labor costs* by billing MDOT for the work of "ghost employees," including their spouses. ECF No. 132 at PageID.1510, 1519–20.

On September 25, 2015, Defendant Jeffrey Bartlett sent Defendants Brian Bartlett, Anthony Thelen, Adam Ball, and Andrew Semenchuk an email entitled "Our Hours," which stated the Defendants would "have a tough time billing out projects if [they] d[id] not have more time to put on them that is *semi-legitimate*." ECF No. 113-2 at PageID.1352 (sealed) (emphasis added). In addition to suggesting Defendants "come up with additional scanner charges" from 2SI, Defendant Ball asked the group whether Defendants could "raise hours/wages for [their] wives." *Id.* Defendant Jeffrey Bartlett responded that Defendants "may have to give [their wives] bigger raises to *help out on overhead*[.]" *Id.* (emphasis added). And, in May 2016, Defendant Semenchuk emailed all Defendants suggesting they represent to MDOT that their wives "performed marketing

duties" because Defendants gave their wives "large bonuses" which "need[ed] to [be] justif[ied]." ECF No. 113-3 at PageID.1387.

In accordance with these emails, SSI's 2017 payroll identified that four of the five Defendants' spouses—Sarah Ball, Jenny Bartlett, Celena Thelen, and Jessica Bartlett—worked on various MDOT contracts as "project assistants." ECF No. 88-1 at PageID.480 (sealed). But MDOT auditors concluded that "none" of these spouses "appear[ed] to have assisted on projects." *Id.* The FBI's investigation reached the same conclusion.[10] *See id.* According to investigating FBI agents, the timesheets Defendants provided MDOT to corroborate their wives' work contained "differing signatures." *Id.* at PageID.481. Yet, Defendants' spouses were among the highest-paid "employees" at SSI, and received hundreds of thousands of dollars in annual bonuses. *Id.* In FY 2017 alone, SSI included $130,156 in its reimbursable direct labor costs to compensate Defendants' spouses. *Id.* Ultimately, MDOT estimates that, from 2016 through 2018, it overpaid SSI approximately $850,360.14 as a result of Defendants' alleged fraudulent payroll misrepresentations. *Id.*

### 3.   Defendants' Alleged Equalization Scheme

The Government alleges Defendants *personally* benefited from the fruits of their alleged fraudulent overbilling labor by "equalizing" the income of all SSI Group companies, such that each Defendant received, pursuant to the 2011 Secret Agreement, their 20% share of the Groups'

---

[10] The FBI's investigation revealed that at least two of Defendants' spouses had other full-time jobs. ECF No. 88-1 at PageID.481 (sealed). In 2019, local news covered the opening of Jenny Bartlett's spa in Midland, Michigan, and reported that she had previously owned spas in Michigan and California. ECF No. 88-1 at PageID.481 (sealed); *see also* Lori Qualls, *Swae' Spa Offers Relaxation-Naturally*, MIDLAND DAILY NEWS (Mar. 12, 2019, 7:33 AM), https://www.ourmidland.com/news/article/Swae-spa-offersrelaxation-nbsp-naturally-13681099. php. And Sarah Ball has purportedly taught at a high school in Saginaw, Michigan, since 2001. ECF No. 88-1 at PageID.481 (sealed).

net income at the end of each fiscal year. ECF No. 132 at PageID.1520–22. To do so, the Government alleges Defendants would offer fictitious "loans" to one another and take fake loans from the SSI Group entities, with the expectation that the loans would never be paid.[11] *Id.*

For example, in December 2015, Sandy Slominski, a CPA with "Folds & Co., P.C. Certified Public Accounts" wrote a memo to Defendant Semenchuk and SSI entitled "2015 Year End Tax Planning" which outlined a "list" of the following "actions to take before the end of the year:"

1. Have SSI take out a loan of $600,000 from the line of credit.
2. Write a check from SSI to 2SI for $438,000
3. Write a check from SSI to [Southfield IT] for $411,110.95
4. Pay bonuses to SSI managers (see attached schedule). Gross bonus amount equals $765,197.00.
5. Write two checks for $205,000 from 2SI—one each to [Defendant Anthony Thelen] and [Defendant Brian Bartlett] for distributions.
6. Write a check from [Southfield IT] to [Defendant] Adam [Ball] for $288,000 for distributions.
7. Write a check for $130,000 to [Defendant] Jeff Bartlett from 2SI as a loan.
8. Write a check for $133,000 to [Defendant] Andy Semenchuk from [Southfield IT] as a loan.

---

[11] Evidence also suggests Defendants used fake "loans" to keep their "books clean" and avoid administrative or criminal investigation. In October 2016, SSI's office manager emailed all Defendants with a "breakdown" of SSI, 2SI, 3SI, and Southfield IT's bank accounts. ECF No. 113-1 at PageID.1032 (sealed). Defendant Ball responded, "[s]hould we take some out of [SSI's] account again? Probably a little risky keeping that much in there[.]" *Id.* Defendant Semenchuk replied:

> I think what we should do, is make a payment to 2SI for some days []of scanner use [s]o Brian [Bartlett] and [Anthony Thelen] [c]an take their loans/distributions from 2[SI] and do an IT payment as well (for Adam [Ball]) to [Southfield IT].

> This method keeps the SSI books clean. Jeff [Bartlett] and I will take loans from SSI. At the end of the year, Jeff and I will have to pay our loans back . . . [a]nd then [can] take the loans from 2SI/[Southfield IT] like we did last year.

> I know it is complicated and paranoia, but [] stay with the flow (clean books) . . .

> Or just all take loans from SSI and sort it out later…

*Id.* at PageID.1031.

ECF No. 113-1 at PageID.1023 (sealed). And CPA Slominski emphasized "[t]he important point is that each of your 'cash after tax' are close to equal.'" *Id.*

The Second Superseding Indictment also alleges that, on December 28, 2017, Defendant Jeffrey Bartlett sent an email to "SSI's accountant" titled "SSI Equalization[]" stating:

> I guess I personally was thinking more on the lines of getting "loans" from SSI in the 2017 year that we know would never be paid back and keep us all equal from year to year.

*Id.* at PageID.1521. Three minutes later, Semenchuk sent Ball, Thelen, and Brian Bartlett an email titled "Update & Question" stating:

> [E]xactly bonuses to keep me under $350 and the rest loans that will never be paid back.[]

*Id.* Five minutes later, Ball responded:

> I thought there was some discussion of doing the loans 1/1/2018 so that 2017 did not show monster loans on the books to the owners for DBE.

*Id.* Nine minutes later, Brian Bartlett responded:

> I thought the 2018 loans were for if we received a bunch more money and were not able to divert it to 2SI and [Southfield IT] because they are maxed out. Then we would do so after the first of the year for Adam [Ball], Brian [Bartlett], [Anthony Thelen] and Jeff [Bartlett]. Andy [Semenchuk] would get loans from SSI then . . .

*Id.* at PageID.1522.

### B. Procedural Posture

On July 23, 2024, Defendant Brian Bartlett filed a Motion for a Bill of Particulars. ECF No. 92. Defendants Jeffrey Bartlett, Adam Ball, and Andrew Semenchuk joined Brian Bartlett's motion, and seek the same relief. ECF Nos. 96; 104; 128. The Government responded on August 9, 2024, ECF No. 112, and Defendant Brian Bartlett replied on August 30, 2024. ECF No. 123.

**II.**

Federal Criminal Rule 7 allows defendants to seek a "bill of particulars." FED. R. CRIM. P. 7(f). "The purpose of a bill of particulars is to give a defendant key factual information not contained in the indictment, so as to enable him or her to prepare a defense and avoid surprise at trial." *United States v. Page*, 575 F. App'x 641, 643 (6th Cir. 2014). On the other hand, a bill of particulars is not intended to arm defendants with a tool to obtain additional discovery or learn more about the Government's theories of the case. *Harvel*, 115 F.4th at 731; *United States v. Khalil*, No. 22-CR-20200, 2024 WL 3160668, at *2 (E.D. Mich. June 25, 2024). "Thus, the test in ruling on a motion for a bill of particulars is whether providing [additional] details is necessary to the preparation of the defense and avoidance of prejudicial surprise." *United States v. Musick*, 291 F. App'x 706, 724 (6th Cir. 2008). "In deciding a motion for a bill of particulars, courts consider 'the complexity of the charges, the clarity of the indictment, and the degree of discovery available to the defense absent a bill of particulars.'" *United States v. Khalil*, No. 22-CR-20200, 2024 WL 3160668, at *2 (E.D. Mich. June 25, 2024) (quoting *United States v. McQuarrie*, No. 16-cr-20499, 2018 WL 372702, at *5 (E.D. Mich. Jan. 11, 2018). A motion for a bill of particulars "lies within the sound discretion of the [district] court," *United States v. Eberle*, No. CR. 08-20139, 2008 WL 4534171, at *2 (E.D. Mich. Oct. 3, 2008), and is reviewed "with deference" for abuse of discretion on appeal. *United States v. Harvel*, 115 F.4th 714, 730 (6th Cir. 2024).

**III.**

Defendants do not challenge Count I—charging conspiracy to commit wire fraud. ECF Nos. 92; 96; 104; 128. Instead, Defendants collectively argue that Count II—charging a conspiracy to defraud the United States—and Counts III through XV (the "Wire Fraud Counts") do not

provide sufficient notice of their alleged unlawful conduct. The sufficiency of each count will be addressed in turn.

### A.  Count II: Conspiracy to Defraud the United States

Beginning with Count II, Defendant Brian Bartlett argues a bill of particulars is necessary because Count II does not expressly allege that he committed any overt acts in furtherance of the charged conspiracy to defraud the United States, such that he "is unable to determine what, if any, criminality the Government wishes to place on him." ECF No. 92 at PageID.658. Defendants Jeffrey Bartlett and Adam Ball join Defendant Brian Bartlett and adopt his argument in full, ECF Nos. 96; 128, despite the fact that Defendant Jeffrey Bartlett is expressly named as an overt actor. *See* ECF No. 132 at PageID.1524. Defendant Semenchuk concedes that Count II—which expressly identifies him as an overt actor—"adequately apprises" him of "the nature of the charge against him." ECF No. 104 at PageID.808. Notwithstanding Semenchuk's concession, Defendants' arguments are without merit.

For starters, Count II—charging conspiracy to defraud the United States—expressly incorporates *all* factual allegations in Count I—charging conspiracy to commit wire fraud. ECF No. 132 at PageID.1522 ("The general allegations and paragraphs 20-49 are included in this Count."); *see also* FED R. CRIM. P. 7(c)(1) ("A count may incorporate by references an allegation made in another count."). And Defendants do not argue these allegations insufficiently notify them of their alleged criminal conduct within the charged conspiracy to commit wire fraud. *See generally* ECF Nos. 92; 96; 128. But the factual allegations ("manner and means") of the charged conspiracy to commit wire fraud—which Defendants do not challenge—are the *same* as those of the charged conspiracy to defraud the United States. *See* ECF No. 132 at PageID.1509–24. These factual allegations span 15 pages of the 26-page Second Superseding Indictment, thoroughly

summarize all facets of Defendants' alleged criminal conduct explained *supra* Section I.A, and

include a plethora of personal allegations specific to each Defendant, including but not limited to:

1. All Defendants were SSI executives,
2. All Defendants signed the 2011 Secret Agreement, such that they equally owned SSI, 2SI, 3SI, and Southfield IT,
3. Defendant Semenchuk joined SSI in early 2011 with the intent—shared by all Defendants—to falsely obtain SSI's DBE certification,
4. Defendants Semenchuk and Brian Bartlett filed numerous false ownership certifications to MDOT to maintain SSI's DBE status from 2011 through 2018,
5. Defendant Ball was an authorized signor on Southfield IT's bank account,
6. Defendant Jeffrey Bartlett was the purported owner of 2SI and was an authorized signor on its bank account,
7. All Defendants submitted "false claims to MDOT for labor costs associated with . . . ghost employees" such as "bonuses as well as payroll,"
8. All Defendants alleged creation of "false and fraudulent timesheets and federal income tax forms . . . to trick MDOT officials into believing the ghost employees were employed by SSI,"
9. Defendants Jeffrey Bartlett, Semenchuk, Ball, and Brian Bartlett all sent emails to each other discussing Defendants' "end of year equalization," in which Defendants planned to offer each other fake loans to ensure each Defendant received 20% of the SSI Group's net income.

*See generally* ECF No. 132 at PageID.1509–22.

These incorporated allegations avoid undue surprise at trial and sufficiently appraise

Defendants of their criminal conduct as alleged in Count II. *See United States v. Valdez-Morales*,

No. 3:15-CR-56, 2016 WL 919029, at *5 (E.D. Tenn. Mar. 4, 2016) (denying bill of particulars

when indictment, charging conspiracy to defraud the United States, did not expressly allege overt

acts but sufficiently explained the "manner and means" of the alleged conspiracy). In addition to

these incorporated allegations, Count II expressly cites 18 U.S.C. § 371 and alleges:

On or about February 25, 2011 , through at least June 2019 , in the Eastern District of Michigan - Northern Division, [D]efendants Jeffrey Bartlett, Andrew Semenchuk, Adam Ball, Brian Bartlett, and Anthony Thelen  knowingly and voluntarily combined, conspired, and agreed with each other and others, known and unknown to the grand jury, to defraud the United States and an agency of the United States, the United States Department of Transportation.

*Id.* at PageID.1523 (emphasis omitted). And the Second Superseding Indictment describes in detail

the three objects of Defendants' alleged conspiracy to defraud the United States:

1. The object of the conspiracy and scheme was to defraud and deprive USDOT of money by means of false and fraudulent material pretenses, representations, and promises made to MDOT with the intent to trick MDOT into compensating SSI for overhead expenses SSI did not incur, or for which SSI was not entitled to receive compensation, as well as paying an inflated profit margin to SSI.

2. It was also an object of the conspiracy that SSI be recognized as a DBE, and to accomplish that the [D]efendants falsely certified that Semenchuk was a 51 percent owner of SSI, purchased SSI with his own funds, and otherwise met qualification requirements to receive DBE status and preferences.

3. It was further an object of the conspiracy and the scheme for the defendants to split the illegally obtained payments equally among themselves and to use them for their personal benefit and enrichment.

*Id.* at PageID.1523.

Count II also alleges the following three overt acts in furtherance of Defendants' conspiracy

to defraud the United States:

1. On April 19, 2023, as the [D]efendants agreed and with intent to defraud, [Defendant] Semenchuk pretended to be a 51% owner of SSI and applied for DBE status for SSI.

2. On October 24, 2013, as the [D]efendants agreed, [Defendants] Semenchuk and Jeffrey Bartlett signed MDOT "On-Site Visit" questionnaires falsely certifying that neither they nor any other member of SSI had an ownership interest in another firm.

3. On February 17, 2015, [D]efendants, with intent to defraud, opened a bank account in the name of Southfield IT and listed [Defendant] Ball as one of the signors. This account was used by [D]efendants to move illegally obtained funds back to themselves and their spouses from Southfield IT's bank account.

*Id.* at PageID.1524 (emphasis omitted).

In this way, Count II "adequately sets forth the elements" of a conspiracy to defraud the

United States, cites the relevant statute, and describes the general "time and place" of Defendant's

alleged illegal conduct. *United States v. Castro-Ramirez*, No. 09-20215, 2009 WL 4950546, at *2 (E.D. Mich. Dec. 16, 2009). "Nothing more is required." *Id.*

Yet the Government provided more. The Government "provided significant pre-indictment discovery to Defendants' prior counsel," including at least two reverse proffers, all "key documents[,] the affidavits in support of [] search warrants, copies of Defendants' voluntary statements to the FBI, witness interview statements[], audit reports, and government work product." *United States v. Bartlett*, No. 1:23-CR-20676, 2024 WL 1715397, at *7 (E.D. Mich. Apr. 22, 2024); *see also* ECF No. 112 at PageID.969. The Government's disclosure efforts continued throughout a Defense Counsel carousel. Most recently, in June 2024, the Government provided another, three-hour reverse proffer presentation to all Defendants and their attorneys of record. This reverse proffer included *hundreds* of PowerPoint slides and pieces of evidence, such as Defendants' emails and SSI Group financial statements and transactions dating back to 2011, outlining all aspects of Defendants' alleged conspiracies. *See* ECF Nos. 113-1 (sealed); 113-2 (sealed); 113-3 (sealed). This substantial discovery "further minimizes the need for a bill of particulars." *United States v. Minion*, No. 22-CR-20059, 2023 WL 2733392, at *3–4 (E.D. Mich. Mar. 31, 2023); *see also United States v. Delgado*, No. 1:22-CR-20187-1, 2024 WL 2806464, at *6 (E.D. Mich. May 31, 2024) (denying bill of particulars, in part because the Government provided substantial discovery and a reverse proffer).

Moreover, Defendants' collective argument—that a bill of particulars is required because the Second Superseding Indictment does not specifically allege each Defendant committed an overt act—is fundamentally flawed. The Government need not allege, nor prove, that *each* Defendant committed an overt act in furtherance of the conspiracy to defraud. To the contrary, to convict on Count II, the Government must prove beyond a reasonable doubt that (1) all Defendants

entered into an agreement to accomplish an illegal objective against the United States; (2) all Defendants had the intent to defraud the United States; and (3) *one or more* Defendant made *one or more* overt act in furtherance of the fraud. *See United States v. Khalife*, 106 F.3d 1300, 1303 (6th Cir. 1997). So long as the challenged portion of the indictment sufficiently alleges that "at least one of the defendants was responsible for either the commission of or the direction of each of the alleged overt acts," a bill of particulars is unnecessary. *United States v. Younes*, 194 F. App'x 302, 309 (6th Cir. 2006) Indeed, as the Sixth Circuit and district courts routinely recognize, "[a] defendant is not entitled to a bill of particulars [to] discover all of the overt acts that might be proven at trial." *United States v. Musick*, 291 F. App'x 706, 724 (6th Cir. 2008); *see also United States v. Lundergan*, No. 518CR00106GFVTMAS, 2019 WL 2082766, at *4 (E.D. Ky. May 13, 2019) ("[Defendant] has received ample information to identify the alleged overt acts, and he is not entitled to discover all overt acts the Government might present at trial.").

Count II adequately appraises all Defendants of their alleged criminal conduct within the charged conspiracy to defraud the United States. A bill of particulars is not necessary to further explain this charge.

### B.  Counts III–XV: Wire Fraud

But a bill of particulars is necessary to provide additional factual detail about the charged Wire Fraud Counts.

"To convict a defendant of wire fraud, the government must prove (1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (internal quotations omitted); *see also* 18 U.S.C. § 1343. "A scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money—

deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir.1999).

The Second Superseding Indictment provides significant factual detail outlining Defendants' alleged overbilling "scheme or artifice" to defraud, and their intent to deprive MDOT of federal funds. Indeed, the Wire Fraud Counts expressly incorporate the factual allegations of Counts I and II, ECF No. 132 at PageID.1524, which, as discussed, sufficiently appraise all Defendants of their alleged fraudulent conduct and intent. *See supra* Section III.A. Defendants do not argue otherwise. *See* ECF Nos. 92; 96; 108; 128.

But the Second Superseding Indictment falls flat when describing how Defendants used the wires *in furtherance* of their alleged fraudulent overbilling scheme. *Daniel*, 329 F.3d at 485 (6th Cir. 2003). The Government groups all Wire Fraud Counts together and alleges Defendants, "with the intent to defraud and for the purpose of executing the scheme" to defraud, "transmitted and caused the transmission of" thirteen separate "wire communications in interstate commerce," from MDOT's Comerica Bank account in Auburn Hills, Michigan to SSI's Huntington Bank account in Columbus, Ohio:

| COUNT | DATE | AMOUNT |
|---|---|---|
| III | December 7, 2018 | $6,824.16 |
| IV | December 7, 2018 | $74,570.94 |
| V | December 10, 2018 | $19,545.10 |
| VI | December 12, 2018 | $73,038.61 |
| VII | December 12, 2018 | $116,353.50 |
| VIII | December 12, 2018 | $26,139.49 |
| IX | December 19, 2018 | $125,351.21 |
| X | December 19, 2018 | $80,238.15 |
| XI | June 21, 2019 | $75,451.26 |
| XII | June 27, 2019 | $120,391.62 |
| XIII | July 25, 2019 | $105,143.78 |
| XIV | July 25, 2019 | $65,103.49 |
| XV | July 29, 2019 | $61,935.75 |

ECF No. 132 at PageID.1525–27 (table in original).

But how were these thirteen transfers allegedly in furtherance of Defendants' alleged fraudulent overbilling scheme? This Court—and Defendants—do not know because the Government does not say. True, the Government need not prove at trial Defendants' alleged criminal conduct "actually defrauded" MDOT of federal funds. *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir. 2003) ("[T]he actual success of a scheme to defraud is not an element of . . . § 1343."). But the Government has not provided *any* information connecting these thirteen identified wire transferers to SSI's alleged overbilling or MDOT's overpayment. Indeed, the Government has not even identified *why* MDOT paid SSI these amounts on these dates, nor does the Government connect these wire transfers to Defendants' alleged end-of-year equalization scheme. Do all transfers correspond to awarded contracts? Again, the Government does not say. And the Government's discovery disclosures do not fill these gaps. Although significant discovery may mitigate the need for a bill of particulars, and the Government has provided significant discovery to Defendants in this case, *see supra* Section III.A., nothing in the Government's most recent reverse proffer explains how these identified transfers were in furtherance of Defendants' alleged fraudulent overbilling scheme. *See* ECF Nos. 113-1 (sealed); 113-2 (sealed); 113-3 (sealed).

True, in some cases, courts have denied defendants' requests for bills of particulars to clarify wire fraud counts when—like here—the Government identifies the relevant transfers by date, bank account number, and amount transferred. *See, e.g.*, *United States v. Caniff*, No. 2:21-CR-121, 2023 WL 3901529, at *7 (S.D. Ohio June 8, 2023); *United States v. Walters*, 963 F. Supp. 2d 125, 134 (E.D.N.Y. 2013); *United States v. Russo*, 483 F. Supp. 2d 301, 311 (S.D.N.Y. 2007). But courts nevertheless consider the "complexity of the charges" when assessing the need for particulars. *United States v. Khalil*, No. 22-CR-20200, 2024 WL 3160668, at *2 (E.D. Mich. June

25, 2024). Here, Defendants alleged fraudulent scheme involves overbilling. Defendants allegedly schemed to (and did) defraud MDOT by misrepresenting SSI's relationship to commonly controlled companies and their own employees, thereby increasing their direct labor costs and overhead rates subject to MDOT reimbursement. *See supra* Section I.A. Unlike generic wire fraud cases, this complex alleged overbilling scheme *necessarily* involves *some* comparison between the reimbursements Defendants *sought* to receive from MDOT and the reimbursements they *should have* received had they accurately represented their ownership of the SSI Group entities and their payroll expenses. But the Second Superseding Indictment does not provide any information for this Court nor Defendants to compare, and Defendants cannot adequately prepare for trial by reading between the lines. *See United States v. Fayad*, 22-cr-20188 (E.D. Mich. Aug. 16, 2023), ECF No. 172 (unpublished) (granting defendant's motion for a bill of particulars because analogous table of identified transfers within charged wire fraud counts did not sufficiently apprise defendant of his alleged criminal conduct); *see also United States v. Grace*, 401 F. Supp. 2d 1103, 1114 (D. Mont. 2005) (noting "Defendants are entitled to know the [G]overnment's theory" about how identified wire transmissions are "made in furtherance of" the alleged scheme to defraud).

So Defendants' motions will be granted in part, and the Government will be directed to file a bill of particulars providing more detail about how the transfers identified in the Wire Fraud Counts were "in furtherance" of Defendants' alleged fraudulent overbilling scheme.[12]

---

[12] This may not be a heavy lift. Defendants would likely be sufficiently apprised of their criminal conduct, as alleged in the Wire Fraud Counts, if the Government alleges that the thirteen specific transfers were sent by MDOT *in connection with contracts awarded to SSI*, and that the total amount of money transferred *included artificially inflated overhead rates or direct labor costs.*

**IV.**

Accordingly, it is **ORDERED** that Defendant Brian Bartlett's Motion for a Bill of Particulars, ECF No. 92,—joined by Defendants Adam Ball, ECF No. 96, Andrew Semenchuk, ECF No. 104, and Jeffrey Bartlett, ECF No. 128—is **GRANTED IN PART**, to the extent it seeks particulars concerning Counts III—XV, charging Defendants with wire fraud in violation of 18 U.S. Code § 1343**.**

Accordingly, it is **ORDERED** that Defendant Brian Bartlett's Motion for a Bill of Particulars, ECF No. 92, is **DENIED IN PART**, in all other respects.

Further, it is **ORDERED** that the Government is **DIRECTED** to file a bill of particulars regarding Counts III–XV **on or before November 22, 2024**. The bill of particulars should clarify how the thirteen identified wire transfers were made "in furtherance" of Defendants' alleged fraudulent overbilling scheme.

**This is not a final order and does not close the above-captioned case.**

Dated: October 25, 2024                         s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge