# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

_____

**UNITED STATES OF AMERICA**
             Plaintiff,             Case No. 1:23-cr-20676-TLL

                                    Hon. Thomas Ludington

v.

**JEFFREY BARTLETT,**
             Defendant.
_____/

## MOTION TO DISMISS OR, ALTERNATIVELY, PRECLUDE ADMISSION OF EVIDENCE AND ARGUMENT REGARDING "COMMON CONTROL"

Mr. Jeffrey Bartlett, by his attorney, Joshua Blanchard, moves the Court to dismiss the indictment or preclude the admission of evidence and argument premised upon a theory that the defendants violated the concept of "common control" in carrying out the alleged scheme because such theory, as alleged by the government, violates the rule of lenity.

Counsel for Mr. Bartlett sought concurrence from the government's

lawyers and it was denied.

Respectfully Submitted,
**BLANCHARD LAW**


Dated: January 15, 2025          /s/ Joshua Blanchard
                                 Joshua Blanchard
                                 Attorney for Mr. Jeffrey Bartlett
                                 309 S. Lafayette St., Ste. 208
                                 Greenville, MI 48838
                                 616-773-2945
                                 josh@blanchard.law

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

_____

**UNITED STATES OF AMERICA**
                 Plaintiff,        Case No. 1:23-cr-20676-TLL

                                        Hon. Thomas Ludington

v.




**JEFFREY BARTLETT,**
                 Defendant.

_____/


## BRIEF IN SUPPORT OF MOTION TO DISMISS OR, ALTERNATIVELY, PRECLUDE ADMISSION OF EVIDENCE AND ARGUMENT REGARDING "COMMON CONTROL"

      **Issue Presented:** Whether the concept of "common control" is so poorly defined that prosecuting Mr. Bartlett premised on a theory that his conduct ran afoul of such rule violates due process and the Rule of Lenity.

      **Most Controlling Authority:** *Jones v. United States*, 529 U.S. 848, 858 (2000); *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004).

## STATEMENT OF FACTS

The Brooks Act, enacted in 1972, governs the method of selecting contractors to provide architectural and engineering services. *See* 40 U.S.C. § 1101-04. Under the Act, agencies must "negotiate contracts for architectural and engineering services on the basis of demonstrated competence and qualification for the type of professional services required and at a fair and reasonable price." 40 U.S.C. § 1101. In other words, the Brooks Act does not allow agencies to award contracts based on the lowest bidder, but rather mandates a selection procedure which is intended to select the "most highly qualified to provide the services required." 40 U.S.C. § 1103. Once the most qualified firm is selected, a contract for services is negotiated where the government determines "fair and reasonable" compensation. 40 U.S.C. § 1104. The selection of an engineering firm is based on quality, not price. *See generally* 23 U.S.C. § 112(b)(2)(A); *Foster v. Michigan*, 573 Fed. Appx. 377, 380 (6th Cir. 2014).

This was the framework under which SSI provided services to the Michigan Department of Transportation. MDOT negotiated contracts with SSI by multiplying SSI's "direct labor costs" by an "indirect overhead rate" and then applying a fixed 11% profit. *See* Opinion and Order

4

Denying Def. Discovery Mot., ECF No. 151, PageID.1657. This Court noted, however, that "critical to the Government's case, if the contractor rents real or personal property from a *commonly controlled entity*, federal regulations prohibit the contractor from including these costs. Instead, contractors renting from commonly controlled entities can only include— as part of their reimbursable overhead rate—the *normal costs of ownership*, such as 'depreciation, taxes . . . and maintenance' for the specific piece of rented property." *Id.* citing 48 C.F.R. § 31.205-36(b)(3); ECF No. 132 at PageID.1518.

According to the Government, the businesses—SSI, 2SI, 3SI, and Southfield IT were under "common control" and that falsely asserting otherwise[1] resulted in Defendants "obtain[ing] more in reimbursement and profit payments from MDOT than they were entitled to". *See* Second Superseding Indictment, ECF No. 132, PageID.1522, ¶ 1522. This alleged overbilling scheme is "*both* an object of their conspiracy to defraud the United States (Count II) *and* forms the factual basis for thirteen separate

---

[1] The government alleges that Semenchuk and J. Bartlett "falsely told MDOT they did not control or own any other companies". *See* Second Superseding Indictment, ECF No. 132, PageID.1517. But that's not even the question asked by MDOT. On the question of common control, the relevant prequalification questionnaire asked "[d]oes the **company** own or control any other company or legal entity (e.g., trust or foundation) through common ownership?" *See* MDOT Prequalification Questionnaire, A.4 (emphasis added).

counts of wire fraud (Counts III-XV)." Opinion, *supra*, ECF No. 151, PageID.1658 (emphasis in original).

## LAW AND ARGUMENT

The rule of lenity is a long-standing principle of statutory construction directing that when "choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *United States v. C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952)). The rule of lenity is one of the three manifestations of the constitutional requirement that criminal statutes should provide fair warning of the boundaries of criminal conduct. *See e.g., Crandon v. United States*, 494 U.S. 152, 158 (1990). When "there is doubt whether the defendants' conduct is criminal, the rule of lenity requires that the doubt be resolved in favor of the accused." *United States v. Ouwenga*, 173 Fed. Appx. 411, 417 (6th Cir. 2006). The rule of lenity exists "in part to protect the Due Process Clause's promise that a 'fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'"

*Bittner v. United States*, 598 U.S. 85, 102 (2023) citing *McBoyle v. United States*, 283 U.S. 25, 27 (1931).

## I.   "COMMON CONTROL" IS WHOLLY UNDEFINED AND HAS NO DISCERNIBLE GUIDING PRINCIPLES TO PLACE A CITIZEN ON NOTICE OF ITS VIOLATION.

"Common control" is not defined in the relevant Code of Federal Regulations, nor any other relevant statute. Likewise, "common control" as a procurement regulation is sufficiently obscure that "persons of ordinary intelligence reading the term could not discern its meaning." *See United States v. Caseer*, 399 F.3d 828, 837 (6th Cir. 2005) (holding that use of the scientific term "cathinone" would not allow a person of ordinary intelligence to discern that possession of khat containing cathinone was possession of a controlled substance). The Supreme Court in *Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) explained as follows:

> The precise point of differentiation in some instances is not easy of statement; but . . . generally . . . the decisions of the court, upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them, or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ, or . . . that,

7

> for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded.

269 U.S. at 391-92 (internal quotation marks and citations omitted); *see also Columbia Natural Res., Inc., v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995) ("Because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.")

Starting in early 2018, it became apparent to several road surveying firms that a particular auditor at MDOT, Chris Schafer, who was described by another engineering firm as "a bulldog", took exception to an industry auditor, Judy Snyder's, auditing work product. *See* April 10, 2018 Email, Ex. A. The consensus was that Mr. Schafer was targeting her. *Id.* They expressed confusion about "how one MDOT person can judge a person completely the opposite of another". *Id.*

During the 2010 audit, MDOT brought to SSI's attention that J. Bartlett was not able to own an interest in the leasing company which owned the Standish office. *See* Karen Liang Email, Ex. B. In response,

Mr. J. Bartlett transferred his ownership in this entity. *See* Bill of Sale, Ex. C. MDOT auditors were satisfied that the transfer fixed the common control issue. *See* Liang Audit Workpapers, Ex. D. The next year, knowing that Mr. Bartlett had previously owned an interest in 2SI and 3SI, Chris Schafer waived off any concerns about common control, writing in his work papers on February 15, 2012 that "common control does not require review." *See* Working Papers, Ex. E.

As late as 2018, just two months before Mr. Semenchuk sold his shares in SSI, MDOT Auditor Chris Schafer and his team were still seemingly struggling to understand contours of the so-called common control regulations. As of Halloween 2018, they still hadn't made a determination regarding common control for SSI. Schafer emailed his state auditor colleagues with "required reading" materials on common control directing that "[i]n making our common control determination related to SSI's operating leases, we make (at least) the following three points, in no particular order: 1. Common officers 2. Family Relationship 3. Unreasonable Lease Terms" *See* Oct. 31, 2018 Email, Ex. F. He attached to this email "required reading" documents, flagging for his

colleagues page 6 of the VIPER[2] manual produced by the Defense Contracting Audit Agency.

A month later, Mr. Schafer emailed the same materials to a private CPA at Rehmann calling the DCAA manual "pseudo-authoritative guidelines" and suggested it was "food for thought, anyhow". *See* November 30, 2018 email, Exhibit F.1.

It is unclear what the DCAA's VIPER manual on *auditing* standards has to do with a road construction project in Northern Michigan. In any case, the section of "required reading" highlighted by Mr. Schafer starts by explaining that "FAR does not specifically define common control" and that "the question of whether two entities are under common control is a question of fact." DCAA VIPER, Chapter 40-5.25, Ex. G. A fact, which Mr. Schafer previously determined "does not require review" despite being aware for more than 7 years that 2SI and 3SI were previously owned by J. Bartlett and presently owned by B. Bartlett and Thelen. *See* Working Papers, Ex. E. And MDOT auditors knew for years that B. Bartlett and Thelen were key employees of SSI. *See* 2010 MDOT

---

[2] Perhaps choosing to name this manual after a venomous snake is apt.

Auditor Karen Liang Working Papers, Ex. H.1 (showing disclosure of compensation to Brian Bartlett of $379,589 and Anthony Thelen of $359,747); Ex. H.2 (2015 Executive Compensation Matrix disclosing SSI compensation in excess of $300,000 to each of the charged defendants as executives of SSI).

Yet, the prosecution relies on this "not specifically define[d]" term as a foundation of its theory. The Eleventh Circuit case, *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004), vacated the convictions of the *Chandler* defendants in a mail fraud conspiracy case where the government's theory depended on an undefined term as the basis for the fraud. The *Chandler* case involved a McDonald's game that used "game stamps" that were attached to certain foods. *Id*. at 799. To manage the game, McDonald's hired Simon Marketing. *Id*. The director of security for Simon Marketing embezzled the game stamps and gave them to relatives and friends to recruit people to submit the stolen game stamps in order to collect the prize money. *Id*. The mail fraud theory was that defendants fraudulently certified themselves as "legitimate" winners of the game stamps. *Id*. at 804.

The Eleventh Circuit explained "we do not think that representations to McDonald's that *may* have violated the rules of its games could form the basis for a criminal prosecution." *Id.* at 805 (emphasis in original). The government's argument that the terms "legitimate" and "illegitimate" were "clearly and unambiguously" used was not compelling. The *Chandler* Court reasoned that the rule of lenity requires that a criminal conviction not be "predicated upon a problematic interpretation and retroactive application" of the rules. *Id.* at 805. Furthermore, "[i]f there is doubt whether the defendant's conduct is criminal, the rule of lenity requires that the doubt be resolved in favor of the accused." *Id.* at 805, citing *Ladner v. United States*, 358 U.S. 169, 178 (1958).

Like the term "legitimate" in *Chandler*, the term "common control" is undefined. Nowhere in 48 CFR Part 31 is "common control" defined. And even the "pseudo-authoritative guidelines" relied upon by MDOT auditors for their "retrospective application" of common control, such as the VIPER manual, do not define the term, cautioning that "FAR does not specifically define common control." Like *Chandler,* the instant prosecution is "predicated upon a problematic interpretation and

retroactive application" of confusing and undefined cost accounting principles. *Chandler,* 388 F.3d at 805.

In *United States v. Tyson Foods Inc.*, 258 F.Supp.2d 809 (E.D. Tenn. 2003), in a prosecution for the use of illegal identification documents, the term "identification document" was not defined, and the *Tyson* Court found that the term was "capable of two completely different, reasonable interpretations" and was therefore ambiguous. *Id*. at 815. The documents at issue were fraudulent social security cards. The court reasoned that while the government's theory that social security cards were "identification documents" was "not entirely implausible", the statute could be read as the opposition conclusion, thereby creating the ambiguity. *Id*. at 815. Invoking the rule of lenity, the *Tyson* Court dismissed the conspiracy count, holding that the government could not seek to prove the conspiracy based on the theory that Social Security cards were identification documents. *Id*. at 818; *see also United States v. Phifer*, 909 F.3d 372, 382 (11th Cir. 2018) (vacating a conviction where the definition of "positional isomer" in 21 C.F.R. § 1300.11 could be interpreted two different ways and was therefore ambiguous).

"Common control" is subject to multiple definitions and open to interpretation, making it ambiguous. The VIPER manual suggests that consideration of the "decision making process is important to determine if control actually exists. For example, if it appears that one company is making practically all of the decisions (e.g., the other party is not present at decision making meetings, or if present rarely provides input), this would be an indication that this company is controlling the joint venture." Here, the government alleges that the parties all participated in decision-making.

The government makes much of an alleged agreement to have equal ownership, but the VIPER manual also warns that the "auditor should remember that percentage ownership is only one factor to be considered". "The existence of unreasonable lease terms may also provide evidence of control" but VIPER warns that "showing that the lease costs are unreasonable will not in itself constitute a determination of common control". Seemingly, everything is both evidence of common control and, at the same time, not evidence of common control.

Here, the defendants clearly did not have common ownership between the entities. The bylaws for SSI, executed after the government's

so-called secret agreement, provide that "[t]he vote of holders (or their proxies) of a majority of the issued shares of Corporation stock at a shareholders' meeting shall be controlling." SSI Amended Bylaws, §2.5, Ex. I. The SSI bylaws called for a single director. *Id.* at §3.3. The director was only removable by a majority vote of the shareholders. *Id.* at §3.5. These Bylaws were adopted on October 31, 2012 at the same meeting where Mr. Semenchuk was elected as the sole director. *See* Minutes, Oct. 31, 2012, Ex. J. Both the title of the Bylaws and the minutes reflect that these amended bylaws "supersede all previous Bylaws and amendments". *Id.*

And Mr. Semenchuk, first through GEO and later individually, alone held a majority stake, owning 5,100 of 10,000 outstanding shares. *See* Stock Cert., Ex. K. And then in 2018, pursuant to a stock redemption agreement, SSI purchased Mr. Semenchuk's shares for $1,980,198. During his ownership, Mr. Semenchuk was the only person with legal control over SSI.

Each year when SSI, 2SI and 3SI filed tax returns, they reported their true ownership. *See,* e.g., IRS Forms, Ex. L. The profits or losses from the various entities were passed on to their owners. The owners paid

taxes on their income. Any transactions between the companies were properly documented, taxed, disclosed, and accounted for.

And notably, the owners of the different companies personally guaranteed the debt only for the companies they owned: J. Bartlett and Semenchuk guaranteed SSI's debt, Thelen and B. Bartlett guaranteed 2SI and 3SI's debt, and Ball didn't guarantee anything. *See* Personal Guarantees, Ex. M. In the event of a default, each would have been personally responsible only for the debt associated with the company they actually owned.

To be sure, SSI's accountants calculated an annual equalization of compensation between the key employees of SSI, some of whom owned 2SI and 3SI. This was done in full view– and with the assistance – of CPAs and lawyers. This information was reflected in SSI's general ledger which was reviewed by SSI's auditor and MDOT OCA auditors. But contrary to the government's view, providing an attractive compensation plan to retain your key talent isn't fraud; it is a good (and necessary) business practice in a competitive industry.   There is a difference between maximizing profits and intending to defraud the government— one involves earning money, the other, stealing. For example, it is

perfectly legal to engage in "tax avoidance" in order to pay the minimal amount of taxes but illegal to engage in "tax evasion" to minimize the amount of tax paid. *See Est. of Kluener v. Comm'r*, 154 F.3d 630, 634 (6th Cir. 1998) ("Tax avoidance is entirely legal and legitimate. Any taxpayer may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." (Internal quotations and citations omitted).).

Whether the entities were under "common control" is entirely dependent on subjective retrospective review by government auditors who were more interested in scheming to "spring a trap" for private industry auditors than calculating accurate numbers or getting to the truth. *See* MDOT OCA Emails, Ex. N (MDOT plotting to "spring a trap" for another auditor who had also been engaged to assist SSI's auditor, describing the problem as originating from SSI's auditor, learning that SSI's auditor who audited many similar consultants had no experience in this area and was apparently unlicensed when conducting audit work).

To read the indictment, one would be forgiven if they believed the government was shocked to learn that 2SI and 3SI had a connection to

SSI. But it can hardly be said that SSI, 2SI, and 3SI are hiding their connection, with names so similar it's comical to suggest the interrelation among them is a result of some nefarious "secret agreement".

For all the evidence the government has suggested that demonstrate common ownership, there is plenty that there is not. SSI's business was done in full view of its CPAs, auditors, and MDOT. MDOT knew the owners of 2SI and 3SI. The compensation paid to the owners of 2SI and 3SI was disclosed to MDOT. The amount of money paid to 2SI, 3SI, and Southfield IT was disclosed to SSI's independent auditor and MDOT with each overhead calculation. *See, e.g.,* 2017 Overhead Calculation, p.5, Ex. O. The employment of B. Bartlett and spouses was disclosed. *Id.* at p.8. Ownership of 2SI and 3SI by Thelen and B. Bartlett was clearly disclosed to MDOT no later than 2013. *See* USDOT Appeal, Ex. P (noting that MDOT's December 2013 denial of DBE status focused on Mr. Thelen and Mr. Brian Bartlett owning 2SI and 3SI). And as explained above, the owners of the various companies were only liable for their own company's debts.

Ironically enough, in 2007, MDOT OCA audited SSI's submitted overhead rate of 176.33% and said it was too low. MDOT OCA increased

the rate to 187.89%. In 2017, the last audited year before the indicted conduct when the government claims there was common control and IT expense fraud, SSI's rate was 186.89%. *See* MDOT Audit Letter, p.6, Ex. Q.

## II.   THE RULE OF LENITY ACTS TO PROTECT AGAINST CONVICTIONS FOR VIOLATING INDEFINITE RULES.

The purpose of lenity is, first, to allow a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *N. Am. Van Lines v. United States*, 243 F.2d 693, 697 (6th Cir. 1957), *see also United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001). Second, lenity mitigates "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Boucha*, 236 F.3d at 774 (quoting *United States v. Bass*, 404 U.S. 336,348 (1971)). In a criminal case, the "standard of certainty is higher" than enforcement of only civil sanctions. *Kolender v Lawson*, 461 U.S. 352, 358 n. 8 (1983), citing *Winters v. New York*, 333 U.S. 507, 515 (1948).

Because the term "common control" is undefined, it is "wholly subjective" and "without statutory definitions, narrowing context, or settled legal meaning[ ]" and therefore cannot serve as the basis for the

government's theory. *United States v. Williams*, 553 U.S. 285, 306 (2008) citing *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971); *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870-74 (1997). The lack of clarity as to the definition and parameters of what it means to be under "common control" gives the government the discretion to determine whether a suspect has committed a violation on an "ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

The rule of lenity has its origins in due process, the idea that individuals must receive adequate notice of what activities are illegal before being punished, but it is also premised on the risk of prosecutorial overreaching. *See Dunn v. United States*, 442 U.S. 100, 112 (1979) (stating that lenity "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate…whether his conduct is prohibited."); *see e.g., United States v. Kozminski*, 487 U.S. 931, 960, n. 7 (1988) (Brennan, J., concurring) (arguing that case-by-case assessment of an ambiguity "delegates open-ended authority to prosecutors and juries"). Because the doctrine guarantees "fair notice" of the conduct a statute prohibits, it is in a sense a "corollary of the separation of powers—requiring that Congress, rather than the executive

or judicial branch, define what conduct is sanctionable and what is not."
*Sessions v. Dimaya*, 584 U.S. 148, 156 (2018); *cf. Kolender v. Lawson*, 461
U.S. 352, 358, n. 7 (1983) ("[I]f the legislature could set a net large enough
to catch all possible offenders, and leave it to the courts to step aside and
say who could be rightfully detained, [it would] substitute the judicial for
the legislative department" (internal quotations omitted)).

In the regulatory context, agencies—as opposed to Congress—draft
the relevant rules, so the incentive of the agency is to maximize its
discretion to enforce its regulations; therefore, it is compelled to draft
broad regulation that can be subject to vast interpretation. Prior to the
overruling of *Chevron*, there existed a tension between the rule of lenity
and the *Chervron* doctrine of deferring to agency interpretation. *See
Whitman v. United States*, 574 U.S. 1003 (2014) ("The rule of lenity
requires interpreters to resolve ambiguity in criminal laws in favor of
defendants. Deferring to the prosecuting branch's expansive views of
these statutes 'would turn [their] normal construction . . . upside-down,
replacing the doctrine of lenity with a doctrine of severity.'" *Id*. at 1005,
citing *Crandon, supra*, 494 U.S. at 178 (Scalia, J., concurring in
judgment)).

"Over the past few decades, the domain of federal criminal law has grown exponentially, propelled primarily by agency regulations. Nobody knows how many federal criminal regulations are on the books. Estimates span literal orders of magnitude – from 10,000 to 1,000,000 – and that is without even trying to count punitive civil regulations, criminal sentencing guidelines, and prison regulations." Thomas Z. Horton, *Lenity Before Kisor: Due Process, Agency Deference, and the Interpretation of Ambiguous Penal Regulations*, Vol, 54, Columbia J. of Law & Social Problems, 632. In overruling *Chevron*, the Supreme Court has tasked courts with exercising independent judgment in deciding relevant questions of law without a deferential standard to the agencies. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). In referring to the "ancient rule of lenity" as one of "*Chevron's* victims", the Supreme Court opined, "[P]ressing *Chevron* deference as far as it can go, the government has sometimes managed to leverage 'ambiguities' in the written law to penalize conduct Congress never clearly proscribed." *Id*. at 2286.[3]

---

[3] As here, Congress stated that the goal was to "negotiate contracts for . . . engineering services on the basis of demonstrated competence and qualification" and obtain the services at "fair and reasonable prices". 40 USC §1101. Nobody questions the "demonstrated competence and

Whether entities are "commonly controlled" is a nuanced question requiring expert opinion of professionals who make judgment calls concerning the operation of companies. "The dividing line between what is lawful and unlawful cannot be left to conjecture" nor can a felony conviction and prison sentence "rest upon an uncertain foundation." *Connally, supra*, 269 U.S. at 393. The "plight [of unclear laws] belongs to private citizens" who are not on notice of what "is enough to sustain a federal felony conviction and decades in federal prison." *Percoco v. United States*, 598 U.S. 319, 336-37 (2023) (Gorsuch, J., and Thomas, J., concurring). Here, to the extent that the government's theory represents a plausible interpretation of what it means to be a commonly controlled entity, the term is not sufficiently clear to warrant the exclusion of an opposing opinion of whether the entities at issue were commonly controlled. The rule of lenity requires the Court to resolve the ambiguity in favor of defendants, rendering the indictment "fatally deficient." *United States v. McLemore*, 28 F.3d 1160, 1164 (11th Cir. 1994).

---

qualification" of SSI. And prior to entering the contract, MDOT made an independent assessment of the cost of the contracts and determined them to be "fair and reasonable".

## CONCLUSION

Because the government relies on an indefinite and uncertain federal regulation as the foundation for its theory, the Court must construe the term in favor of the Defendants and dismiss the indictment or preclude the admission of evidence or argument premised upon a theory that the defendants violated the concept of "common control" in carrying out the alleged scheme.

Respectfully Submitted,
**BLANCHARD LAW**

Dated: January 15, 2025          /s/ Joshua Blanchard
                                 Joshua Blanchard
                                 Attorney for Mr. Jeffrey Bartlett
                                 309 S. Lafayette St., Ste. 208
                                 Greenville, MI 48838
                                 616-773-2945
                                 josh@blanchard.law