# Exhibit P

USDOT Decision re: DBE Status



**U.S. Department of Transportation**

Office of the Secretary
of Transportation

1200 New Jersey Avenue, SE
Washington, DC 20590

July 27, 2015

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Reference Number: 14-0071

Franklin Adams, Manager
Michigan Department of Transportation Business
and Administrative Services Division
Office of Business Development
Post Office Box 30050
Lansing, MI 48909

Dear Mr. Adams:

This letter responds to the January 21, 2014 letter in which Surveying Solutions, Inc. (SSI) appeals the Michigan Department of Transportation's (MDOT) denial of its application to be certified as a Disadvantaged Business Enterprise (DBE) under the rules of 49 C.F.R. Part 26 (the Regulation). After carefully reviewing the entire administrative record, the U.S. Department of Transportation, Departmental Office of Civil Rights (Department), concludes that MDOT's decision is unsupported by substantial evidence and that SSI satisfied its burden of proving eligibility. We therefore reverse MDOT's decision and direct MDOT to certify the firm without delay.[1]

## FACTS

The facts presented involve two firms that previously held DBE certification. Appellant SSI is a Michigan-based corporation that provides surveying, engineering, and material testing services; it was founded and previously owned by Guy Spreeman, who passed away in January 2011. While Mr. Spreeman was the owner, SSI was certified as a DBE. Upon his death, majority ownership of SSI passed from his estate back to the corporation and remained as treasury stock while SSI sought a buyer for the company.[2] In the meantime, majority ownership passed by default to a non-disadvantaged individual, Mr. Jeffrey Bartlett (the former 48% minority owner); thus MDOT removed SSI's DBE certification in July 2011.

---

[1] See 49 CFR § 26.89(f)(2)

[2] See April 18, 2013 cover letter of DBE application from Mr. Semenchuk to MDOT at page 1. At one point in the process, Courtney Stodolak, the Office Manager and longest-serving employee of SSI, attempted to purchase the shares, but dropped out when she could not secure adequate funding. *Id.*; see also October 21, 2013 email from Mr. Semenchuk to Ms. Ward.

In June 2012, Geo Precision Services (Geo), a certified DBE engaged in largely the same types of work as SSI and 100%-owned by Mr. Andrew Semenchuk, a disadvantaged individual, purchased a 51% majority stake in SSI, intending to make SSI a subsidiary of Geo.[3] In October 2012, MDOT revoked Geo's DBE status based upon its purchase of SSI, stating that Geo was no longer operating as an independent business.[4] Mr. Semenchuk opted not to appeal the decertification,[5] and instead decided to dissolve Geo and transfer all its assets to SSI, and operate solely under SSI's name, because it had better name recognition and a more established credit history than Geo.[6] Thus in December 2012, Mr. Semenchuk as an individual (rather than through Geo) became the 51% majority owner of SSI. In April 2013, SSI applied for DBE certification. On December 19, 2013, MDOT denied SSI DBE certification.

There is no dispute over Mr. Semenchuk's disadvantaged status, business size, or his ownership of SSI. MDOT's decision is based mainly on its concerns over whether Mr. Semenchuk meets the control requirements as set forth in 49 C.F.R. § 26.71. In particular, MDOT focused on SSI's relationship with 2SI Development, LLC (2SI) and 3SI Building and Leasing, LLC (3SI). SSI leases two of its three office complexes from 3SI; SSI also leases 25 vehicles, survey equipment, and a mobile scanner from 2SI. Two SSI employees, Brian Bartlett (brother of Jeffrey Bartlett, the 48% minority owner of SSI) and Anthony Thelan, are owners of 2SI and 3SI, though the record is unclear as to their percentage ownership stakes in those companies.

MDOT requested that Mr. Semenchuk provide 2SI and 3SI's tax returns and other outside lease agreements in order to better ascertain the relationship between the companies.[7] 2SI and 3SI, citing privacy concerns for their other clients,[8] refused to provide that information to Mr. Semenchuk, who then told MDOT that these were totally separate companies over which he wielded no control, as neither he nor any owners of SSI possessed any ownership interest in them; thus he could not force them to provide any information they did not wish to turn over.[9]

---

[3] See April 18, 2013 cover letter of DBE application from Mr. Semenchuk to MDOT at 2; Appeal letter at 2.
[4] See October 11, 2012 Notice of Intent to Remove Disadvantaged Business Enterprise Eligibility letter at 3.
[5] Mr. Semenchuk alleges that MDOT advised him against appealing, telling him that having SSI as a subsidiary would doom his chances at DBE certification – thus his decision to consolidate the businesses under one name: "the MDOT DBE office conveniently omitted the fact that they had advised to dissolved either GEO Precision Services or SSI, but I could not continue to be an owner of both companies and retain DBE status." See Appeal letter at 36.
[6] See April 18, 2013 cover letter to DBE application from Mr. Semenchuk to MDOT, pages 2-3; Appeal letter at 2.
[7] See November 19, 2013 email exchange between Mr. Semenchuk and Ms. Penny Ward of MDOT.
[8] See November 19, 2013 email from Mr. Semenchuk to Ms. Ward: "I spoke with Brian and Tony. At this point they are unwilling to provide the tax returns or a copy of the leases (privacy issues with other clients). Is there any other type of information that would be helpful to you? Should I see if they would be willing to provide a letter stating the fact that they have other leases?"
[9] See November 20, 2013 email from Mr. Semenchuk to Ms. Ward: "I made another attempt to have 2SI and 3SI provide their tax statements per your request and they will not. I am in no position to force any of my vendors to provide that type of documentation and hope that you realize that this request reaches beyond my ability to provide said documentation. During this whole review process I have been open and transparent and have cooperated with every request that has been made by your office regarding additional information. As mentioned before, these entities (2SI and 3SI) are totally separate and distinct entities from SSI and I have no control over their actions."

While not specifically citing 49 CFR 26.73(c),[10] MDOT noted that this lack of cooperation meant it could not ascertain the relationship between the firms and thus determined that the leasing arrangements with 2SI and 3SI compromised the independence of SSI.[11]  Consequently, MDOT denied SSI's DBE certification, and SSI timely appealed to the Department.

STANDARD OF REVIEW

Under 49 C.F.R. § 26.86(d), a firm may appeal its DBE denial to the Department. The Department does not make a de novo review or conduct a hearing; its decision is based solely on a review of the entire administrative record as supplemented by the appeal. *Id.* § 26.89(e). Finally, the Department affirms the below decision unless it determines, based upon its review of the entire administrative record, that the decision was "unsupported by substantial evidence or inconsistent with the substantive or procedural provisions of this part concerning certification." *Id.* § 26.89(f)(1).

DISCUSSION

*Relationships with Other Firms*

According to the Regulation, only an independent business, meaning "one the viability of which does not depend on its relationship with another firm or firms," may be certified as a DBE. 49 C.F.R. § 26.71(b). The certifying agency "must consider whether present or recent employer/employee relationships between the disadvantaged owner(s) of the potential DBE and non-DBE firms or persons associated with non-DBE firms or persons compromise the independence of the potential DBE firm." *Id.* § 26.71(b)(2). In the context of equipment leases, the certifying agency "must not determine that a firm is not controlled by socially and economically disadvantaged individuals solely because the firm leases, rather than owns such equipment, where leasing equipment is normal industry practice and the lease does not involve a relationship with a prime contractor or other party that compromises the independence of the firm." *Id.* § 26.71(m).

In considering these factors, MDOT concluded that SSI's viability depended on its relationship with 2SI and 3SI, and therefore it was not an independent business eligible for DBE certification. First, MDOT's analysis under § 26.71(b)(2) focused on the relationship between SSI's minority non-disadvantaged owner Jeffrey Bartlett and his brother Brian Bartlett, an employee of SSI and

---

[10] § 26.73(c) provides that "firms seeking DBE certification shall cooperate fully with [the certify agency's] requests (and DOT requests) for information *relevant to the certification process*. Failure or refusal to provide such information is a ground for a denial or removal of certification." [Emphasis added].

[11] Failure to cooperate was not one of the grounds for denial cited by MDOT.  In his appeal letter, Mr. Semenchuk alleges that Ms. Ward "told [him] that the MDOT DBE office would basically have to deny the application if I did not provide the requested information for 2si and 3si." Appeal Letter at 13. In its denial letter, MDOT states, "[t]he interrelationships between the 48% owner and his brother who is an employee, employee versus employer, Lessor and Lessee, etc. creates independence issues and can influence the decisions of the company in numerous ways." Denial Letter at 6. MDOT did not further specify what the "numerous ways" were.

As Mr. Semenchuk stated, 2SI and 3SI are outside firms over which he has no control or authority, and his inability to produce the tax returns and other lease agreements of these companies cannot be held against SSI's certification application.  MDOT's request for this information was unreasonable without establishing the relevance of that information to SSI's certification eligibility.  In addition, MDOT's implicit use of failure to cooperate as a basis for denial without citing it as grounds for denial was improper.

owner of 2SI and 3SI, in its determination that the relationship "creates independence issues and can influence the decisions of the company in numerous ways,"[12] without specifying what those ways are. The regulation instructs the certifying agency to consider the employer/employee relationship between the *disadvantaged* owner and non-disadvantaged individuals associated with non-DBE firms.  In this case, the analysis would be of the employer/employee relationship between Semenchuk (the disadvantaged owner) and Brian Bartlett and Anthony Thelan (his employees who own 2SI and 3SI).

The question, then, is whether Brian Bartlett's and Anthony Thelan's relationship as employees of Semenchuk compromises SSI's independence. Nothing in the record indicates that it does. None of the 2SI's or 3SI's owners, officers, or directors have any ownership of SSI.  There is no evidence that either Brian Bartlett or Anthony Thelan exercise control over SSI. MDOT expressed concern that 70% of SSI's business account payments (excluding personnel costs) were paid to those two companies, indicating SSI's viability relied upon its relationship with non-DBE firms. However, the evidence in the record indicates that the transactions between SSI and 2SI/3SI were arms-length transactions.  Semenchuk notes that when he took over SSI, he analyzed all of the leasing agreements in place and determined that 2SI's and 3SI's prices were very competitive. Semenchuk provided MDOT with several examples of other companies' pricing to demonstrate this; he also stated that if he ever found the pricing to become uncompetitive, he would drop them and use a different vendor.[13]

The role of the Department in reviewing MDOT's certification decision is to evaluate the sufficiency of the evidence relied upon to support the conclusion reached by MDOT and ensure the proper application of the Regulation to the evidence in the record.  MDOT's finding that SSI's relationship with 2SI and 3SI compromised its independence is not adequately explained or supported by substantial evidence.

Second, MDOT also cited § 26.71(m) regarding owning or leasing necessary equipment to support its denial, concluding that the fact that SSI rented much of its equipment compromised its independence. However, MDOT failed to apply the second part of the provision, which explicitly states that the certifying agency must consider any equipment leasing arrangements within the context of normal industry practice.  Based on unrefuted information provided by Mr. Semenchuk, leasing vehicles and surveying equipment is common within the industry, but SSI also owns enough of its own equipment to remain viable without those leases.[14]

---

[12] See *Id.*

[13] In Mr. Semenchuk's own words, "When I come to SSI I performed a thorough review of the rental amounts and found them very competitive. I asked up front before I came aboard what and there is NO document that forces me to lease from these entities, it would just be stupid for me to change anything as they are very competitive. . . . I have since diversified SSI's pool of rental and lease vendors. [List of vendors]. . . In order to be competitive I shop around for the best deals and availability of the equipment we need. 2SI and 3SI have been vendors to SSI prior to my involvement in SSI and they continue to provide competitive pricing so I continue to use them. If they fail to be competitive then I will seek out other vendors as I have with the most of the new hi tech stuff." See November 1, 2013 email from Mr. Semenchuk to Ms. Ward.

[14] Mr. Semenchuk explains, "We own enough of our own survey and all of our own testing equipment to continue performing our work without the need to lease. However, because survey equipment is continually evolving, we choose to lease the latest and greatest survey equipment to stay on the cutting edge and ahead of the competition. If necessary, we can always fall back and use the SSI owned survey equipment and not miss a beat." Appeal Letter at 22.

Thus MDOT's conclusion that SSI's leases with outside firms compromise Mr. Semenchuk's control over the company is not supported by substantial evidence.

### *Purpose of Transfer and Control by Disadvantaged Owner*

Where a firm was formerly owned by a non-disadvantaged individual and this individual remains involved with the firm in any capacity, the presumption of control by the non-disadvantaged individual[15] can be rebutted by clear and convincing evidence that both "transfer of ownership and/or control to the disadvantaged individual was made for reasons other than obtaining certification as a DBE" and that "the disadvantaged individual actually controls the management, policy, and operations of the firm, notwithstanding the continuing participation of a nondisadvantaged individual who formerly owned and/or controlled the firm." 49 C.F.R. §§ 26.71(l)(1) and (2).  Additionally, the certifying agency must evaluate a firm's eligibility only on the basis of present circumstances and cannot refuse to certify a firm "based solely on historical information indicating a lack of ownership or control of the firm by socially and economically disadvantaged individuals at some time in the past, if the firm currently meets the ownership and control standards of this part." 49 C.F.R. § 26.73(b)(1).

Despite that SSI and Geo were both previously DBE-certified, the higher clear and convincing standard of proof applies here because upon Guy Spreeman's death, SSI's ownership passed to a non-disadvantaged individual, Jeffrey Bartlett, before Mr. Semenchuk bought out the firm, and Jeffrey Bartlett remained involved in the firm as minority owner. While this transfer situation is not the typical transfer that raises concerns to which this provision is addressed, in order to be DBE-eligible SSI regardless must prove by clear and convincing evidence both that Mr. Semenchuk became the majority owner of the SSI for reasons other than gaining DBE certification and that he actually controls the business. As explained below, the evidence in the record is sufficient to rebut the presumption of control.

For the first prong of this test, MDOT concluded that SSI could not prove by clear and convincing evidence that transfer of ownership occurred for reasons other than obtaining DBE certification, relying upon the fact that between Mr. Spreeman's death and Mr. Semenchuk's purchase of the company, a long-time female employee of SSI (Ms. Courtney Stodolak) attempted to purchase Mr. Spreeman's share before dropping out due to inability to secure adequate funding. MDOT questioned why Jeffrey Bartlett did not want to retain majority ownership, and further, why one of the many nondisadvantaged Caucasian males employed at the company did not attempt to purchase those shares, instead of Ms. Stodolak.[16] However, it would not be out of the ordinary for one of the longest-serving employees who had been with the company since its beginning to seek to purchase the company.

---

[15] See § 26.71(l): "Where a firm was formerly owned and/or controlled by a non-disadvantaged individual (whether or not an immediate family member), ownership and/or control were transferred to a socially and economically disadvantaged individual, and the nondisadvantaged individual remains involved with the firm in any capacity, there is a rebuttable presumption of control by the non-disadvantaged individual . . ."

[16] See MDOT's Appeal Response Letter, dated March 18, 2014 at 3-4. MDOT's question suggests that it believed that one of the several experienced male surveyors would have been a more natural fit to take over the business than Ms. Stodolak, who is a member of one of the groups rebuttably presumed to be disadvantaged.

Moreover, as § 26.73(b)(1) sets forth, the certifying agency must evaluate a firm's eligibility on the basis of present circumstances. MDOT's consideration of Ms. Stodolak's earlier failed attempt to purchase SSI focuses on historical information about the company unrelated to the current owner's motivation for acquiring a majority interest in the company.

The record demonstrates that Mr. Semenchuk established by clear and convincing evidence that his purchase of SSI occurred for reasons other than obtaining DBE certification. Mr. Semenchuk owned Geo, a certified DBE firm in the same industry. In Mr. Semenchuk's words, he purchased SSI because he wanted "to expand [his] previous company [Geo], eliminate the competition, and ultimately make a profit."[17] Moreover, from Mr. Semenchuk's perspective, he would have no reason to purchase SSI for the purpose of obtaining DBE-certification; he already owned such a company in Geo. He states that he did not originally intend to seek DBE certification for SSI and only planned to operate it as a subsidiary of Geo.[18] His plans changed once MDOT revoked Geo's certification and advised him against such plans.[19] The record provides ample substantiation that SSI proved by clear and convincing evidence that Mr. Semenchuk's purchase of the firm occurred for reasons other than obtaining DBE certification.

Under the second prong of this test, MDOT concluded that SSI had not proven by clear and convincing evidence that Mr. Semenchuk actually controlled the firm. As noted above, much of its evaluation focused on what it considered to be an improper relationship with 2SI and 3SI, and, as discussed, that analysis was flawed and need not be addressed again here. Additionally, while not explicitly citing 49 CFR § 26.71(g), which provides that the disadvantaged owner must have the competence and experience to control the business,[20] MDOT also expressed concern that Jeffrey Bartlett is an experienced surveyor and implied that he therefore had the ability to control the firm.[21] However, MDOT failed to address the fact that Mr. Semenchuk is also an experienced surveyor, has 18 years of experience and several professional licenses, owned his own surveying firm prior to taking over SSI, and has background and experience in other types of work performed by SSI that Mr. Bartlett does not.[22] There is no evidence that Mr. Bartlett has the power or authority to control the business, and it is clear from the evidence that the disadvantaged owner has more than adequate background and experience to control the company. MDOT's concerns about Mr. Semenchuk's technical expertise in surveying and material testing are not supported by the evidence. MDOT raised no other substantive concerns about Mr. Semenchuk's control of the business. Therefore substantial evidence does not support MDOT's conclusion; SSI has proven by clear and convincing evidence that Mr. Semenchuk in fact controls the management, policy, and operations of the firm, meeting the second prong of § 26.71(l).

---

[17] See Appeal Letter at 36.
[18] See April 18, 2013 cover letter of DBE application from Mr. Semenchuk to MDOT at 2; Appeal Letter at 2.
[19] Id.
[20] Specifically, under § 26.71(g): "The socially and economically disadvantaged owners must have an overall understanding of, and managerial and technical competence and experience directly related to, the type of business in which the firm is engaged and the firm's operations. The socially and economically disadvantaged owners are not required to have experience or expertise in every critical area of the firm's operations, or to have greater experience or expertise in a given field than managers or key employees."
[21] See Denial Letter at 6.
[22] See Semenchuk and Bartlett resumes; Appeal Letter at 37.

CONCLUSION

We reverse MDOT's denial of certification as unsupported by substantial evidence and inconsistent with the substantive provisions of the Regulation as previously discussed. SSI met its burden of proving that it is eligible to be certified as a DBE. We direct MDOT to certify SSI without delay and to add the firm to the Michigan Unified Certification directory of DBE firms. This decision is administratively final.

Sincerely,

Sheryl G. Williams
Acting Associate Director
External Civil Rights Programs Division
Departmental Office of Civil Rights

cc: Andrew Semenchuk, President, Surveying Solutions, Inc.