United States District Court
Eastern District of Michigan
Northern Division

United States of America,

No. 23-cr-20676

              Plaintiff,

Honorable Thomas L. Ludington

vs.

D-1 Jeffrey Bartlett,

              Defendant.

_____/

## Government's Sentencing Memorandum

This case is ordinary in that it involves lying to get money. But it is extraordinary in that Jeffrey Bartlett (J. Bartlett) and his co-defendants used relentless and uncommon means executed over many years to cheat the Michigan Department of Transportation out of a staggering amount of money.

## I.    Background

J. Bartlett pleaded guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 2). As the Court previously recognized, the charges arise from fraudulent conduct "in three parts," including "fraudulently misrepresent[ing] SSI's overhead and labor

costs to artificially inflate MDOT's reimbursement." (ECF No. 150, PageID.1623.) J. Bartlett and his co-defendants overbilled MDOT through "two separate schemes flush with fraudulent misrepresentations and omissions." *Id.*, PageID.1630.

It is unnecessary to repeat the Court's full recitation of the factual allegations and evidence against J. Bartlett, *see generally* ECF No. 150, PageID.1623–39, but the Court got it right. The government adopts the timeline of relevant case events, the description of the charge to which J. Bartlett has pleaded guilty, and the statement of the offense conduct detailed by the probation department in the Presentence Investigation Report (PSR) dated October 8, 2025. Here, the government focuses on the particular events and facts that are relevant to the sentence this Court should impose on J. Bartlett.

## II.   **J. Bartlett's Participation in the Fraud**

In August 2001, J. Bartlett, Brian Bartlett (B. Bartlett), and G.S. opened SSI. Publicly filed documents including stock purchase agreements, disadvantaged business enterprise (DBE) applications and "no change" affidavits, and MDOT prequalification packages all reported—falsely—that G.S., a minority, was a 51% owner of SSI. J.

Bartlett, B. Bartlett, and G.S. were equal owners of SSI and related entities from 2001 and throughout SSI's corporate life until July 2019. One reason for this artifice was to support SSI's claimed identity as a disadvantaged business. This designation gave SSI, and principal contractors they worked with, a preference when MDOT awarded highway construction projects. Another reason the Bartletts and G.S. created this facade was to facilitate fraudulent billing practices and inflate reimbursement rates charged to MDOT.

J. Bartlett pleaded guilty to engaging in a fraudulent conspiracy from February 2011, but parts of this scheme began as soon as SSI was established—and J. Bartlett played a role in it from the beginning. Evidence of his intent can be found in a memorandum drafted for G.S.'s widow after his sudden and unexpected death in February 2011. Because publicly filed corporate documents falsely reported that G.S. was a 51% owner of SSI, the surviving owners needed to set the record straight for his widow to protect their actual ownership interests. This memorandum makes it clear that J. Bartlett and the other SSI owners were—in reality—equal partners and that public records indicating that G.S. was a 51% owner "were so written as to qualify the business as a

'minority owned business' with the State of Michigan Department of Transportation." (Exhibit A). The memorandum included an agreement dated October 15, 2001, signed by Jeffrey D. Bartlett, [G.S.], and Brian M. Bartlett that states "…it is the intention of the parties that they will ultimately be equal shareholders/owners of the Corporation." *Id*.

The memorandum provides a clear understanding of J. Bartlett's knowledge and intent during the years charged in the indictment and demonstrates that he is one of the two most culpable defendants in this case.[1]

J. Bartlett 's pattern of deliberately fraudulent conduct was not confined to false statements about SSI's ownership. From SSI's inception, J. Bartlett falsely claimed that his wife and later his domestic partner, as well as wives of the other owners, were employees of SSI and included their salaries and bonuses as reimbursable expenses to MDOT. From 2015–2019 alone, Jeffrey Bartlett reported $440,909 in fraudulent payroll and bonus expenses for his domestic partner. (Exhibit B). MDOT calculates that from 2012 through 2018 it overpaid

---

[1] The other is Andrew Semenchuk.

SSI $1,817,983.39 because of falsified payroll expenses claimed for the defendant-owners' wives and domestic partner. (Exhibit C).

In 2002, Anthony Thelen joined SSI. By at least 2004, he shared equally in the profits of SSI and its related entities with J. Bartlett, B. Bartlett and G.S. In 2004, all four owners agreed to create 2SI, an LLC they used to hold title to SSI vehicles and equipment. The defendant-owner[2] falsely told MDOT that 2SI was an independent third-party vendor of SSI. Lying about it allowed SSI to claim significantly more reimbursable expenses from MDOT on highway projects. This artifice was repeated and certified in SSI prequalification packages every year until July 2019. MDOT calculates that it overpaid SSI $8,028,285.98 for

---

[2] J. Bartlett and his co-defendants have argued they were not equal owners of SSI, 2SI, 3SI, and Southfield IT (SFIT), because publicly filed documents reported that J. Bartlett and Semenchuk owned SSI, B. Bartlett and Thelen owned 2SI and 3SI, and Adam Ball (Ball) and his wife owned SFIT. But all five defendants shared equally in the profits of SSI, 2SI, 3SI, and SFIT. These entities shared resources, including an office manager, and bookkeeper. Management decisions for all the entities were made by all five defendants and money routinely moved between the entities at their direction. In secret agreements the defendant-owners referred to each other as equal owners regardless of what publicly filed documents reported. And most importantly, the defendants conducted the business of SSI, 2SI, 3SI, GEO, and SFIT as one entity. Because of their conduct, the government refers to them as owners or defendant-owners.

equipment and vehicle costs relating to 2SI and falsely claimed by SSI. (Exhibit C).

In 2009, J. Bartlett and the other defendant-owners of SSI created 3SI an LLC they used to hold title to real estate. Again, they lied to MDOT about the relationship 3SI had to SSI by falsely claiming 3SI was an independent third-party vendor. This enabled J. Bartlett and the other defendant-owners to claim substantially more in reimbursable expenses then they were entitled to. MDOT calculates that it overpaid SSI $911,158.38 for falsely claimed real estate costs relating to 3SI. (Exhibit C).

By the time G.S. died, J. Bartlett had for some time been negotiating with Andrew Semenchuk to join SSI as another owner. Shortly after G.S.'s death, Semenchuk left his job at MDOT and joined SSI. With this addition and that of Adam Ball, the defendant-owners needed to clarify their relationship to each other and the various SSI entities. On February 25, 2011, the defendants executed a new secret agreement in which they acknowledged they were equal owners of SSI and each of its related entities, regardless of what any publicly facing corporate documents stated. (Exhibit D). Nine days before this secret

agreement was executed, granting each defendant 20% ownership in 3SI and other SSI Group entities, J. Bartlett sent a "sworn statement" to MDOT Senior Auditor Karen Liang stating, "I do not in any way own any part of the Standish Property that we lease." The Standish Property is the home office building of SSI, which was held in the name of 3SI. (Exhibit E).

On March 11, 2011, B. Bartlett sent an email to the defendant-owners containing two versions of SSI's ownership and its related companies. The first version divided ownership of 2SI, 3SI, and SSI in a way that fraudulently supported higher reimbursement claims to MDOT and supported SSI's DBE efforts. The second—and accurate version—confirmed the defendant-owners' intent that they owned the entities equally. The truthful version controlled how they managed SSI and what compensation J. Bartlett and his co-defendants received.

After G.S. died, Jeffrey Bartlett scrambled to find someone to fill G.S.'s spot as the purported minority owner of SSI. He first chose SSI's office manager C.S., a woman. On May 2, 2011, Jeffrey Bartlett drove C.S. to a hearing at which they both testified in front of MDOT and DBE officials to make the case that C.S. was the new 51% owner of SSI.

During that hearing, J. Bartlett and C.S. falsely testified that C.S. was the new 51% owner of SSI, that she was the highest paid employee, and was most qualified to be the new majority owner of SSI. J. Bartlett testified that C.S. ran the company "period" and they both testified that C.S. was J. Bartlett 's supervisor. None of this was true.  On July 13, 2011, MDOT denied SSI's application for DBE status based on C.S. as the minority owner.

J. Bartlett knew that a higher overhead rate for SSI's compensation from MDOT would increase his own compensation from SSI. On November 11, 2011, J. Bartlett sent an email to the other owners of SSI and bragged that "I am still planning on calculating the overhead rate so that we get where we want it. Then we can have them review and 'rubber stamp' it…so to speak." (Exhibit F).

On January 31, 2012, J. Bartlett certified the prequalification package SSI submitted to MDOT in support of its reimbursement rate calculation. That prequalification package contained numerous false statements including that the owners' spouses were employees of SSI, and that both 2SI and 3SI were independent third-party vendors of SSI.

These lies substantially increased the overhead rate SSI calculated for MDOT reimbursement. (Exhibit G).

In the fall of 2013, MDOT was considering SSI's application for DBE designation and questioned claims that J. Bartlett and Semenchuk made about SSI's ownership. MDOT scheduled an in-person interview where Semenchuk and J. Bartlett would each have to fill out and certify a questionnaire. Semenchuk and J. Bartlett knew they had to convince MDOT that Semenchuk was not just a qualifying minority, but the majority owner of SSI. In preparation for those interviews, Semenchuk obtained a copy of the questionnaire. Both he and J. Bartlett reviewed it to make sure they would be giving the same answers.

On October 14, 2013, MDOT authorities met with J. Bartlett and Semenchuk. They purported to be 48 % and 51% owners of SSI, respectively. J. Bartlett and Semenchuk were placed in separate locations and were monitored to ensure they did not discuss their answers. J. Bartlett made the following false statements in his completed questionnaire, among others:

- That he was a 48% owner of SSI.

- That Semenchuk was a 51% owner of SSI.

- That Semenchuk made more money than he did.

- That neither he nor other members of SSI had an ownership interest in any other firm.

- That SSI did not share resources.

- That Semenchuk managed SSI's day to day operations.

- That Semenchuk handled SSI's finances.

J. Bartlett signed this questionnaire and certified that his answers were true. They were not. (Exhibit H).

By August 28, 2014, when SSI was deep into its effort to qualify as a DBE, J. Bartlett, sent an email to the defendant-owners bragging, "Not bad for a bunch of white guys trying to be a minority-owned business… And we will be billing the FUCK out of August thru November for sure." (Exhibit I). And this was not just conceit. By September 2014, the defendant-owners were putting this billing promise into action. On September 25, 2014, J. Barlett sent an email to the defendant-owners suggesting how they could artificially inflate

billings for September, October, and November. (Exhibit J). One idea was to raise the defendant-owners' reported hours.

By the end of December 2014, Adam Ball and Andrew Semenchuk had completed their buy-in obligations and were able to share fully in SSI's profits. On December 31, 2014, Semenchuk proposed forming an IT company "for overhead purposes." J. Bartlett responded: "I like it." Beginning in 2015, SSI started fraudulently billing MDOT for IT services that it did not incur. MDOT calculates that it overpaid SSI $1,928,372 based on these false billings. (Exhibit C).

As time went on, J. Bartlett and his co-defendants successfully and fraudulently obtained DBE status for SSI, continued to bill MDOT for payroll and IT services SSI did not incur, and inflated reimbursement from MDOT by hiding the true relationship between 2SI, 3SI, and SSI. At the end of every year, a thorough report was generated which equalized all the profits, losses, and obligations of SSI and all its entities and split the net profits equally between the defendant-owners. And every year SSI filed a prequalification package with MDOT containing false information to calculate an inflated overhead rate for reimbursement.

11

Every year until Semenchuk left SSI at the end of 2018, he submitted and certified the accuracy of the prequalification packages, the DBE applications, and DBE no-change affidavits. In 2019, J. Bartlett once again took over that responsibility. By this time, J. Bartlett had been warned by Thelen that SSI's IT costs could not be supported and should not be included in the prequalification package. But J. Bartlett ignored the warning and included them. And once again, J. Bartlett falsified payroll costs by including his domestic partner and the wives of Thelen and B. Bartlett as employees.

J. Bartlett and his co-defendants may claim to be as equal in their culpability as they were as partners in and owners of SSI. But such a claim would be as false as their representations to MDOT.  J. Bartlett's scheme to defraud MDOT reaches back to the very inception of SSI in 2001 and continued until the execution of search warrants on July 25, 2019. From the beginning, the ownership of SSI was concealed from MDOT and the wives were used to inflate payroll costs. As time went on and the company grew in size and reputation, the false statements continued and expanded along with it. J. Bartlett held himself out as a leader and 48% owner of SSI and willingly falsified documents in

12

support of reimbursement claims to MDOT and in DBE efforts. (Exhibit K).

## III.   Sentencing Guideline Calculations

### A.   Base Level - 6:  USSG 2B1.1(a)(1)

J. Bartlett pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The maximum possible penalty is 5 years imprisonment. This guideline provision sets the base level at 6. (PSR ¶ 49).

### B.   Loss:  USSG 2B1.1(b)(1)(J): +18

The PSR correctly applies an 18-level upward adjustment, pursuant to § 2B1.1(b)(1)(J), because the fraud loss exceeds $3.5 million. (PSR ¶ 50).

In determining the amount of loss, the district court is to determine it by a preponderance of the evidence. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). The court is not required to compute the loss with precision and it need only make a reasonable estimate of the loss given the available information. *Id*. at 320; USSG § 2B1.1, comment. (n.3(C)).

The parties agree that if the Court accepts the plea agreement, "the guideline range will be predicated on a fraud loss of more than $3,500,000 and less than $9,500,000." (ECF No. 270, PageID3061).

### C.   Restitution

This court must order restitution, pursuant to 18 U.S.C. § 3663A, for monetary losses suffered by any individual or entity who was270 a victim of the fraud scheme. J. Bartlett agreed to pay restitution in the amount of $914,360.00 to the victim, Michigan Department of Transportation, representing one-fifth of $4,571,800.00, which is the Government's calculation of total unpaid restitution." (ECF No. 270, PageID.3064).

### D.   Sophisticated Means - U.S.S.G. § 2B1.1(b)(10)(C): +2

The Probation Department and the government agree that a two-level increase in J. Bartlett's offense level should be assessed under U.S.S.G. §2B1.1(b)(10)(C). (PSR ¶ 51). This enhancement is appropriate and supported by the facts and the evidence. The commentary defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1, comment. (n. 9(B)).

14

A series of criminal actions may constitute sophisticated means even if none of the offenses, standing alone, is "especially complex" or "especially intricate." *United States v. Tandon,* 111 F.3d 482, 491 (6th Cir. 1997); *United States v. Pierce*, 17 F.3d 146, 150-51 (6th Cir. 1994).

In *United States v. Cox,* 357 F. Appx. 629 (6th Cir. 2009), the court observed that while the defendant was not "especially sophisticated," the sophisticated means enhancement applied because the defendant set up a "'pretty clever and sophisticated method of setting up these [accounts] so it would appear that money was being transferred to charities.'" *Id.* Here, J. Bartlett is both a "sophisticated" defendant who used a "clever and sophisticated" means to accomplish his fraud.

In the *United States v. Erwin*, 67 F. Appx. 876 (6th Cir. 2003), the defendant-stockbroker embezzled approximately $2.3 million from twelve client accounts over a five-year period. *Id.* at 878. The Court upheld the application of the sophisticated means enhancement in large part because the defendant ". . .had to constantly monitor those account statements and perform sophisticated calculations in order to render falsified accounts to his clients and customers. . ." *Id.* at 881. That precise observations apply to J. Bartlett's conduct.

15

J. Bartlett's scheme was, by any measure, sophisticated, complex, and intricate. It included the following:

- It began in 2001 by including non-employee wives in payroll reimbursement claims to MDOT and false claims supporting DBE status. And it grew in size and intricacy over the next 18 years. J. Bartlett and B. Bartlett were owners from the beginning.

- J. Bartlett had to keep track of false billings, inflated payroll, fake lease agreements, and contracts on an almost daily basis. Bank account balances had to be monitored and supported constantly.

- J. Bartlett and Semenchuk held themselves out as the owners of SSI and were the go-to individuals when questions came up.

- J. Bartlett took C.S. to a hearing in 2011 where they both lied in a concerted effort to convince MDOT to grant them DBE status.

- J. Bartlett often took the lead in creating new ways to inflate billings to MDOT. (Exhibit J).

- J. Bartlett and Semenchuk coordinated false answers they gave to MDOT in 2013 during a DBE investigation of SSI.

- As the conspiracy grew in size and complexity over the years, J. Bartlett embraced new streams of illegally-obtained income from MDOT and worked to maximize them. This culminated in the 2019 prequalification package he certified and submitted as 100% owner of SSI.

16

• The conspiracy J. Bartlett helped to manage was multi-pronged and required constant vigilance by him to assure its success.

Considering the elaborate nature of the conspiracy and scheme, J. Bartlett's ability to conceal its true nature, and the scheme's resulting success and longevity, this offense involved sophisticated means.

## IV.  Application of 18 U.S.C. § 3553

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  In order to determine the "particular" sentence to impose, this Court must consider the familiar statutory factors listed in §3553(a)(1)–(7).

The probation department calculates J. Bartlett's guidelines at 37–41 months. If the Court accepts the plea agreement, J. Bartlett's sentence would be capped at 21 months. After consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the most appropriate sentence for J. Bartlett is 21 months.

### A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

J. Bartlett's offense was complex, highly orchestrated, and devastating to the trust that the State of Michigan, USDOT, and MDOT

17

gives self-reporting companies to whom they award contracts. J. Bartlett engaged in an extensive, well-planned scheme to defraud over the course of 18 years that, just in 2012–2018, involved over-payments by MDOT to SSI of more than $12 million. The conspiracy required J. Bartlett's daily attention and effort to keep it from being discovered. His scheme demonstrated disrespect for the law and for the basic moral and ethical behavior expected. And it was well within his power to cease his criminal activity at any point. But the money was just too good.

## B.   **The History and Characteristics of the Defendant**

Given his background, family support, employment history, education, and extensive connections to the community, J. Bartlett had every opportunity to succeed and thrive in the legitimate career he chose. Unlike many criminal defendants who resort to crime out of financial desperation, J. Bartlett did not devise his scheme in the face of economic privation. Instead, he purposely and intentionally orchestrated a multi-pronged scheme that was both extensive and complex. But at its core, it was a quintessential example of "lying to get money" driven purely by greed.

The Court will no doubt hear J. Bartlett and his co-defendants offer excuses, chief among those, "But we did the work and did it better

18

than anyone else." There was nothing more important to the success of the conspiracy and scheme than the fact that SSI did the work and did it well. It tricked MDOT into awarding contracts based on lies and likely contributed to MDOT giving SSI the benefit of the doubt once questions arose. J. Bartlett understood that SSI was taking advantage of MDOT's good opinion of them. Rather than feeling any shame or contrition for his actions at the time, he treated it as a green light to continue the scheme and to find even new ways to increase illegally gained profits from MDOT as the years passed.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment for the Offense.

A sentence of 21 months would reflect the seriousness of the offense, promote respect for the law, and adequately punish J. Bartlett for his criminal behavior. While J. Bartlett pleaded guilty to engaging in an eight-year conspiracy to defraud the United States that caused significant financial harm to MDOT, parts of the scheme actually began in 2001. Such repeated, serious criminal behavior calls for a prison sentence to punish J. Bartlett and promote respect for the law. A sentence of 21 months is adequate to achieve those objectives.

**D.  <u>The Need to Afford Adequate Deterrence to Criminal Conduct <ins>and To Protect the Public From Further Crimes of the Defendant</ins></u>**

A sentence of 21 months is necessary to deter others as well as to protect the public from further criminal activity of J. Bartlett.

The justice system must send a clear message to those inclined to engage in widespread fraud—especially involving highway construction contracts—that such conduct will result in a prison sentence. A sentence of 21 months will achieve this objective, especially in light of J. Bartlett's level of culpability when compared to his co-defendants. A sentence below the maximum 21 months that the Court is empowered to impose under the plea agreement will lessen the deterrent effect on others who might face the same temptation as J. Bartlett.

**E.  <u>The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>**

There is no need in this case to adjust the sentence below the guideline range in order to provide J. Bartlett with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D).  The prison system can accommodate all of J. Bartlett's medical conditions and it is unlikely that he needs to seek further educational opportunities.

**F.    The Need to Avoid Unwarranted Sentence
Disparities Among Defendants with Similar Records
Who have been Found Guilty of Similar Conduct**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the guidelines, coupled with careful consideration of the § 3553(a) factors relevant to a specific defendant, is the only available means of preventing the disfavored result of basing sentences on the luck-of-the-draw in judicial assignments. Accordingly, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders.  *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

Here, the parties have agreed to cap J. Bartlett's sentence at 21 months if the Court accepts the plea agreement. Such a sentence is lower than the guidelines calculated by the probation department but would not be unduly disparate.

## V.    <u>Conclusion</u>

Based on the extent of J. Bartlett's conduct and the significant role he played in the conspiracy, the government urges this Court to impose a sentence of 21 months in prison.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney


s/ Karen L. Reynolds
Karen L. Reynolds
William J. Vailliencourt, Jr.
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov
william.vailliencourt@usdoj.gov


Dated:  November 10, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2025, I electronically filed

the foregoing document with the Clerk of the Court using the ECF

system which will send notification of such filing to the attorneys of

record.

s/ Karen L. Reynolds
Karen L. Reynolds  (P31029)
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov

23