**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA,**
         Plaintiff,

                                                        Case No. 1:23-cr-20676-TLL
vs.                                                Hon. Thomas L. Ludington

**JEFFREY BARTLETT,**
         Defendant.
_____

**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**
_____

**NOW COMES** the Defendant, Jeffrey Bartlett, by his counsel, Joshua Blanchard, and submits this Sentencing Memorandum in support of a sentence below the advisory sentencing guidelines. Such a sentence reflects the nature and circumstances of Mr. Bartlett's offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

1

# INTRODUCTION

## I.   UNRESOLVED OBJECTIONS TO PSIR AND SCORING

There are no unresolved objections to the PSIR or scoring of the sentencing guidelines.

## II.   NATURE AND CIRCUMSTANCES OF MR. BARTLETT'S OFFENSE

Mr. Bartlett accepts full responsibility for his conduct in this case. As part of his role at Surveying Solutions, Inc. (SSI), he participated in the preparation and submission of the company's annual overhead rate to the Michigan Department of Transportation. That rate was inaccurate and overstated, resulting in SSI receiving more than it was entitled to on certain government contracts.

The conduct did not begin with an intent to defraud. What began smaller ultimately snowballed; Mr. Bartlett failed to stop it when he should have. Instead, he he took part in it, allowed the practices to continue, rationalizing his behavior with the mistaken belief that because others were doing similar things, and because SSI's work was of exceptional quality and delivered at the lowest cost to the State, the issue was less serious than it truly was. That belief was wrong, and Mr. Bartlett understands that. He regrets not exercising the restraint and judgment expected of him and takes ownership for the decisions and actions that led to this case.

For most of his professional life, Mr. Bartlett's reputation has been defined by integrity, competence, and community service. A career spent helping to build and maintain Michigan's infrastructure makes this offense especially painful. He knows

that his actions contributed to a breach of trust with the public agencies he served, and he has devoted himself to helping restore that trust.

Since the offense, Mr. Bartlett has taken meaningful steps to make amends. SSI has implemented comprehensive corporate reforms to ensure complete compliance with all contracting requirements, and he has supported those efforts in full. Mr. Bartlett has stepped back from being an officer or principal of SSI. The company now has an independent board of directors and independent officers, including co-presidents who are licensed surveying professionals. SSI has negotiated an administrative monitoring and compliance agreement with the Federal Highway Administration and Mr. Bartlett has agreed to place his shares into a trust with an independent trustee as part of that agreement.

In this case, he voluntarily entered a plea of guilty and has ensured that restitution and forfeiture are fully satisfied. Undersigned counsel is in possession of certified funds totaling $1,729,000, which will be delivered to the government at or before sentencing. In total, by the time of sentencing, the government will have collected financial penalties and restitution from SSI and the individual defendants of $15,630,943.93.[1] This is more than two times the intended loss for the entire conspiracy as calculated by the United States Probation Office. PSR at ¶43.

This case represents Mr. Bartlett's only meaningful contact with the criminal legal system, apart from a decades-old operating while intoxicated offense noted in

---

[1] This is calculated based on the following repayments to the government:
| | |
|---|---|
| Civil settlement with MDOT | $3,564,031.54 |
| Backpay forewent by SSI | $2,321,912.39 |
| Monetary Penalty for NPA | $1,100,000.00 |
| Individual Defendant Payments | $8,645,000.00 |

3

the presentence report. He has expressed deep remorse for his conduct and has demonstrated through his actions that he has learned from this experience. Nothing in his background or character suggests that incarceration is necessary to deter him from future misconduct or to protect the public.

### III.   MR. BARTLETT'S HISTORY AND CHARACTERISTICS.

Jeffrey Bartlett is a lifelong Michigander, a father, and a career surveyor whose work has been tied to Michigan's public infrastructure for more than three decades. People who have worked with him and lived alongside him consistently describe a steady, service-oriented person whose instinct is to show up and help.

Mr. Bartlett's strongest anchors and proudest accomplishments are his children and long-time partner, Jenny Saxman. His eldest, Brenna (age 23), married Hunter James—a DTE linesman who regularly works overtime—in August 2024; they live in Kingston, Michigan, and are expecting their first child due January 7. Brenna grew up working part-time on the family farm, now works part-time at McLaren in Flint, and will graduate this December from the University of Michigan–Flint with a B.S. in Nursing. She graduated third in her class at Standish-Sterling Central High School.

His son Brock (age 19) likewise worked on the family farm and now helps at SSI during summers and holiday breaks, mainly on highway projects. He is a freshman at the University of Michigan–Ann Arbor studying engineering and was his class salutatorian.

Mr. Bartlett's youngest, B.B. (age 17), also assists at SSI during school breaks (private boundary and ALTA surveys), is a senior at Standish-Sterling Central, and is presently on track to be salutatorian.

Mr. Bartlett's children reflect the best of him, and he is deeply proud of their successes.

Mr. Bartlett and Jenny Saxman have been in a committed relationship for many years (they celebrated their relationship in a wedding ceremony in Costa Rica and have lived as husband and wife for years). Jenny owns a small business in Midland, leasing space to other entrepreneurs and works very hard to provide space an opportunities to other entrepreneurs. She plays a central role in Mr. Bartlett's physical and mental health, maintaining a positive home environment that offsets work stress. Together, this close-knit family reflects stability, responsibility, and ongoing community ties—factors that strongly support continued success under community-based supervision.

SSI employee Andrew Muto—who first met Mr. Bartlett in 2014—explains how Mr. Bartlett hired him when others would not. *See* Muto Letter, Ex. C. On Muto's third day, Mr. Bartlett called Muto into his office to ask about his criminal record and prior prison sentence. And he listened to Muto when others would not. As Muto recounts, Mr. Bartlett "said he believed in second chances and understood that people make mistakes." He adds, "I have been trying to repay that generosity for the past 11 years, although he has told me on more than one occasion that I owe him nothing." The letter goes on to describe SSI's annual Thanksgiving effort: "Every year, a little

5

prior to Thanksgiving, Surveying Solutions Inc. gives away meals to the less fortunate . . . Jefferey Bartlett is there the whole time, elbow to elbow with the rest of the volunteers . . . he will gather the volunteers around and ask if anyone can suggest people with mobility issues that could not make it to the office." *Id.*

Community members echo the same themes. Ryan Raymond writes that over decades of friendship and civic work together, "we have always agreed that 'doing the right thing' was more important than fulfilling a personal agenda," and "I have never seen him put his own agenda ahead of anything, for personal gain." *See* Raymond Letter, Ex. F. He details years of quiet support—youth sports, uniforms, travel costs, and SSI's holiday meal deliveries—observing, "I do not believe there has been a better role model to the youth in our community," and, "There is no one that I would trust more than Jeff Bartlett to take care of my family, if something were to happen to me."

Professional peers describe both competence and generosity. Gordon K. Perry, a licensed professional land surveyor with more than 40 years' experience, notes that Mr. Bartlett "provided something different . . . he sees beyond the initial value of these advanced survey technologies to provide more value to HNTB project teams and clients. Jeff is a true 'think outside the box' collaborator and businessman." *See* Perry Letter, Ex. G. Perry's letter includes a personal moment that captures Mr. Bartlett's reflex to help: while Perry's move collapsed at the last minute, Mr. Bartlett told him—without fanfare—"I got this," and arrived "10 or 12 hours later… with several buddies and their trucks and large trailers ready to move my wife and I without saying a word or accepting any form of payment." Perry also recounts

6

"providing holiday meals for the greater Standish community, or the endless hours of coaching youth sports teams because no one else would."

Family members describe a devoted and hands-on presence. Mr. Bartlett's mother, Marianne Bartlett, writes: "I would like you to know how thoughtful and kind he is . . . He is a huge supporter of his community as he with his business has provided more than 400 meals to the home bound and those families recommended to him for support during the holidays for many years." *See* M. Bartlett Letter, Ex. I. His longtime partner, Jenny Saxman, adds: "Jeff is a man whose actions consistently speak to his compassion, generosity, and devotion to both his family and his community," noting that he has "continually given back—organizing annual food drives through SSI, helping feed local families, and contributing to youth sports teams." *See* Saxman Letter, Ex. A.

Mr. Bartlett's daughter, Brenna, while acknowledging what her father has done, explains that "[t]hroughout my life, my father has been my greatest role model, and I will always carry pride in the values he has instilled in me. No conviction can diminish the love and respect I hold for him. As I prepare to welcome a child of my own, I can only hope that my daughter will one day look to me with the same admiration and gratitude that I feel toward my father." *See* James Letter, Ex. B. Indeed, this relationship is especially important to Mr. Bartlett and he looks forward to meeting his first grandchild and building as strong a relationship as he enjoys with his daughter.

Across all the letters, a consistent picture emerges: a person defined not by courtroom labels but by long-standing habits of responsibility, mentorship, and community work. Mr. Bartlett's record reflects stable ties, steady employment, and decades of service—punctuated by specific, concrete acts that others remember because they felt them directly.

This case is Mr. Bartlett's only contact with the federal criminal legal system. The letters uniformly describe the offense conduct as out of character for him and emphasize the remorse they have observed in the years since. They also reflect a robust support network—family, friends, colleagues, and employees—committed to holding him accountable and helping him continue contributing positively.

Taken together, Mr. Bartlett's history and characteristics show a man who has lived a life of work and service, who has learned painful lessons from this case, and who has the support and stability to ensure it is never repeated. Those qualities align with the purposes of sentencing and strongly support a non-custodial sentence.

### IV. TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE.

As the Court is well aware, §3553(a)(2)(A) requires the Court to consider "the need for the sentence imposed…to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense." These sentencing objectives set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just desserts," theory considers only the defendant's past actions, not his or her probable future conduct or the

8

> effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of **blameworthiness** for his or her past actions, focusing on the offense being sentenced. . . . Third, the degree of blameworthiness of an offense is generally assessed according to **two kinds of elements**: the **nature and seriousness of the harm caused or threatened** by the crime; and the **offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity**.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied).

Mr. Bartlett plainly understands the seriousness of the offense. He has gone from being a respected member of the surveying community to a federal felon. He is facing potential incarceration. His decisions have already cost him dearly, both financially and in reputation.

From the beginning of the investigation through the present time, Mr. Bartlett has showed a positive and appropriate attitude toward authority. He spoke to investigators, he proactively engaged in corporate reforms, he encouraged his company to voluntarily enter into a civil settlement with MDOT, and he has pled guilty. He does not make excuses for his actions.

V. **TO AFFORD ADEQUATE DETERRANCE TO CRIMINAL CONDUCT.**

Section 3553(a)(2)(B) requires the court to consider "the need for the sentence imposed...to afford adequate deterrence to criminal activity." A leading scholar on federal sentencing is debunking the myth that lengthy sentences have a deterrent effect. She writes:

9

> Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," *i.e.*, whether any particular quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

Amy Baron Evans, Sentencing By the Statute (April 27, 2009, revised December 21, 2010),https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/sentencing-by-the-statute.pdf. It appears there is little or no positive correlation between the length of sentence and general deterrence. More important is that people who commit crimes be held accountable. Mr. Bartlett will be held accountable: he has been apprehended, his case has received broad media coverage, he has accepted responsibility, faces potential incarceration, and a lengthy period of supervised release.

### VI. TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. BARTLETT.

Section 3553(a)(2)(C) asks what sentence is necessary "to protect the public from further crimes of the defendant." On this record, incarceration is not required to accomplish that goal; a non-custodial sentence with appropriate conditions will provide equal or greater protection.

First, Mr. Bartlett has no meaningful criminal record. Aside from an old misdemeanor OWI noted in the PSR, this case is his only contact with the criminal legal system. He is a first-time, non-violent offender in Criminal History Category I. Nothing in his background suggests a propensity for repeated criminal conduct. And the lengthy interval from the execution of the search warrant in July 2019 and case resolution in July 2025 without additional criminal conduct strongly suggests that Mr. Bartlett can be properly managed in the community without risk of further criminality.

Second, the specific opportunity structure that enabled the offense no longer exists. The company has undergone a wholesale reorganization with independent leadership, formal governance controls, and compliance protocols that Mr. Bartlett has supported. He is personally excluded from government contracting and will be likely be debarred. He is not in a position to supervise public-funded contracting or bind the company in covered transactions, and board resolutions and shareholder agreements place those decisions squarely with others. In short, the avenues through which the offense occurred have been narrowed or closed.

Third, the financial incentives that could fuel reoffending have been removed and reversed. Full restitution and forfeiture will be paid at or before sentencing; undersigned counsel holds certified funds totaling $1,729,000 for delivery to the government before sentencing. That payment, together with the prior civil resolution of overhead rate issues with MDOT, eliminates any unjust enrichment and aligns Mr.

Bartlett's future interests with lawful compliance. When there is nothing left to "gain," specific deterrence is already achieved.

Fourth, Mr. Bartlett's age, stability, and community ties strongly predict desistance. He is a long-tenured professional with deep family and community roots, a steady work history, and a robust support network that has shown up for him in force. The many letters describe a person whose day-to-day life is defined by responsibility to others—employees, neighbors, and family. Those stabilizing factors are the opposite of criminogenic risk.

Fifth, this case has had powerful non-custodial consequences that deter future misconduct: public accountability, professional restrictions, reputational harm, and sustained court supervision. Mr. Bartlett has already experienced the life-altering impact of a felony conviction. He has expressed remorse and taken concrete steps to make amends; there is no realistic prospect that he will risk repeating the conduct that led here.

Finally, targeted probation conditions can fully address any residual risk without imprisonment. The Court can prohibit any involvement in government-funded contracting, require financial disclosure and compliance training, impose a term of home confinement, and require community service. Those tailored conditions directly address the conduct at issue, ensure transparency, and maintain meaningful oversight—while allowing Mr. Bartlett to continue supporting his family and contributing to restitution and the community.

In sum, the record shows a low-risk, first-time offender who has removed the means and motives for re-offense, accepted the consequences, taken meaningful steps to right his wrongs, and lives within a strong framework of accountability and support. Probation—with appropriate conditions—will protect the public every bit as effectively as imprisonment, while better serving the § 3553(a) goals of restitution, rehabilitation, and proportionality.

### VII. TO PROVIDE MR. BARTLETT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER.

Section 3553(a)(2)(D) directs the Court to impose a sentence that provides "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." For Mr. Bartlett, that aim is best served through a community-based, probationary sentence with targeted conditions, not incarceration.

First, the corrective needs here are educational and vocational, not custodial. The offense arose in a professional context—cost accounting and compliance in public contracting—not from criminogenic factors that prison programs are traditionally designed to address. What will most effectively prevent future misconduct is structured ethics and compliance education (e.g., government-contract accounting under FAR/CAS, internal-controls, and conflict-of-interest rules), along with practicums that reinforce accurate overhead-rate preparation and documentation. Those are training opportunities that can be delivered promptly and flexibly in the community, integrated with supervision, employer oversight, and real-world

13

accountability. BOP programming, by contrast, is generalized and not tailored to niche professional compliance topics that matter in this case.

Second, probation allows the Court to custom-fit conditions that directly remediate the knowledge and process gaps revealed by the conduct. Tailored conditions can require: (1) completion of accredited courses in government-contract compliance and cost accounting; (2) periodic third-party compliance audits and financial disclosures; (3) restrictions on any role involving the preparation, certification, or submission of overhead rates or invoices on publicly funded contracts; and (4) community service that leverages Mr. Bartlett's skill set to benefit the public (e.g., training young engineers on ethics and documentation). These interventions are specific, measurable, and verifiable—and therefore more effective than a custodial term that cannot replicate job-embedded learning and independent auditing.

Third, to the extent any behavioral-health support or counseling is indicated by supervision (for example, stress-management or decision-making counseling), those services are more accessible and continuous in the community. Probation permits Mr. Bartlett to establish and maintain care with providers of the Court's choosing, follow consistent treatment plans, and verify compliance—without the interruptions caused by transfers, waitlists, or facility limitations.

Fourth, a community-based sentence maximizes the positive vocational structure that already exists and that the letters describe: stable employment, long-standing professional ties, and a support network that holds him accountable. Maintaining that structure while layering education, audits, and supervisory

14

oversight is the most effective correctional approach for a first-time, non-violent professional offender. Removing him from that environment would not add educational value; it would delay the very training and monitoring that § 3553(a)(2)(D) contemplates.

Finally, probation aligns educational effectiveness with the other statutory goals. While learning and treatment occur, Mr. Bartlett can continue working to support his family and team members at SSI, remain under meaningful court supervision, and complete concrete, skill-based compliance milestones that the Court can review. That is a more efficient and targeted use of correctional resources than incarceration, and it yields a more reliable assurance against future recidivism.

In sum, the record shows that Mr. Bartlett's corrective needs are best met by targeted education, auditing, and monitored practice—all of which are most effectively delivered under probation with tailored conditions, rather than in a custodial setting.

### VIII. A DOWNWARD VARIANCE FROM THE ADVISORY GUIDELINE RANGE IS APPROPRIATE.

Courts are not required to impose a sentence within the range recommended by the United States Sentencing Guidelines. *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738 (2005). The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 128 S.Ct. 558, 564 (2007) (internal quotations omitted); *Gall v. United States*, 128 S.Ct. 586, 602 (2007) (same). Courts "may vary [from the

15

Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines". *Kimbrough,* 128 S.Ct. at 570.

When a Court disagrees with the Guidelines, the courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." *Rita v. United States,* 127 S.Ct. 2456, 2465, 2468 (2007). The Guidelines deserve some level of deference from the Court when they are based on (1) empirical evidence of pre-guideline sentencing practice and (2) periodic review/revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field. *Rita,* 127 S.Ct. at 2464-65. However, as the Supreme Court noted, "not all of the Guidelines are tied this empirical evidence." *Gall,* 128 S.Ct. at 594 n.2. When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve the purposes of sentencing, as set forth in 18 U.S.C. § 3553(a), even in the average case. *Kimbrough,* 128 S.Ct. at 575.

Because the "Guidelines are not the only consideration," the Court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by the party." *Gall* at 596. The Court must "impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing. *Id* at 597. In doing so, the Court must independently evaluate the appropriate sentence in light of § 3553(a), consider arguments that the guidelines should not apply on general policy grounds or case specific grounds, but "may not

16

presume that the Guidelines range is reasonable." *Rita,* 127 S.Ct. at 2463, 2465, 2467-68; *Gall,* 128 S.Ct. at 596-97.

## APPLICATION TO MR. BARTLETT'S CASE

A downward variance to a non-custodial sentence is warranted under § 3553(a). Mr. Bartlett is a first-time, non-violent offender in Criminal History Category I whose conduct occurred in a professional setting and has been comprehensively remediated. He has accepted responsibility, voluntarily pled guilty, and arranged for full restitution and forfeiture; undersigned counsel holds certified funds of $1,729,000 for delivery at or before sentencing. The specific opportunity structure that enabled the offense no longer exists: SSI underwent governance reforms that removed Mr. Bartlett from any role that could affect public-funded contracting and instituted independent oversight and compliance controls. These changes, combined with restitution, eliminate any continuing risk and satisfy specific deterrence without imprisonment. General deterrence is served by the felony conviction, public accountability, financial penalties, and the Court's supervision. To the extent the advisory range here is driven by loss-table arithmetic and enhancements that are not grounded in empirical penological data, the Guidelines overstate the need for incarceration in a case like this. See *Kimbrough* and *Gall*. Probation with targeted conditions—ethics/compliance training, financial disclosures, restrictions on government-contracting functions, community service, and (if the Court deems appropriate) a period of home confinement—will achieve

17

punishment, deterrence, rehabilitation, and restitution in the most effective manner, and is "sufficient, but not greater than necessary."

## IX. CONCLUSION

Because a sentence below the advisory guideline range would be "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. § 3553(a), Mr. Bartlett requests a downward variance to a sentence that involves a period of probation with such conditions as the Court deems appropriate.

Respectfully submitted:
**BLANCHARD LAW**

Dated: November 11, 2025                /s/ Joshua A. Blanchard
                                        Joshua Blanchard (P72601)
                                        Attorney for Defendant
                                        309 S. Lafayette St., Ste. 208
                                        P.O. Box 938
                                        Greenville, MI 48838
                                        616-773-2945
                                        josh@blanchard.law